1  MONICA Y. KIM (SBN 180139)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: myk@lnbrb.com, jyo@lnbrb.com

6  Proposed Attorneys for Chapter 11 Debtor
7  and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                 **LOS ANGELES DIVISION**

11

12  In re                                ) Case No. 2:10-bk-10642-VZ
                                         )
13  CENTRAL METAL, INC., a California    ) Chapter 11
    corporation,                         )
14                                       )
                                         )
15              Debtor.                  ) **DEBTOR'S EMERGENCY MOTION
                                         ) FOR AN ORDER EXTENDING TIME
16                                       ) FOR DEBTOR TO (1) FILE
                                         ) SCHEDULES OF ASSETS AND
17                                       ) LIABILITIES AND STATEMENT OF
                                         ) FINANCIAL AFFAIRS; AND (2)
18                                       ) SUBMIT CREDITOR MATRIX;
                                         ) MEMORANDUM OF POINTS AND
19                                       ) AUTHORITIES; DECLARATIONS OF
                                         ) SUK WON BYUN AND CHARLES T.
20                                       ) MOFFITT IN SUPPORT THEREOF**
                                         )
21                                       )
                                         ) DATE:   January 14, 2010
22                                       ) TIME:   11:00 a.m.
                                         ) PLACE:  Courtroom 1368
23                                       )         255 E. Temple Street
                                         )         Los Angeles, California
24                                       )
                                         )
25                                       )
                                         )
26  _____ )

27

28

                                    1

1

**SUMMARY**

2      Pursuant to Local Bankruptcy Rules 1007-1(e), 2081-1(a)(2) and 9075-1 and Federal

3   Rule of Bankruptcy Procedure Rule 1007(c), Central Metal, Inc., a California corporation (the

4   "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy

5   case, hereby moves, on an emergency basis (the "Motion"), for entry of an order extending the

6   time within which the Debtor must (1) file its Schedules of Assets and Liabilities ("Schedules")

7   and Statement of Financial Affairs ("Statement"), and (2) submit its creditor matrix (the

8   "Matrix"). The Schedules, Statement and Matrix for the Debtor is currently due on January 22,

9   2010. By this Motion, the Debtor requests an extension through February 22, 2010 to file its

10   Schedules, Statement and Matrix.

11      The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as

12   amended, the "Bankruptcy Code") on January 8, 2010 (the "Petition Date"). The Debtor

13   continues to operate its business, manage its financial affairs and operate its bankruptcy estate as

14   a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtor

15   is a fully integrated scrap metal processing company that purchases, processes and sells ferrous

16   and non-ferrous metals domestically and internationally. The Debtor currently operates out of

17   five (5) active facilities throughout Southern California – two facilities in the Los Angeles

18   County area, one facility in Hinkley, one facility in San Bernardino, and one facility in

19   Bakersfield.

20      In addition to addressing Chapter 11 transition issues during the first few weeks of its

21   case (issues which are mostly unfamiliar to the Debtor and its management), the Debtor will

22   need to continue operating the Debtor's business in an orderly and efficient manner, respond to

23   inquiries by the Debtor's employees, vendors, creditors and parties in interest, and comply with

24   all of the administrative requirements of the Office of the United States Trustee and the Court.

25   The time demands of Chapter 11 are exacerbated in the Debtor's case due to the current state of

26   the Debtor's books and records, the numerous locations from which the Debtor operates its

27   business, and the fact that the Debtor's accounting and operations staff, in addition to

28

1  maintaining the normal operation of the Debtor's business, has been working with the Debtor's

2  bankruptcy counsel to prepare various emergency "first-day" motions and address numerous

3  administrative issues relating to the Debtor's case. Additionally, in response to the concerns

4  expressed by the Debtor's primary lender, Center Bank, the Debtor has retained C.T. Moffitt &

5  Company ("CTMC") as its financial advisors and Charles T. Moffitt as its CRO, effective as of

6  the Petition Date, to review the Debtor's financial data and operations and oversee all aspects of

7  the Debtor's business operations and financial affairs. Although CMTC and Mr. Moffitt have

8  spent the few days following the Petition Date familiarizing themselves with the Debtor's

9  business operations and books and records, they will require additional time to get "up to speed"

10 regarding the Debtor's accounting practices and to feel comfortable regarding the accuracy of the

11 Debtor's financial records.

12        Based on the foregoing, it will be extremely difficult for the Debtor to complete its

13 Schedules, Statement and Matrix accurately by January 22, 2010, the date by which they are

14 currently due. It will take significant time and effort on the part of the Debtor's accounting and

15 operations staff, who must continue to handle its normal accounting and business operation

16 responsibilities, and CMTC and Mr. Moffitt, who are in the process of getting "up to speed"

17 regarding the Debtor's operations and accounting practices, to sort through the Debtor's business

18 records to identify and compile the information necessary to accurately complete the Debtor's

19 Schedules, Statement and Matrix. Therefore, the Debtor respectfully submits that an extension

20 of time for the Debtor to accurately prepare its Schedules, Statement and Matrix in this case is

21 warranted and appropriate.    Furthermore, the Debtor respectfully submits that none of its

22 creditors will be prejudiced by the extension of time requested herein.

23                              **ADDITIONAL INFORMATION**

24        This Motion is based upon Local Bankruptcy Rules 1007-1(e), 2081-1(a)(2) and 9075-1,

25 Federal Rule of Bankruptcy Procedure Rule 1007(c), this Motion, the supporting Memorandum

26 of Points and Authorities, the Declarations of Suk Won "Tim" Byun and Charles T. Moffitt

27

28

3

1  attached hereto, the arguments and statements of counsel to be made at the hearing on the

2  Motion, and other admissible evidence properly brought before the Court.

3        In order to provide maximum notice of this Motion, concurrently with the filing of this

4  Motion with the Court (on January 12, 2010), the Debtor has served a copy of this Motion and all

5  supportive papers (including notice of the hearing) upon the Office of the United States Trustee,

6  all secured creditors and their counsel (if known), the Debtor's 20 largest unsecured creditors,

7  and other parties in interest via overnight mail. These parties will receive delivery of the Motion

8  and all supportive papers by not later than the morning of Wednesday, January 13, 2010.

9        **WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

10  Motion and issue an order:

11        (a)      granting the Motion;

12        (b)      affirming the adequacy of the notice given;

13        (c)      extending the deadline by which the Debtor must file its Schedules, Statement and

14  Matrix through February 22, 2010; and

15        (d)      granting such other and further relief as the Court deems just and proper.

16  Dated: January 12, 2010                         CENTRAL METAL, INC.

17

18                                                  By: _____
                                                        MONICA Y. KIM
19                                                      JULIET Y. OH
                                                        LEVENE, NEALE, BENDER,
20                                                          RANKIN & BRILL L.L.P.
                                                        Proposed Attorneys for Chapter 11
21                                                      Debtor and Debtor in Possession

22

23

24

25

26

27

28

4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I. STATEMENT OF FACTS

3

**A.   Background.**

4        1.      On January 8, 2010 (the "Petition Date"), Central Metal, Inc., a California

5    corporation, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the

6    "Bankruptcy Code"). The Debtor continues to operate its business, manage its financial affairs and

7    operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the

8    Bankruptcy Code.

9        2.      The Debtor is a fully integrated scrap metal processing company that purchases,

10   processes and sells ferrous and non-ferrous metals domestically and internationally. The Debtor is

11   one of the largest processing companies on the West Coast, has one of the largest land sites and

12   processing capacities, and is fully diversified in its business portfolio that entails dynamic trading

13   relationships with renowned metal manufacturers around the world.

14       3.      The Debtor currently operates out of five (5) active facilities throughout Southern

15   California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in

16   San Bernardino, and one facility in Bakersfield.

17       4.      The Debtor was founded in 1993 by Jong Uk Byun, the sole shareholder and

18   President of the Debtor.    Under Mr. Byun's management, the Debtor has experienced

19   extraordinary growth, particularly in the last three years. In 2006, total sales volume was at

20   approximately 50,000 tons. By 2008, total sales volume had increased to over 150,000 tons. Mr.

21   Byun remains actively involved in the management of the Debtor. In 2009, the Debtor had annual

22   gross sales totaling approximately $36.5 million.

23   **B.   Events Leading To The Filing Of The Debtor's Bankruptcy Case.**

24       5.      Over the years, the Debtor has obtained financing from Center Bank ("Center") on

25   a secured basis to operate and expand its business. According to the Debtor's books and records,

26   Center as well as an entity called KEB LA Financial Corp. ("KEB") may have liens against

27

28

substantially all of the Debtor's assets. As of the Petition Date, Center was owed approximately $16.3 million and KEB was owed approximately $900,000 by the Debtor.[1]

6. In order to increase its processing capacity and produce the level of volume necessary to meet the demand from its customers, the Debtor heavily invested in new equipment beginning in late 2005 and through early 2008. Since 2006, the Debtor has committed approximately $25 million – through a combination of cash and financing from various equipment lessors/lenders – to obtain new equipment and heavy duty trucks.

7. Once installed in early 2008, the new equipment could not be operated at full capacity until they were "broken in," approximately six months to one year later. As a result, the Debtor was unable to produce the level of volume it had anticipated during the "break in" period following the installation of the new equipment. Nevertheless, the Debtor was obligated to make payments on the new equipment, and continued to do so throughout 2008 and through April 2009

8. The price of steel peaked in the summer of 2008, at approximately $750 to $800 per ton. However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to approximately $200 per ton. This dramatic drop in steel prices was accompanied by a corresponding decline in demand for steel, due at least in part to the overall decline in the economy worldwide.

9. The demand for steel and the price of steel plunged at the same time that the Debtor's new equipment became fully functional. At the same time, availability of scrap metal decreased by at least 50%, requiring the Debtor to pay more for its supply. This increase in the cost of its supply, along with the drop in steel prices and the drop in demand for steel, all of which occurred virtually simultaneously, resulted in the Debtor's inability to generate the level of revenue necessary to service all of its debts.

---

[1] Wilshire State Bank ("Wilshire") recorded a financing statement against the Debtor with the California Secretary of State indicating that it asserts a security interest and lien upon substantially all of the Debtor's assets; however, the Debtor contends that Wilshire provided the Debtor with purchase money financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the security interest and lien of Wilshire applies only against these trucks, and not against any other assets of the estate.

6

1        10.    As a result, beginning in approximately May 2009, the Debtor stopped making

2    payments to Center, Wilshire and its equipment lessors/lenders. In November 2009, a number of

3    the Debtor's equipment lessors/lenders filed complaints against the Debtor in state court based

4    upon the Debtor's nonpayment and default under their respective loans/capital leases.

5        11.    Upon its default, the Debtor attempted to restructure its payment obligations to

6    Center. The parties successfully negotiated and entered into a forbearance agreement, but the

7    Debtor was ultimately unable to perform on the terms of such agreement. Notwithstanding this,

8    the parties continued to discuss the plight of the Debtor's situation.

9        12.    In October 2009, the Debtor submitted a restructuring proposal to Center. In

10   response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its

11   financial advisors to review the Debtor's financial data and operations. The Debtor did, in fact,

12   hire Focus in December 2009. Members associated with Focus came on-site at the Debtor, and

13   received a tremendous amount of requested information, documents, data and reports. The main

14   on-site personnel of Focus was Edmund C. King ("King").

15       13.    Without any advance notice or warning, on or about January 6, 2010, Center filed a

16   complaint against the Debtor, Mr. Byun, and other related defendants, and on the morning of

17   January 7, 2010 (before the complaint had been served), Center's counsel provided telephonic

18   notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for the appointment of a

19   receiver over the properties of all of the defendants, including the Debtor. The Debtor filed its

20   Chapter 11 case on an emergency basis to avoid the possibility of a receiver being appointed over

21   its properties, and reorganize.

22       14.    As part of its *ex parte* application for the appointment of a receiver, Center filed

23   with the state court several declarations, including a declaration for King. King states in his

24   declaration that: (a) accounting records or details regarding cash payments totaling $17.8 million

25   were "lost" by the Debtor, (b) that the Debtor's accounting practices are "severely lacking and

26   unsophisticated" and (c) Mr. Byun wanted to give him a cash gift (which was not accepted).

27

28

1  Counsel for Center has characterized this "gift" as an attempted bribe. The Debtor vigorously
2  disputes such allegations.

3      15.    In the ordinary course of its business, the Debtor transacts much of its business
4  dealings in cash. Because a large amount of the Debtor's scrap metal comes from individual
5  "peddlers" who simply drive up to the Debtor's business locations in pick-up trucks with scrap
6  metal (which the Debtor then processes into usable steel) to sell, the Debtor pays for such metal in
7  cash. Cash transactions are expected and very commonplace for this business and industry, and if
8  news spread around town that the Debtor pays for purchases with a check, then peddlers would
9  elect to go to a different scrap metal dealer in town. In short, the Debtor's access to scrap that is
10  essential to sales would be severely impaired if it is not allowed to continue to pay in cash for scrap
11  metal.

12      16.    The filing of a bankruptcy case presented the only viable way for the Debtor to
13  survive and restructure its financial affairs. The Debtor intends to aggressively pursue a financial
14  transaction, including a possible sale of some or substantially all of its assets, locate a financial
15  partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to develop and
16  pursue all of its options and strategies.

17      17.    The cash nature of the Debtor's business and the current state of the Debtor's books
18  and records have given rise to a variety of concerns by Center which need to be addressed in this
19  case. In addition, the Debtor is aware that being in Chapter 11, as well as transitioning into
20  Chapter 11 as a debtor in possession, are complex matters with extensive reporting and disclosure
21  requirements. Based on all of these factors, the Debtor has determined that it would be in the best
22  interests of its estate to employ financial advisors and a Chief Restructuring Officer ("CRO") in
23  this case. Towards that end, the Debtor has retained C.T. Moffitt & Company ("CTMC") as its
24  financial advisors and Charles T. Moffitt as CRO for the Debtor to oversee all aspects of the
25  Debtor's business operations and financial affairs. Concurrently herewith, the Debtor has filed an
26  application to employ CTMC as the Debtor's financial advisor and Mr. Moffitt as the Debtor's
27  CRO, effective as of the Debtor's chapter 11 filing date of January 8, 2010.

28

**II.    CAUSE EXISTS FOR AN EXTENSION OF TIME TO FILE SCHEDULES,**

**STATEMENT AND MATRIX**

11 U.S.C. § 521(a) provides, in relevant part:

> (a) The debtor shall –
>     (1) file –
>         (A) a list of creditors; and
>         (B) unless the court orders otherwise –
>             (i)  a schedule of assets and liabilities;
>             (ii) a schedule of current income and current
>                  expenditures;
>             (iii) a statement of the debtor's financial affairs...[.]

Federal Rule of Bankruptcy Procedure 1007(c) provides that, "[i]n a voluntary case, the schedules, statements, and other documents...shall be filed with the petition or within 15 days thereafter...[.]"    Fed. R. Bankr. P. 1007(c).    Under Federal Rule of Bankruptcy Procedure 1007(c), the deadline for the Debtor to (1) file its Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("Statement"), and (2) submit its creditor matrix (the "Matrix") is January 22, 2010.

An extension of the foregoing deadline is contemplated for cause by Federal Rule of Bankruptcy Procedure 1007(c) and Local Bankruptcy Rule 1007-1(e).    Specifically, Local Bankruptcy Rule 1007-1(e) provides that "[a] motion for an extension of time to file the lists of creditors and equity security holders, or to file the schedules, statements and other documents must comply with [Federal Rule of Bankruptcy Procedure] 1007(c)" and "must be accompanied by evidence demonstrating cause for the requested extension of time."    Federal Rule of Bankruptcy Procedure 1007(c) states that "any extension of time to file schedules, statements, and other documents...may be granted only on motion for cause shown and on notice to the United States trustee, any committee elected under § 705 or appointed under § 1102 of the Code, trustee, examiner, or other party as the court may direct."

The Debtor respectfully submits that there is sufficient cause for the Court to extend the deadline by which the Debtor must file its Schedules, Statement and Matrix.    In addition to addressing Chapter 11 transition issues during the first few weeks of its case (issues which are

mostly unfamiliar to the Debtor), the Debtor will need to continue operating the Debtor's business in an orderly and efficient manner, respond to inquiries by the Debtor's employees, vendors, creditors and parties in interest, and comply with all of the administrative requirements of the Office of the United States Trustee and the Court. The time demands of Chapter 11 are exacerbated in the Debtor's case due to the current state of the Debtor's books and records, the numerous locations from which the Debtor operates its business, and the fact that the Debtor's accounting and operations staff, in addition to maintaining the normal operation of the Debtor's business, has been working with the Debtor's bankruptcy counsel to prepare various emergency "first-day" motions and address numerous administrative issues relating to the Debtor's case.

Additionally, as noted above, the Debtor retained CMTC as its financial advisors and Mr. Moffitt as its CRO, effective as of the Petition Date, primarily in response to the concerns expressed by Center. CMTC and Mr. Moffitt are responsible for, among other things, reviewing the Debtor's financial data and operations and overseeing all aspects of the Debtor's business operations and financial affairs. Although CMTC and Mr. Moffitt have spent the few days following the Petition Date familiarizing themselves with the Debtor's business operations and books and records, they will require additional time to get "up to speed" regarding the Debtor's accounting practices and to feel comfortable regarding the accuracy of the Debtor's financial records.

Based on the foregoing, it will be extremely difficult for the Debtor to complete its Schedules, Statement and Matrix accurately by January 22, 2010, the date by which they are currently due. It will take significant time and effort on the part of the Debtor's accounting and operations staff, who must continue to handle its normal accounting and business operation responsibilities, and CMTC and Mr. Moffitt, who are in the process of getting "up to speed" regarding the Debtor's operations and accounting practices, to sort through the Debtor's business records to identify and compile the information necessary to accurately complete the Debtor's Schedules, Statement and Matrix. If the Debtor is forced to file its Schedules, Statement and Matrix by January 22, 2010, it is very likely that the Debtor will have to later revise or amend

1    much of the documents. Doing so will require the Debtor's staff and the Debtor's professionals

2    to spend additional time and effort and ultimately increase the administrative expenses of the

3    Debtor's estate. Furthermore, the Debtor does not believe that any of its creditors will be

4    prejudiced by the extension of time requested herein. Accordingly, the Debtor respectfully

5    submits that an extension of time to accurately prepare its Schedules, Statement and Matrix is

6    warranted and appropriate.

7        By this Motion, the Debtor requests an extension of approximately thirty (30) days, to

8    and including February 22, 2010, within which to file its Schedules, Statement and Matrix. The

9    Debtor will make every effort to complete and file its Schedules, Statement and Matrix before

10    the extended date.

### III.    CONCLUSION

12    **WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

13    Motion and issue an order:

14        (a)    granting the Motion;

15        (b)    affirming the adequacy of the notice given;

16        (c)    extending the deadline by which the Debtor must file its Schedules, Statement and

17    Matrix through February 22, 2010; and

18        (d)    granting such other and further relief as the Court deems just and proper.

19    Dated: January ____, 2010            CENTRAL METAL, INC.

By: _____

     MONICA Y. KIM
     JULIET Y. OH
     LEVENE, NEALE, BENDER,
         RANKIN & BRILL L.L.P.
     Proposed Attorneys for Chapter 11
     Debtor and Debtor in Possession

## DECLARATION OF SUK WON BYUN

I, Suk Won "Tim" Byun, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am the General Manager of Central Metal, Inc., a California corporation (the "Debtor"), debtor and debtor in possession herein, and, as such, am familiar with the business operations and financial affairs of the Debtor. I have access to the Debtor's books and records and, to the extent necessary to complete this declaration, I have reviewed such books and records.

3.    I make this declaration in support of the Debtor's emergency motion (the "Motion") for the entry of an order extending the time within which the Debtor must (A) file its Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("Statement"), and (B) submit its creditor matrix (the "Matrix"), to which this declaration is attached.

4.    The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 8, 2010 (the "Petition Date").

5.    The Debtor is a fully integrated scrap metal processing company that purchases, processes and sells ferrous and non-ferrous metals domestically and internationally. To the best of my knowledge, the Debtor is one of the largest processing companies on the West Coast, has one of the largest land sites and processing capacities, and is fully diversified in its business portfolio that entails dynamic trading relationships with renowned metal manufacturers around the world.

6.    The Debtor currently operates out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield.

7.    It is my understanding and belief that the Debtor was founded in 1993 by Jong Uk Byun, the sole shareholder and President of the Debtor. In 2006, the Debtor's total sales volume

1  was at approximately 50,000 tons. By 2008, the Debtor's total sales volume had increased to

2  over 150,000 tons. Mr. Byun remains actively involved in the management of the Debtor. In

3  2009, the Debtor had annual gross sales totaling approximately $36.5 million.

4       8.     Based on my review of the Debtor's books and records, it is my understanding

5  and belief that, over the years, the Debtor has obtained financing from Center Bank ("Center")

6  on a secured basis to operate and expand its business. According to the Debtor's books and

7  records, as well as an entity called KEB LA Financial Corp. ("KEB") may have liens against

8  substantially all of the Debtor's assets. As of the Petition Date, Center was owed approximately

9  $16.3 million and KEB was owed approximately $900,000 by the Debtor.

10      9.     It is my understanding and belief that Wilshire State Bank ("Wilshire") recorded a

11  financing statement against the Debtor with the California Secretary of State indicating that it

12  asserts a security interest and lien upon substantially all of the Debtor's assets. However, the

13  Debtor's books and records reflect that Wilshire provided the Debtor with purchase money

14  financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the Debtor

15  contends that the security interest and lien of Wilshire applies only against these trucks, and not

16  against any other assets of the estate.

17      10.    In order to increase its processing capacity and produce the level of volume

18  necessary to meet the demand from its customers, the Debtor heavily invested in new equipment

19  beginning in late 2005 and through early 2008. Based on my review of the Debtor's books and

20  records, since 2006, the Debtor has committed approximately $25 million – through a

21  combination of cash and financing from various equipment lessors/lenders – to obtain new

22  equipment and heavy duty trucks.

23      11.    Once installed in early 2008, the new equipment could not be operated at full

24  capacity until they were "broken in," approximately six months to one year later. As a result, the

25  Debtor was unable to produce the level of volume it had anticipated during the "break in" period

26  following the installation of the new equipment. Nevertheless, the Debtor was obligated to make

27

28

1   payments on the new equipment, and continued to do so throughout 2008 and through April
2   2009.

3       12.    The price of steel peaked in the summer of 2008, at approximately $750 to $800
4   per ton. However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to
5   approximately $200 per ton.    This dramatic drop in steel prices was accompanied by a
6   corresponding decline in demand for steel.

7       13.    The demand for steel and the price of steel plunged at the same time that the
8   Debtor's new equipment became fully functional. At the same time, availability of scrap metal
9   decreased by at least 50%, requiring the Debtor to pay more for its supply. I believe that this
10  increase in the cost of its supply, along with the drop in steel prices and the drop in demand for
11  steel, all of which occurred virtually simultaneously, resulted in the Debtor's inability to generate
12  the level of revenue necessary to service all of its debts.

13      14.    As a result, beginning in approximately May 2009, the Debtor stopped making
14  payments to Center, Wilshire and its equipment lessors/lenders. It is my understanding and
15  belief that, in November 2009, a number of the Debtor's equipment lessors/lenders filed
16  complaints against the Debtor in state court based upon the Debtor's nonpayment and default
17  under their respective loans/capital leases.

18      15.    Upon its default, the Debtor attempted to restructure its payment obligations to
19  Center. The parties successfully negotiated and entered into a forbearance agreement, but the
20  Debtor was ultimately unable to perform on the terms of such agreement. Notwithstanding this,
21  the parties continued to discuss the plight of the Debtor's situation.

22      16.    In October 2009, the Debtor submitted a restructuring proposal to Center. In
23  response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its
24  financial advisors to review the Debtor's financial data and operations. The Debtor did, in fact,
25  hire Focus in December 2009. Members associated with Focus came on-site at the Debtor, and
26  were provided with a tremendous amount of requested information, documents, data and reports.
27  The main on-site personnel of Focus was Edmund C. King ("King").

28

14

1        17.    Without any advance notice or warning, on or about January 6, 2010, Center filed

2    a complaint against the Debtor, Mr. Byun, and other related defendants. It is my understanding

3    that, on the morning of January 7, 2010 (before the complaint had been served), Center's counsel

4    provided telephonic notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for

5    the appointment of a receiver over the properties of all of the defendants, including the Debtor.

6    The Debtor filed its Chapter 11 case on an emergency basis to avoid the possibility of a receiver

7    being appointed over its properties, and reorganize.

8        18.    As part of its *ex parte* application for the appointment of a receiver, which I have

9    reviewed, Center filed with the state court several declarations (which I have reviewed),

10   including a declaration for King. King states in his declaration that: (a) accounting records or

11   details regarding cash payments totaling $17.8 million were "lost" by the Debtor, (b) that the

12   Debtor's accounting practices are "severely lacking and unsophisticated" and (c) Mr. Byun

13   wanted to give him a cash gift (which was not accepted). Counsel for Center has characterized

14   this "gift" as an attempted bribe. The Debtor vigorously disputes such allegations.

15       19.    In the ordinary course of its business, the Debtor transacts much of its business

16   dealings in cash. Because a large amount of the Debtor's scrap metal comes from individual

17   "peddlers" who simply drive up to the Debtor's business locations in pick-up trucks with scrap

18   metal (which the Debtor then processes into usable steel) to sell, the Debtor pays for such metal

19   in cash. Based on my experience, cash transactions are expected and very commonplace for this

20   business and industry, and if news spread around town that the Debtor pays for purchases with a

21   check, then peddlers would elect to go to a different scrap metal dealer in town. In short, I

22   believe that the Debtor's access to scrap that is essential to sales would be severely impaired if it

23   is not allowed to continue to pay in cash for scrap metal.

24       20.    I believe that the filing of a bankruptcy case presented the only viable way for the

25   Debtor to survive and restructure its financial affairs. The Debtor intends to aggressively pursue

26   a financial transaction, including a possible sale of some or substantially all of its assets, locate a

27

28

1    financial partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to
2    develop and pursue all of its options and strategies.

3    21.    The cash nature of the Debtor's business and the current state of the Debtor's
4    books and records have given rise to a variety of concerns by Center which I believe need to be
5    addressed in this case. In addition, the Debtor and its management are aware that being in
6    Chapter 11, as well as transitioning into Chapter 11 as a debtor in possession, are complex
7    matters with extensive reporting and disclosure requirements. Based on all of these factors, the
8    Debtor has determined that it would be in the best interests of its estate to employ financial
9    advisors and a Chief Restructuring Officer ("CRO") in its case. Towards that end, the Debtor
10   has retained C.T. Moffitt & Company ("CTMC") as its financial advisors and Charles T. Moffitt
11   as CRO for the Debtor to oversee all aspects of the Debtor's business operations and financial
12   affairs. Concurrently herewith, the Debtor has filed an application to employ CTMC as the
13   Debtor's financial advisor and Mr. Moffitt as the Debtor's CRO, effective as of the Debtor's
14   chapter 11 filing date of January 8, 2010.

15   22.    In addition to addressing Chapter 11 transition issues during the first few weeks
16   of its case (issues which are mostly unfamiliar to the Debtor's management), the Debtor will
17   need to continue operating the Debtor's business in an orderly and efficient manner, respond to
18   inquiries by the Debtor's employees, vendors, creditors and parties in interest, and comply with
19   all of the administrative requirements of the Office of the United States Trustee and the Court. I
20   believe that the time demands of Chapter 11 are exacerbated in the Debtor's case due to the
21   current state of the Debtor's books and records, the numerous locations from which the Debtor
22   operates its business, and the fact that the Debtor's accounting and operations staff, in addition to
23   maintaining the normal operation of the Debtor's business, has been working with the Debtor's
24   bankruptcy counsel to prepare various emergency "first-day" motions and address numerous
25   administrative issues relating to the Debtor's case.

26   / / /

27   / / /

28

16

23.    Although CMTC and Mr. Moffitt, who have been retained as financial advisors and CRO, respectively, to review the Debtor's financial data and operations and oversee all aspects of the Debtor's business operations and financial affairs, have spent the few days following the Petition Date familiarizing themselves with the Debtor's business operations and books and records, they will, in my opinion, require additional time to get "up to speed" regarding the Debtor's accounting practices and to feel comfortable regarding the accuracy of the Debtor's financial records.

24.    Based on the foregoing, I believe it will be extremely difficult for the Debtor to complete its Schedules, Statement and Matrix accurately by January 22, 2010. I believe it will take significant time and effort on the part of the Debtor's accounting and operations staff, who must continue to handle its normal accounting and business operation responsibilities, and CMTC and Mr. Moffitt, who are in the process of getting "up to speed" regarding the Debtor's operations and accounting practices, to sort through the Debtor's business records to identify and compile the information necessary to accurately complete the Debtor's Schedules, Statement and Matrix. If the Debtor is forced to file its Schedules, Statement and Matrix by January 22, 2010, I believe it is very likely that the Debtor will have to later revise or amend much of the documents.

25.    I do not believe that any of the Debtor's creditors will be prejudiced by the extension of time requested in the Motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of January 2010, at Huntington Park, California.

Suk Won "Tim" Byun, Declarant

17

## DECLARATION OF CHARLES T. MOFFITT

I, Charles T. Moffitt, hereby declare as follows:

1.     I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.     I am the Managing Partner of C.T. Moffitt & Company ("CTMC"). CTMC has been requested by Central Metal, Inc., a California corporation (the "Debtor"), debtor and debtor in possession herein, to act as its financial advisors. I personally have been requested by the Debtor to act as its Chief Restructuring Officer ("CRO").

3.     I make this declaration in support of the Debtor's emergency motion (the "Motion") for the entry of an order extending the time within which the Debtor must (A) file its Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("Statement"), and (B) submit its creditor matrix (the "Matrix"), to which this declaration is attached.

4.     CTMC is a management consulting and interim management firm that I founded in 1985. CTMC has extensive experience assisting companies in transition, ranging from startups to well established enterprises in need of fresh perspective, to companies on the brink of and/or in bankruptcy. Using the broad experience of its principals and allied consultants, CTMC provides services in the areas of corporate performance improvement, turnaround management, financial restructuring and interim management. CTMC has served a variety of industries including, among others, specialty retail, steel manufacturing and fabrication, computer hardware and software, consumer electronics, telecommunications, entertainment and real estate. CTMC has been engaged as financial advisors, turnaround/restructuring consultants and interim management in numerous chapter 11 bankruptcy cases.

5.     It is my understanding and belief that, given the rapidly evolving nature of the Debtor's case and the immediate reporting requirements facing the Debtor, the Debtor wishes to immediately employ CTMC as its financial advisors and me as its CRO. CTMC was retained on January 8, 2010, the date of the Debtor's bankruptcy filing (the "Petition Date"), and has already

18

1   spent days working with the Debtor to, among other things, understand the Debtor's business

2   model and operations and to assist the Debtor in the preparation of cash flow projections.

3         6.       As part of its engagement, and effective as of January 8, 2010, CTMC will serve

4   as the Debtor's financial advisors and I will serve as the Debtor's CRO. CTMC's duties and my

5   duties shall include:

6               ■   promptly undertaking an independent analysis and review of the Debtor's

7                   business and operations, including the Debtor's cash management and financial

8                   and accounting controls of the business;

9               ■   ensuring the proper reporting and depositing into the debtor in possession bank

10                  accounts of all collections and payments including any cash collections or

11                  payments;

12              ■   overseeing and reviewing the preparation of all financial data and reports

13                  including the Debtor's cash flow projections; and

14              ■   providing all other financial advisory, turnaround and restructuring services as

15                  needed by the Debtor.

16        7.       In addition to the foregoing, I shall be the sole individual with check writing and

17  payment authority on any debtor in possession bank account of the Debtor.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

19

1        8.      Although CMTC and I have spent the few days following the Petition Date

2   familiarizing ourselves with the Debtor's business operations and books and records, we will

3   require additional time to get "up to speed" regarding the Debtor's accounting practices and to

4   feel comfortable regarding the accuracy of the Debtor's financial records. I believe it will take

5   significant time and effort on the part of the Debtor's accounting and operations staff, who must

6   continue to handle its normal accounting and business operation responsibilities, and CMTC and

7   myself, who are in the process of getting "up to speed" regarding the Debtor's operations and

8   accounting practices, to sort through the Debtor's business records to identify and compile the

9   information necessary to accurately complete the Debtor's Schedules, Statement and Matrix. If

10  the Debtor is forced to file its Schedules, Statement and Matrix by January 22, 2010, I believe it

11  is very likely that the Debtor will have to later revise or amend much of the documents.

12        I declare under penalty of perjury that the foregoing is true and correct.

13        Executed this 11th day of January 2010, at _*Los Angeles*_ , California.

14

15        _____

16        Charles T. Moffitt, Declarant

17

18

19

20

21

22

23

24

25

26

27

28

| In re:<br>CENTRAL METAL, INC. | Debtor. | Chapter 11<br>2:10-bk-10642-VZ |
|---|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR AN ORDER EXTENDING TIME FOR DEBTOR TO (1) FILE SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS; AND (2) SUBMIT CREDITOR MATRIX; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF SUK WON BYUN AND CHARLES T. MOFFITT IN SUPPORT THEREOF**
will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 12 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Monica Y Kim   myk@lnbrb.com
- Dare Law   dare.law@usdoj.gov
- Juliet Y Oh   jyo@lnbrb.com, jyo@lnbrb.com
- United States Trustee (LA)   ustpregion16.la.ecf@usdoj.gov

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **January 12, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

> ***By overnight mail:***
> ***Secured creditors***
> ***20 largest creditors***
> ***(See attached)***

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 12, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

> *By attorney service:*
> *The Honorable Vincent P. Zurzolo*
> *255 East Temple Street*
> *Los Angeles, CA 90012*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 12, 2010 | Marguerite Hardin | *Marguerite Hardin* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
20 Largest

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Sun Construction
26071 Hinckley Street
Loma Linda, CA 92354

Bay City Trading
4051 Via Oro
Long Beach, CA 90810

Zimex Logitech, Inc.
5400 Orange Avenue, Suite 108
Cypress, CA 90630

US Bank
P.O. Box 790408
Saint Louis, MO 63179

American Express
P.O. Box 981535
El Paso, TX 79998

Bank of America
P.O. Box 851001
Dallas, TX 75285

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
Secured

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

American Honda Finance Corp.
P.O. Box 6070
Cypress, CA 90630-6070

Bank of America
c/o Frandzel, Robbins, Bloom, et al
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

Center Bank
3435 Wilshire Blvd., Suite 700
Attn: Lisa K. Pai
Los Angeles, CA 90010

Center Capital Corporation
P.O. Box 330
Hartford, CT 06141

Chase
P.O. Box 78067
Phoenix, AZ 85062-8067

GE
300 E. John Carpenter Fwy, 4th Fl.
Attn: Rena Harris
Irving, TX 75062

H. West Equipment, Inc.
645 N. Main Street
Orange, CA 92868-1103

Lexus Financial Services
P.O. Box 2991
Mail Drop L201
Torrance, CA 90509

People's Capital and Leasing Corp.
255 Bank Street
Attn: Jeffrey A. Kennedy
Waterbury, CT 06702-2219

The CIT Group/Equipment Financing
305 Fellowship Road, Suite 300
Attn: Paul Plunkett
Mount Laurel, NJ 08054

Wilshire State Bank
3822 Wilshire Blvd.
Los Angeles, CA 90010

Counsel for Center Bank
Steven G. Polard, Esq.
Perkins Coie LLP
1888 Century Park East, Ste 1700
Los Angeles, CA 90067-1721