MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: myk@lnbrb.com, jyo@lnbrb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>CENTRAL METAL, INC., a California corporation,<br><br>        Debtor. | Case No. 2:10-bk-10642-VZ<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PAYMENT TO UTILITY COMPANIES PURSUANT TO 11 U.S.C. § 366; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SUK WON BYUN IN SUPPORT THEREOF**<br><br>DATE:    January 14, 2010<br>TIME:    11:00 a.m.<br>PLACE:  Courtroom 1368<br>           255 E. Temple Street<br>           Los Angeles, California |

1

## SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1(a)(3) and 9075-1 and 11 U.S.C. § 366, Central Metal, Inc., a California corporation (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to provide adequate assurance of future payment to certain utility companies pursuant to 11 U.S.C. § 366.

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code") on January 8, 2010 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a fully integrated scrap metal processing company that purchases, processes and sells ferrous and non-ferrous metals domestically and internationally. The Debtor is one of the largest processing companies on the West Coast, equipped with the largest land sites and processing capacity, and fully diversified in its business portfolio that entails dynamic trading relationships with renowned metal manufacturers around the world. The Debtor currently operates out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield. To maintain and operate these facilities, the Debtor receives water, electricity, telephone, internet and similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies"). Given the importance of the services provided by the Utility Companies to the operation of the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies which provide utility services to the Debtor be determined immediately so that there is no interruption in the services provided.

Attached as Exhibit "1" to the Declaration of Suk Won "Tim" Byun (the "Byun Declaration") annexed hereto is a list which sets forth, on an account-by-account basis, the name and address of the Utility Company that is currently providing utility services to the Debtor, the

2

type of utility services provided by the Utility Company, the account number with the Utility Company, the total amount paid by the Debtor on such account during the past three months, and the average monthly payment based on the total amount paid by the Debtor during the past three months.

The Debtor intends to provide adequate "assurance of payment" by providing the Utility Companies with cash deposits, as authorized by Section 366(c)(1)(A)(i) of the Bankruptcy Code, in the amounts proposed in Exhibit "1" to the Byun Declaration. The total amount of the cash deposits proposed to be paid is $45,822.43. Generally, for each account that the Debtor has with a Utility Company, the Debtor is proposing to provide the Utility Company with a cash deposit in an amount equal to the average monthly payment based on payments made on the account during the past three months.

In addition to the foregoing cash deposits, the Debtor will bring the Utility Companies current on all post-petition debts owed to such Utility Companies.

The source of the funds to be used to pay the cash deposits to the Utility Companies will be the Debtor's revenue, which the Debtor assumes that Center Bank ("Center") and KEB LA Financial Corp. ("KEB") contend constitutes their cash collateral. Concurrently herewith, the Debtor has filed an emergency motion for authority to use cash collateral in accordance with an operating budget which accompanies such motion. While the Debtor will attempt to reach the terms of a consensual cash collateral arrangement with Center and KEB, given the Debtor's immediate cash needs, the Debtor believes that there is an insufficient amount of time to finalize a consensual agreement with Center and KEB prior to the time of the hearing on the Motion. The Debtor submits that, based on the operating budget attached to its emergency cash collateral motion, the payment of the proposed cash deposits to the Utility Companies will not render the Debtor's bankruptcy estate administratively insolvent.

## ADDITIONAL INFORMATION

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(3) and 9075-1 and 11 U.S.C. § 366, this Motion, the supporting Memorandum of Points and Authorities, the Byun

1    Declaration attached hereto, the arguments and statements of counsel to be made at the hearing

2    on the Motion, and other admissible evidence properly brought before the Court.

3    In order to provide maximum notice of this Motion, concurrently with the filing of this

4    Motion with the Court (on January 12, 2010), the Debtor has served a copy of this Motion and all

5    supportive papers (including notice of the hearing) upon the Office of the United States Trustee,

6    all secured creditors and their counsel (if known), the Debtor's 20 largest unsecured creditors,

7    and other parties in interest including, among others, the Utility Companies, via overnight mail.

8    These parties will receive delivery of the Motion and all supportive papers by not later than the

9    morning of Wednesday, January 13, 2010.

10   **WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

11   Motion and issue an order:

12   (a)    granting the Motion;

13   (b)    affirming the adequacy of the notice given;

14   (c)    authorizing the Debtor to provide adequate "assurance of payment" to the Utility

15   Companies via cash deposits in the amounts set forth in Exhibit "1" to the Byun Declaration

16   annexed hereto;

17   (d)    deeming the cash deposits paid by the Debtor to the Utility Companies in the

18   amounts set forth in Exhibit "1" to the Byun Declaration as constituting adequate "assurance of

19   payment" pursuant to Section 366(c) of the Bankruptcy Code;

20   (e)    requiring each Utility Company that receives a cash deposit under an order of the

21   Court granting this Motion to return such cash deposit to the Debtor within ten (10) business

22   days if, and when, the Utility Company's services are terminated by the Debtor; and

23   ///

24   ///

25   ///

26   ///

27   ///

28

4

(f)     granting such other and further relief as the Court deems just and proper.

Dated: January 12, 2010

CENTRAL METAL, INC.

By:_____

MONICA Y. KIM
JULIET Y. OH
LEVENE, NEALE, BENDER,
    RANKIN & BRILL L.L.P.
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

### A. Background.

1.    On January 8, 2010 (the "Petition Date"), Central Metal, Inc., a California corporation, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a fully integrated scrap metal processing company that purchases, processes and sells ferrous and non-ferrous metals domestically and internationally. The Debtor is one of the largest processing companies on the West Coast, has one of the largest land sites and processing capacities, and is fully diversified in its business portfolio that entails dynamic trading relationships with renowned metal manufacturers around the world.

3.    The Debtor currently operates out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield.

4.    The Debtor was founded in 1993 by Jong Uk Byun, the sole shareholder and President of the Debtor.    Under Mr. Byun's management, the Debtor has experienced extraordinary growth, particularly in the last three years. In 2006, total sales volume was at approximately 50,000 tons. By 2008, total sales volume had increased to over 150,000 tons. Mr. Byun remains actively involved in the management of the Debtor. In 2009, the Debtor had annual gross sales totaling approximately $36.5 million.

### B. Events Leading To The Filing Of The Debtor's Bankruptcy Case.

5.    Over the years, the Debtor has obtained financing from Center Bank ("Center") on a secured basis to operate and expand its business. According to the Debtor's books and records, Center as well as an entity called KEB LA Financial Corp. ("KEB") may have liens against

substantially all of the Debtor's assets. As of the Petition Date, Center was owed approximately $16.3 million and KEB was owed approximately $900,000 by the Debtor.[1]

6. In order to increase its processing capacity and produce the level of volume necessary to meet the demand from its customers, the Debtor heavily invested in new equipment beginning in late 2005 and through early 2008. Since 2006, the Debtor has committed approximately $25 million – through a combination of cash and financing from various equipment lessors/lenders – to obtain new equipment and heavy duty trucks.

7. Once installed in early 2008, the new equipment could not be operated at full capacity until they were "broken in," approximately six months to one year later. As a result, the Debtor was unable to produce the level of volume it had anticipated during the "break in" period following the installation of the new equipment. Nevertheless, the Debtor was obligated to make payments on the new equipment, and continued to do so throughout 2008 and through April 2009

8. The price of steel peaked in the summer of 2008, at approximately $750 to $800 per ton. However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to approximately $200 per ton. This dramatic drop in steel prices was accompanied by a corresponding decline in demand for steel, due at least in part to the overall decline in the economy worldwide.

9. The demand for steel and the price of steel plunged at the same time that the Debtor's new equipment became fully functional. At the same time, availability of scrap metal decreased by at least 50%, requiring the Debtor to pay more for its supply. This increase in the cost of its supply, along with the drop in steel prices and the drop in demand for steel, all of which occurred virtually simultaneously, resulted in the Debtor's inability to generate the level of revenue necessary to service all of its debts.

---

[1] Wilshire State Bank ("Wilshire") recorded a financing statement against the Debtor with the California Secretary of State indicating that it asserts a security interest and lien upon substantially all of the Debtor's assets; however, the Debtor contends that Wilshire provided the Debtor with purchase money financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the security interest and lien of Wilshire applies only against these trucks, and not against any other assets of the estate.

7

10. As a result, beginning in approximately May 2009, the Debtor stopped making payments to Center, Wilshire and its equipment lessors/lenders. In November 2009, a number of the Debtor's equipment lessors/lenders filed complaints against the Debtor in state court based upon the Debtor's nonpayment and default under their respective loans/capital leases.

11. Upon its default, the Debtor attempted to restructure its payment obligations to Center. The parties successfully negotiated and entered into a forbearance agreement, but the Debtor was ultimately unable to perform on the terms of such agreement. Notwithstanding this, the parties continued to discuss the plight of the Debtor's situation.

12. In October 2009, the Debtor submitted a restructuring proposal to Center. In response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its financial advisors to review the Debtor's financial data and operations. The Debtor did, in fact, hire Focus in December 2009. Members associated with Focus came on-site at the Debtor, and received a tremendous amount of requested information, documents, data and reports. The main on-site personnel of Focus was Edmund C. King ("King").

13. Without any advance notice or warning, on or about January 6, 2010, Center filed a complaint against the Debtor, Mr. Byun, and other related defendants, and on the morning of January 7, 2010 (before the complaint had been served), Center's counsel provided telephonic notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for the appointment of a receiver over the properties of all of the defendants, including the Debtor. The Debtor filed its Chapter 11 case on an emergency basis to avoid the possibility of a receiver being appointed over its properties, and reorganize.

14. The filing of a bankruptcy case presented the only viable way for the Debtor to survive and restructure its financial affairs. The Debtor intends to aggressively pursue a financial transaction, including a possible sale of some or substantially all of its assets, locate a financial partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to develop and pursue all of its options and strategies.

1    15.    The cash nature of the Debtor's business and the current state of the Debtor's books
2  and records have given rise to a variety of concerns by Center which need to be addressed in this
3  case. In addition, the Debtor is aware that being in Chapter 11, as well as transitioning into
4  Chapter 11 as a debtor in possession, are complex matters with extensive reporting and disclosure
5  requirements. Based on all of these factors, the Debtor has determined that it would be in the best
6  interests of its estate to employ financial advisors and a Chief Restructuring Officer ("CRO") in
7  this case. Towards that end, the Debtor has retained C.T. Moffitt & Company ("CTMC") as its
8  financial advisors and Charles T. Moffitt as CRO for the Debtor to oversee all aspects of the
9  Debtor's business operations and financial affairs. Concurrently herewith, the Debtor has filed an
10  application to employ CTMC as the Debtor's financial advisor and Mr. Moffitt as the Debtor's
11  CRO, effective as of the Debtor's chapter 11 filing date of January 8, 2010.

12  **B.    The Utility Companies.**

13    16.    The Debtor is currently operating out of five (5) active facilities throughout
14  Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one
15  facility in San Bernardino, and one facility in Bakersfield (collectively, the "Facilities").

16    17.    To maintain and operate the Facilities, the Debtor receives water, electricity,
17  telephone, internet and similar utility services from a number of utility companies (each a "Utility
18  Company," and collectively, the "Utility Companies"). Given the importance of the services
19  provided by the Utility Companies to the operation of the Debtor's business, it is crucial that the
20  means of providing adequate assurance to the Utility Companies which provide utility services to
21  the Debtor be determined immediately so that there is no interruption in the services provided.

22    18.    Attached as Exhibit "1" to the Declaration of Suk Won "Tim" Byun (the "Byun
23  Declaration") annexed hereto is a list which sets forth, on an account-by-account basis, the name
24  and address of the Utility Company that is currently providing utility services to the Debtor, the
25  type of utility services provided by the Utility Company, the account number with the Utility
26  Company, the total amount paid by the Debtor on such account during the past three months, and

27

28

9

1    the average monthly payment based on the total amount paid by the Debtor during the past three

2    months.

3        19.    The Debtor intends to provide adequate "assurance of payment" by providing the

4    Utility Companies with cash deposits, as authorized by Section 366(c)(1)(A)(i) of the Bankruptcy

5    Code, in the amounts proposed in Exhibit "1" to the Byun Declaration. The total amount of the

6    cash deposits proposed to be paid is $45,822.43. Generally, for each account that the Debtor has

7    with a Utility Company, the Debtor is proposing to provide the Utility Company with a cash

8    deposit in an amount equal to the average monthly payment based on payments made on the

9    account during the past three months.

10        20.    In addition to paying the foregoing cash deposits, the Debtor will bring the Utility

11    Companies current on all post-petition debts owed to such Utility Companies.

12    **II.    DISCUSSION**

13        Section 366 of the Bankruptcy Code, as amended by The Bankruptcy Abuse Prevention

14    and Consumer Protection Act of 2005 ("BAPCPA") and applicable herein, provides, in pertinent

15    part, as follows:

16    "(a) Except as provided in subsections (b) and (c) of this section, a
      utility may not alter, refuse, or discontinue service to, or discriminate
17    against, . . . the debtor solely on the basis of the commencement of a
      case under this title or that a debt owed by the debtor to such utility
18    for services rendered before the order for relief was not paid when
      due.
19    . . .

20    (c)(2) Subject to paragraphs (3) and (4), with respect to a case filed
      under chapter 11, a utility referred to in subsection (a) may alter,
21    refuse, or discontinue utility service, if during the 30-day period
      beginning on the date of the filing of the petition, the utility does not
22    receive from the debtor . . . adequate assurance of payment for the
      utility service that is satisfactory to the utility.
23
      (3)(A) On request of a party in interest[2] and after notice and a
24    hearing, the court may order the modification of the amount of an
      assurance of payment under paragraph (2)."
25
      11 U.S.C. § 366.
26

27    _____

28      [2] The Debtor is a party in interest. 11 U.S.C. § 1109(b).

10

Whether a utility is subject to an unreasonable risk of nonpayment must be determined from the facts and circumstances of each case. See, Massachusetts Elec. Co. v. Keydata Corp (In re Keydata Corp.), 12 B.R. 156, 158 (1st Cir. B.A.P. 1981). Prior to the enactment of BAPCPA, where a debtor has, with few exceptions, timely paid its utility bills prior to the commencement of its chapter 11 case, the administrative expense priority provided in sections 503(b) and 507(a)(1) of the Bankruptcy Code often constituted adequate assurance of payment, and no deposit or other security was required. See, Virginia Elec. & Power Co. v. Caldor, Inc., 117 F.3d 646, 651 (2d Cir. 1997); see, also Demp v. Philadelphia Elec. Co. (In re Demp), 22 B.R. 331, 332 (Bankr. E.D. Pa. 1982).

Now, pursuant to the BAPCPA, the administrative expense priority provided by Sections 503(b) and 507(a)(1) of the Bankruptcy Code specifically is not a means of providing "assurance of payment" under Section 366(c)(2) of the Bankruptcy Code. 11 U.S.C. § 366(c)(1)(B). Instead, a Chapter 11 debtor must provide "assurance of payment" pursuant to Section 366(c)(1)(A) of the Bankruptcy Code, which states that "assurance of payment" means: a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption, or another form of security that is mutually agreed on between the utility and the debtor. 11 U.S.C. § 366(c)(1)(A).

Based on the foregoing, during the first 30 days following the commencement of a voluntary Chapter 11 bankruptcy case, a utility may not alter, refuse, or discontinue service to, or discriminate against, a debtor solely on the basis of the commencement of the case or the failure of the debtor to pay a pre-petition debt for utility services provided. Following the foregoing 30-day period, however, utility companies may alter, refuse or discontinue service if the debtor does not furnish adequate "assurance of payment" of post-petition utility service obligations that is satisfactory to the relevant utility.

Under Section 366(c) of the Bankruptcy Code, this Court has exclusive responsibility for determining what constitutes adequate assurance of payment of post-petition utility charges and is not bound by local or state regulations. See, e.g. Begley v. Philadelphia Elec. Co. (In re

11

1    Begley), 41 B.R. 402, 405-06 (Bankr. E.D. Pa. 1984), aff'd, 760 F.2d 46 (3d Cir. 1985) (pre-

2    BAPCPA); Marion Steel Co. v. Ohio Edison Co. (In re Marion Steel Co.), 35 B.R. 188, 195

3    (Bankr. D. Ohio 1983) (pre-BAPCPA case finding that determinations of adequate assurance

4    under section 366 are fully within the Court's discretion).

5         In the case herein, the Debtor intends to provide adequate "assurance of payment" by

6    providing the Utility Companies with cash deposits, as authorized by Section 366(c)(1)(A)(i) of

7    the Bankruptcy Code, in the amounts set forth in Exhibit "1" to the Byun Declaration annexed

8    hereto. The total amount of the cash deposits proposed to be paid is $45,822.43. As noted

9    above, generally, for each account that the Debtor has with a Utility Company, the Debtor is

10   proposing to provide the Utility Company with a cash deposit in an amount equal to the average

11   monthly payment based on payments made on the account during the past three months.

12        In addition to the foregoing, the Debtor will bring the foregoing Utility Companies

13   current on all post-petition debts owed to such Utility Companies and will remain current with

14   them.

15        The source of the funds to be used to pay the cash deposits to the Utility Companies will

16   be the Debtor's revenue, which the Debtor assumes that Center and KEB contend constitutes

17   their cash collateral. Concurrently herewith, the Debtor has filed an emergency motion for

18   authority to use cash collateral in accordance with an operating budget which accompanies such

19   motion. While the Debtor will attempt to reach the terms of a consensual cash collateral

20   arrangement with Center and KEB, given the Debtor's immediate cash needs, the Debtor

21   believes that there is an insufficient amount of time to finalize a consensual agreement with

22   Center and KEB prior to the time of the hearing on the Motion. The Debtor submits that, based

23   on the operating budget attached to its emergency cash collateral motion, the payment of the

24   proposed cash deposits to the Utility Companies will not render the Debtor's bankruptcy estate

25   administratively insolvent.

26   / / /

27   / / /

28

12

## III.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the Motion and issue an order:

(a)    granting the Motion;

(b)    affirming the adequacy of the notice given;

(c)    authorizing the Debtor to provide adequate "assurance of payment" to the Utility Companies via cash deposits in the amounts set forth in Exhibit "1" to the Byun Declaration annexed hereto;

(d)    deeming the cash deposits paid by the Debtor to the Utility Companies in the amounts set forth in Exhibit "1" to the Byun Declaration as constituting adequate "assurance of payment" pursuant to Section 366(c) of the Bankruptcy Code;

(e)    requiring each Utility Company that receives a cash deposit under an order of the Court granting this Motion to return such cash deposit to the Debtor within ten (10) business days if, and when, the Utility Company's services are terminated by the Debtor; and

(f)    granting such other and further relief as the Court deems just and proper.

Dated:  January 12, 2010                    CENTRAL METAL, INC., a California corporation


                                        By: _____
                                            MONICA Y. KIM
                                            JULIET Y. OH
                                            LEVENE, NEALE, BENDER,
                                                RANKIN & BRILL L.L.P.
                                            Proposed Attorneys for Chapter 11
                                            Debtor and Debtor in Possession

13

1

## DECLARATION OF SUK WON BYUN

2    I, Suk Won "Tim" Byun, hereby declare as follows:

3    1.    I have personal knowledge of the facts set forth below and, if called to testify, I
4  would and could competently testify thereto.

5    2.    I am the General Manager of Central Metal, Inc., a California corporation (the
6  "Debtor"), debtor and debtor in possession herein, and, as such, am familiar with the business
7  operations and financial affairs of the Debtor. I have access to the Debtor's books and records
8  and, to the extent necessary to complete this declaration, I have reviewed such books and
9  records.

10    3.    I make this declaration in support of the Debtor's emergency motion for authority
11  to provide adequate assurance of future payment to certain utility companies pursuant to Section
12  366(c) of the Bankruptcy Code (the "Motion"), to which this declaration is attached.

13    4.    The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code
14  on January 8, 2010 (the "Petition Date").

15    5.    The Debtor is a fully integrated scrap metal processing company that purchases,
16  processes and sells ferrous and non-ferrous metals domestically and internationally. To the best
17  of my knowledge, the Debtor is one of the largest processing companies on the West Coast, has
18  one of the largest land sites and processing capacities, and is fully diversified in its business
19  portfolio that entails dynamic trading relationships with renowned metal manufacturers around
20  the world.

21    6.    The Debtor currently operates out of five (5) active facilities throughout Southern
22  California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in
23  San Bernardino, and one facility in Bakersfield.

24    7.    It is my understanding and belief that the Debtor was founded in 1993 by Jong Uk
25  Byun, the sole shareholder and President of the Debtor. In 2006, the Debtor's total sales volume
26  was at approximately 50,000 tons. By 2008, the Debtor's total sales volume had increased to

27

28

14

1    over 150,000 tons. Mr. Byun remains actively involved in the management of the Debtor. In

2    2009, the Debtor had annual gross sales totaling approximately \$36.5 million.

3        8.      Based on my review of the Debtor's books and records, it is my understanding

4    and belief that, over the years, the Debtor has obtained financing from Center Bank ("Center")

5    on a secured basis to operate and expand its business. According to the Debtor's books and

6    records, Center and an entity called KEB LA Financial Corp. ("KEB") may have liens against

7    substantially all of the Debtor's assets. As of the Petition Date, Center was owed approximately

8    \$16.3 million and KEB was owed approximately \$900,000 by the Debtor.

9        9.      It is my understanding and belief that Wilshire State Bank ("Wilshire") recorded a

10   financing statement against the Debtor with the California Secretary of State indicating that it

11   asserts a security interest and lien upon substantially all of the Debtor's assets. However, the

12   Debtor's books and records reflect that Wilshire provided the Debtor with purchase money

13   financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the Debtor

14   contends that the security interest and lien of Wilshire applies only against these trucks, and not

15   against any other assets of the estate.

16       10.     In order to increase its processing capacity and produce the level of volume

17   necessary to meet the demand from its customers, the Debtor heavily invested in new equipment

18   beginning in late 2005 and through early 2008. Based on my review of the Debtor's books and

19   records, since 2006, the Debtor has committed approximately \$25 million – through a

20   combination of cash and financing from various equipment lessors/lenders – to obtain new

21   equipment and heavy duty trucks.

22       11.     Once installed in early 2008, the new equipment could not be operated at full

23   capacity until they were "broken in," approximately six months to one year later. As a result, the

24   Debtor was unable to produce the level of volume it had anticipated during the "break in" period

25   following the installation of the new equipment. Nevertheless, the Debtor was obligated to make

26   payments on the new equipment, and continued to do so throughout 2008 and through April

27   2009.

28

15

12.      The price of steel peaked in the summer of 2008, at approximately $750 to $800 per ton. However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to approximately $200 per ton. This dramatic drop in steel prices was accompanied by a corresponding decline in demand for steel.

13.      The demand for steel and the price of steel plunged at the same time that the Debtor's new equipment became fully functional. At the same time, availability of scrap metal decreased by at least 50%, requiring the Debtor to pay more for its supply. I believe that this increase in the cost of its supply, along with the drop in steel prices and the drop in demand for steel, all of which occurred virtually simultaneously, resulted in the Debtor's inability to generate the level of revenue necessary to service all of its debts.

14.      As a result, beginning in approximately May 2009, the Debtor stopped making payments to Center, Wilshire and its equipment lessors/lenders. It is my understanding and belief that, in November 2009, a number of the Debtor's equipment lessors/lenders filed complaints against the Debtor in state court based upon the Debtor's nonpayment and default under their respective loans/capital leases.

15.      Upon its default, the Debtor attempted to restructure its payment obligations to Center. The parties successfully negotiated and entered into a forbearance agreement, but the Debtor was ultimately unable to perform on the terms of such agreement. Notwithstanding this, the parties continued to discuss the plight of the Debtor's situation.

16.      In October 2009, the Debtor submitted a restructuring proposal to Center. In response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its financial advisors to review the Debtor's financial data and operations. The Debtor did, in fact, hire Focus in December 2009. Members associated with Focus came on-site at the Debtor, and were provided with a tremendous amount of requested information, documents, data and reports. The main on-site personnel of Focus was Edmund C. King ("King").

17.      Without any advance notice or warning, on or about January 6, 2010, Center filed a complaint against the Debtor, Mr. Byun, and other related defendants. It is my understanding

that, on the morning of January 7, 2010 (before the complaint had been served), Center's counsel provided telephonic notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for the appointment of a receiver over the properties of all of the defendants, including the Debtor The Debtor filed its Chapter 11 case on an emergency basis to avoid the possibility of a receiver being appointed over its properties, and reorganize.

18. I believe that the filing of a bankruptcy case presented the only viable way for the Debtor to survive and restructure its financial affairs. The Debtor intends to aggressively pursue a financial transaction, including a possible sale of some or substantially all of its assets, locate a financial partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to develop and pursue all of its options and strategies.

19. The cash nature of the Debtor's business and the current state of the Debtor's books and records have given rise to a variety of concerns by Center which I believe need to be addressed in this case. In addition, the Debtor and its management are aware that being in Chapter 11, as well as transitioning into Chapter 11 as a debtor in possession, are complex matters with extensive reporting and disclosure requirements. Based on all of these factors, the Debtor has determined that it would be in the best interests of its estate to employ financial advisors and a Chief Restructuring Officer ("CRO") in its case. Towards that end, the Debtor has retained C.T. Moffitt & Company ("CTMC") as its financial advisors and Charles T. Moffitt as CRO for the Debtor to oversee all aspects of the Debtor's business operations and financial affairs. Concurrently herewith, the Debtor has filed an application to employ CTMC as the Debtor's financial advisor and Mr. Moffitt as the Debtor's CRO, effective as of the Debtor's chapter 11 filing date of January 8, 2010.

20. The Debtor is currently operating out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield (collectively, the "Facilities").

21. To maintain and operate the Facilities, the Debtor receives water, electricity, telephone, internet and similar utility services from a number of utility companies (each a

1   "Utility Company," and collectively, the "Utility Companies"). Given the importance of the
2   services provided by the Utility Companies to the operation of the Debtor's business, I believe it
3   is crucial that the means of providing adequate assurance to the Utility Companies which provide
4   utility services to the Debtor be determined immediately so that there is no interruption in the
5   services provided.

6       22.   Attached hereto as Exhibit "1" is a list which sets forth, on an account-by-account
7   basis, the name and address of the Utility Company that is currently providing utility services to
8   the Debtor, the type of utility services provided by the Utility Company, the account number
9   with the Utility Company, the total amount paid by the Debtor on such account during the past
10  three months, and the average monthly payment based on the total amount paid by the Debtor
11  during the past three months.

12      23.   The Debtor intends to provide adequate "assurance of payment" by providing the
13  Utility Companies with cash deposits in the amounts proposed in Exhibit "1" hereto. The total
14  amount of the cash deposits proposed to be paid is $45,822.43. Generally, for each account that
15  the Debtor has with a Utility Company, the Debtor is proposing to provide the Utility Company
16  with a cash deposit in an amount equal to the average monthly payment based on payments made
17  on the account during the past three months.

18      24.   The source of the funds to be used to pay the cash deposits to the Utility
19  Companies will be the Debtor's revenue, which the I assume that Center and Wilshire contend
20  constitutes their cash collateral. Concurrently herewith, the Debtor has filed an emergency
21  motion for authority to use cash collateral in accordance with an operating budget which
22  accompanies such motion. While the Debtor will attempt to reach the terms of a consensual cash
23  collateral arrangement with Center and Wilshire, given the Debtor's immediate cash needs. I
24  believe that there is an insufficient amount of time to finalize a consensual agreement with
25  Center and Wilshire prior to the time of the hearing on the Motion.

26  ///

27  ///

28

18

1    25.    Based on the operating budget attached to the Debtor's emergency cash collateral

2  motion, which I have reviewed and am familiar with, I believe that the Debtor will be in a

3  position to pay the proposed cash deposits to the Utility Companies. In addition to paying the

4  foregoing cash deposits, the Debtor will bring the Utility Companies current on all post-petition

5  debts owed to such Utility Companies.

6    I declare under penalty of perjury that the foregoing is true and correct.

7    Executed this 11th day of January 2010, at Huntington Park, California.

8

9

10    Suk Won "Tim" Byun, Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# UTILITIES EXHIBIT

| Vendor | Phone No. | Address | Acct.# | Oct. | Nov. | Dec. | Average | Service Location |
|---|---|---|---|---|---|---|---|---|
| & T | 877 750 2355 | Payment Center, Sacramento, CA 95887 | 323 234 3658 076 3 | | | | | 2203 Alameda St. Los Angeles, CA 90058 |
| | | | 323 234 1458 | | | | | |
| | | | 323 234 1602 | $ 146.89 | $ 123.62 | $ 122.82 | $ 131.11 | |
| | | | 323 234 9835 | | | | | |
| | | | 213 746 3680 991 9 | | | | | 2203 Alameda St. Los Angeles, CA 90058 |
| | | | 213 746 5234 | $ 190.12 | $ 174.43 | $ 165.83 | $ 176.79 | |
| | | | 213 746 1265 | | | | | |
| | | | 323 587 6006 472 | | | | | |
| | | | 323 587 1416 | | | | | 8201 Santa Fe Ave. Huntington Park, CA 90255 |
| | | | 323 587 2404 | | | | | |
| | | | 323 587 3535 | $ 839.97 | $ 734.66 | $ 597.03 | $ 723.89 | |
| | | | 323 587 4030 | | | | | |
| | | | 323 587 6001 | | | | | |
| | | | 323 587 6145 | | | | | |
| Dec (Trash) | 760 256 2730 | 2340 W. Main St. Barstow, CA 92311 | 30 CA 707679 | $ 79.18 | $ 79.18 | $ 79.18 | $ 79.18 | Barstow Trash |
| Consolidated Disposal | 562 347 4000 | 12949 Telegraph Rd. Santa Fe Springs, CA 90670 | 3 0902 9528885 | $ 2,145.93 | $ 1,577.67 | $ 2,278.73 | $ 2,000.78 | 2203 S. Alameda |
| | | | 3 0902 9528869 | $ 151.09 | $ 286.95 | $ 390.55 | $ 276.20 | 2203 S. Alameda |
| | | | 3 0902 9528866 | $ 515.59 | $ 599.04 | $ 1,296.65 | $ 803.76 | 2203 S. Alameda |
| | | | 3 0902 9509565 | $ 983.41 | $ 982.06 | $ 1,003.97 | $ 989.81 | 8201 Santa Fe Ave. |
| City of LA Municipal Services (DWP) | 800 499 8840 | P.O. Box 30808 Los Angeles, CA 90030 | 1 43 00927 02201 00 0000 0 01 | $ 306.64 | $ 148.43 | $ 157.75 | $ 204.27 | 2201 S. Alameda st. LA |
| | | | 1 01 95679 01770 00 0006 6 01 | $ 224.36 | $ 199.67 | $ 50.28 | $ 158.10 | 1770 E. 22nd St. LA |
| | | | 1 43 00927 02203 00 0000 0 01 | $ 2,440.65 | $ 2,784.30 | $ 1,814.17 | $ 2,346.37 | 2203 S. Alameda St. LA |
| | | | 1 43 00927 02445 00 0000 4 01 | $ 288.27 | $ 326.65 | $ 573.27 | $ 396.06 | 2445 S. Alameda St. LA |
| City of S.B. Municipal Water Dept. | 909 384 5095 | 300 N. D St. San Bernardino, CA 92418 | 171933-9816 | $ 135.94 | $ 116.89 | $ 72.45 | $ 108.43 | San Bernardino Water |
| | | | 171933-9818 | $ 34.35 | $ 34.35 | $ 18.48 | $ 29.06 | San Bernardino Water |
| California Water Services | 661 837 7200 | 3725 S. 'H' St. Bakersfield, CA 93304 | 4552756487 | $ 52.61 | $ 52.62 | $ 52.61 | $ 52.61 | Bakersfield |
| | | | 1875650123 | $ 113.80 | $ 105.09 | $ 116.53 | $ 111.81 | Bakersfield |
| | | | 4533149958 | $ 97.07 | $ 97.07 | $ 97.87 | $ 97.34 | Bakersfield |
| Golden State Water Company | 866 360 2279 | 7105 D Eastern Ave. Bell Garden, CA 90201 | 576093 9 | $ 284.00 | $ 427.46 | $ 378.52 | $ 363.33 | Los Angeles |
| | | | 576096 2 | $ 102.40 | $ 165.40 | $ 194.17 | $ 153.99 | Los Angeles |
| | | | 795465 4 | $ 35.60 | $ 0.10 | $ 36.13 | $ 23.94 | Los Angeles |
| | | | 705069 3 | $ 295.05 | $ 134.94 | $ 637.83 | $ 355.94 | Bakersfield |
| Pacific Gas & Electric Company | 800 743 5000 | 1918 H St. Bakersfield, CA 93301 | 1459732696 8 | $ 98.07 | $ 105.87 | $ 126.33 | $ 110.09 | Bakersfield |
| Sprint (Radio and Cell phone) | 877 639 8351 | P.O. Box 8077, London, KY 40742 | 974726317 | $ 3,764.70 | $ 1,771.22 | $ 1,815.82 | $ 2,450.58 | Cell Phone & Radio |

| Vendor | Phone No. | Address | Acct.# | Oct. | Nov. | Dec. | Average | Service Location |
|---|---|---|---|---|---|---|---|---|
| Southern California Edison | 800 950 2356 | P.O. Box 300 Rosemead, CA 91772 | 2 25 203 5266 | $ 146.86 | $ 185.43 | $ 146.86 | $ 159.72 | 8201 Santa Fe Ave. |
| | | | 2 27 148 5260 | $ 141.17 | $ 194.59 | $ 216.28 | $ 184.01 | 8150 Maribisa |
| | | | 2 22 831 4449 | $ 28,262.30 | $ 19,628.69 | $ 22,897.99 | $ 23,596.33 | 8201 Santa Fe Ave. |
| | | | 2 27 738 9649 | $ 10,325.07 | $ 9,002.53 | $ 7,836.46 | $ 9,054.69 | Los Angeles |
| ele Pacific | 877 487 8722 | 515 S. Flower St. Los Angeles, CA 90071 | 56016 | $ 428.56 | $ 426.35 | $ 444.29 | $ 433.07 | Phone and Internet |
| Verizon California | 888 755 7211 | P.O. Box 9688 Mission Hills, CA 91346 | 760 253 7408 | $ 48.87 | $ 49.17 | $ 49.25 | $ 49.10 | Barstow Fax |
| | | | 909 889 0626 | $ 113.00 | $ 251.76 | $ 241.49 | $ 202.08 | San Bernardino |
| Total | | | | $ 52,791.52 | $ 40,766.19 | $ 43,909.59 | $ 45,822.43 | |

| In re:<br>CENTRAL METAL, INC. | Debtor. | Chapter 11<br>2:10-bk-10642-VZ |
|---|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PAYMENT TO UTILITY COMPANIES PURSUANT TO 11 U.S.C. § 366; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SUK WON BYUN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 12 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Monica Y Kim    myk@lnbrb.com
- Dare Law    dare.law@usdoj.gov
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **January 12, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

*By overnight mail:*
*Secured creditors*
*20 largest creditors*
*Utility companies*
*(See attached)*

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 12, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

*By attorney service:*
*The Honorable Vincent P. Zurzolo*
*255 East Temple Street*
*Los Angeles, CA 90012*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 12, 2010 | Marguerite Hardin | *Marguerite Hardin* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
20 Largest

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Sun Construction
26071 Hinckley Street
Loma Linda, CA 92354

Bay City Trading
4051 Via Oro
Long Beach, CA 90810

Zimex Logitech, Inc.
5400 Orange Avenue, Suite 108
Cypress, CA 90630

US Bank
P.O. Box 790408
Saint Louis, MO 63179

American Express
P.O. Box 981535
El Paso, TX 79998

Bank of America
P.O. Box 851001
Dallas, TX 75285

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
Secured

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

American Honda Finance Corp.
P.O. Box 6070
Cypress, CA 90630-6070

Bank of America
c/o Frandzel, Robbins, Bloom, et al
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

Center Bank
3435 Wilshire Blvd., Suite 700
Attn:  Lisa K. Pai
Los Angeles, CA 90010

Center Capital Corporation
P.O. Box 330
Hartford, CT 06141

Chase
P.O. Box 78067
Phoenix, AZ 85062-8067

GE
300 E. John Carpenter Fwy, 4th Fl.
Attn: Rena Harris
Irving, TX 75062

H. West Equipment, Inc.
645 N. Main Street
Orange, CA 92868-1103

Lexus Financial Services
P.O. Box 2991
Mail Drop L201
Torrance, CA 90509

People's Capital and Leasing Corp.
255 Bank Street
Attn: Jeffrey A. Kennedy
Waterbury, CT 06702-2219

The CIT Group/Equipment Financing
305 Fellowship Road, Suite 300
Attn:  Paul Plunkett
Mount Laurel, NJ 08054

Wilshire State Bank
3822 Wilshire Blvd.
Los Angeles, CA 90010

Counsel for Center Bank
Steven G. Polard, Esq.
Perkins Coie LLP
1888 Century Park East, Ste 1700
Los Angeles, CA 90067-1721

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ

**Utilities**

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Attn:  Dare Law, Esq.
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

AT&T
Bankruptcy Dept
PO Box 769
Arlington, TX 76004

Burtec
2340 W. Main Street
Barstow, CA 92311

Consolidated Disposal
12949 Telegraph Rd
Santa Fe Springs, CA 90670

L.A. DWP – Bankruptcy Unit
PO Box 51111
Los Angeles, CA 90051

City of San Bernardino
Municipal Water Dept
300 N. 'D' Street
San Bernardino, CA 92418

California Water Svcs
3725 S. "H" Street
Bakersfield, CA 93304

Golden State Water Company
7105 D Eastern Ave
Bell Garden, CA 90201

Pacific Gas & Electric Co.
1918 H Street
Bakersfield, CA 93301

Sprint Cellular Service
6391 Sprint Parkway
Overland Park, KS 66251-4300

Southern California Edison
PO Box 300
Rosemead, CA 91772

TelePacific
515 S. Flower Street
Los Angeles, CA 90071

Verizon California
Bankruptcy Dept.
Attn:  Deanna
404 Brock Drive
Bloomington, IL 61701

Verizon California
PO Box 9688
Mission Hills, CA 91346