1  MONICA Y. KIM (SBN 180139)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  myk@lnbrb.com, jyo@lnbrb.com

6  Proposed Attorneys for Chapter 11 Debtor
7  and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10                  LOS ANGELES DIVISION
11

12  In re                              )  Case No. 2:10-bk-10642-VZ
                                       )
13  CENTRAL METAL, INC., a California  )  Chapter 11
    corporation,                       )
14                                     )
                                       )
15              Debtor.                )  DEBTOR'S EMERGENCY MOTION FOR
                                       )  USE OF CASH COLLATERAL ON AN
16                                     )  INTERIM BASIS PENDING A FINAL
                                       )  HEARING; MEMORANDUM OF POINTS
17                                     )  AND AUTHORITIES; DECLARATION
                                       )  OF SUK WON BYUN IN SUPPORT
18                                     )  THEREOF
                                       )
19                                     )  DATE:     January 14, 2010
                                       )  TIME:     11:00 a.m.
20                                     )  PLACE:    Courtroom 1368
                                       )            255 E. Temple Street
21                                     )            Los Angeles, California
                                       )
22                                     )
                                       )
23

24      **TO ALL SECURED CREDITORS; THE TWENTY LARGEST UNSECURED**
25  **CREDITORS; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL**
26  **PARTIES REQUESTING SPECIAL NOTICE:**
27

28

                                   1

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 8

I.    CASE BACKGROUND ........................................................................................ 8

      A.    Background ...................................................................................... 8

      B.    Events Leading To The filing Of the Debtor's Bankruptcy Case ........................ 8

      C.    Secured Liabilities of the Debtor ................................................................ 12

      D.    Assets of the Debtor .......................................................................... 13

      E.    The Debtor's Need for Use of Cash Collateral .................................................. 14

II.   DISCUSSION ...................................................................................................... 15

      A.    The Debtor Must Be Authorized to Use Cash Collateral to Operate,
            Maintain and Preserve Its Business............................................................... 15

      B.    The Secured Creditors Are Adequately Protected by an Adequate
            Equity Cushion, the Debtor's Continued Use of Cash Collateral,
            Personal Guaranty and Replacement Liens .................................................... 17

      C.    The Procedural Requirements Regarding Approval of the Emergency
            Motion Have Been Satisfied ....................................................................... 21

III.  CONCLUSION ...................................................................................................... 21

DECLARATION OF SUK WON BYUN ............................................................................... 23

i

# TABLE OF AUTHORITIES

*In re Dynaco Corporation,*
162 B.R. 389 (Bankr. D.N.H. 1993).................................................................16, 18, 19

*In re Immenhausen Corp.,*
164 B.R. 347, 352 (Bankr. M.D.Fla. 1994) ........................................................ 18, 19

*In re Jug End in The Berkshires, Inc.,*
46 B.R. 892 (Bankr. D.Mass. 1985).......................................................................... 17

*In re McCombs Properties VI, Ltd.,*
88 B.R. 261, 265 (Bankr. C.D.Cal. 1988).............................................................. 17, 19

*In re Mellor,*
734 F.2d 1396, 1400 (9th Cir. 1984) ........................................................................ 17

*In re Newark Airport/Hotel Ltd. Partnership,*
156 B.R. 444, 450 (Bankr. D.N.J. 1993)................................................................ 18, 19

*In re Oak Glen R-Vee,*
8 B.R. 213, 216 (Bankr. C.D.Cal. 1981)................................................................... 16

*In re O'Connor,*
808 F.2d 1393, 1398 (10th Cir. 1987) ...........................................................17, 19, 20

*In re Planned Systems, Inc.,*
78 B.R. 852, 862 (Bankr. S.D.Ohio 1987)................................................................ 17

*Matter of Pursuit Athletic Footwear, Inc.,*
193 B.R. 713 (Bankr. D.Del. 1996).................................................................... 18, 19

*In re Smithfield Estates, Inc.,*
48 B.R. 910 (Bankr. D.R.I. 1985).......................................................................... 18

*In re Stein,*
19 B.R. 458, 459 (Bankr. E.D.Pa. 1982)............................................................. 16, 19

*In re Swedeland Development Group, Inc.,*
16 F.3d 552, 564, n. 14 (3d Cir. 1994)................................................................. 20

*In re Triplett,*
87 B.R. 25 (Bankr. W.D.Tex. 1988)..................................................................... 19

*In re Tucson Industrial Partners,*
129 B.R. 614 (9th Cir. BAP 1991) ...................................................................... 16

*United Savings Association v. Timbers of Inwood Forest Associates,*
108 S.Ct. 626, 629 (1988) ............................................................................................ 17

11 U.S.C. § 101 ........................................................................................................ 2, 8
11 U.S.C. § 361(1) .......................................................................................................... 17
11 U.S.C. § 361(2) .......................................................................................................... 17
11 U.S.C. § 363 .............................................................................................................. 15
11 U.S.C. § 363(a) .................................................................................................... 16, 17
11 U.S.C. § 363(c) ............................................................................................................ 2
11 U.S.C. § 363(c)(1) ..................................................................................................... 15
11 U.S.C. § 363(c)(2) ................................................................................................ 16, 17
11 U.S.C. § 362(c)(2)(A) ............................................................................................... 16
11 U.S.C. § 363(c)(2)(B) ........................................................................................... 6, 16
11 U.S.C. § 506(a) .......................................................................................................... 17
11 U.S.C. § 506(a)(1) ..................................................................................................... 17
11 U.S.C. § 506(c) ............................................................................................................ 6
11 U.S.C. § 544 ................................................................................................................. 6
11 U.S.C. § 545 ................................................................................................................. 6
11 U.S.C. § 547 ................................................................................................................. 6
11 U.S.C. § 548 ................................................................................................................. 6
11 U.S.C. § 549 ................................................................................................................. 6
11 U.S.C. § 1107 ......................................................................................................... 2, 8
11 U.S.C. § 1107(a) ........................................................................................................ 15
11 U.S.C. § 1108 ................................................................................................... 2, 8, 15

Rule 4001, Federal Rules of Bankruptcy Procedure ........................................................ 2
Rule 4001(b), Federal Rules of Bankruptcy Procedure ................................................. 21
Rule 4001(b)(2), Federal Rules of Bankruptcy Procedure .............................................. 5
Rule 9014, Federal Rules of Bankruptcy Procedure ........................................................ 2

Local Bankruptcy Rule 2081-1(a)(9) ............................................................................... 2
Local Bankruptcy Rule 4001-2 ........................................................................................ 2
Local Bankruptcy Rule 9075-1 ........................................................................................ 2

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977),
1978 U.S. Code Cong. & Admin. News, p. 5787 ....................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of

2  title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy

3  Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy

4  Rules"), Central Metal, Inc., a California corporation, Chapter 11 debtor and debtor in possession

5  herein (the "Debtor"), hereby moves, on an emergency basis (the "Emergency Motion"), for

6  entry of an interim order authorizing the Debtor to use cash collateral on an emergency interim

7  basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"). a

8  copy of which is attached as Exhibit "1" to the annexed Declaration of Suk Won Byun (the

9  "Byun Declaration").    A further description of the Budget is set forth in the annexed

10  Memorandum of Points and Authorities.

11    The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on

12  January 8, 2010 (the "Petition Date").  The Debtor continues to operate its business, manage its

13  financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections

14  1107 and 1108 of the Bankruptcy Code.

15    The Debtor is a fully integrated scrap metal processing company that purchases,

16  processes and sells ferrous and non-ferrous metals domestically and internationally.  The Debtor

17  is one of the largest processing companies on the West Coast, has one of the largest land sites

18  and processing capacities, and is fully diversified in its business portfolio that entails dynamic

19  trading relationships with renowned metal manufacturers around the world.   The Debtor

20  currently operates out of five (5) active facilities throughout Southern California – two facilities

21  in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one

22  facility in Bakersfield.

23    According to the Debtor's books and records, and as described more fully in the annexed

24  Memorandum of Points and Authorities, the Debtor believes that there are two creditors which

25  may have liens against substantially all of the Debtor's assets.  These creditors are Center Bank

26  ("Center") and KEB LA Financial Corp. ("KEB").  As of the Petition Date, Center was owed

27  approximately $16.3 million and KEB was owed approximately $900,000.  The Debtor believes

28

2

1    that Center and KEB (collectively, the "Secured Creditors") are the only creditors who may have

2    valid liens against the Debtor's cash collateral.[1]

3    The main assets of the Debtor are the Debtor's inventory of metals which are located

4    throughout the Debtor's business locations and which also vary greatly in type and category, the

5    Debtor's equipment, and the Debtor's real property. As set forth in the Byun Declaration and

6    exhibits attached thereto, (1) the current value of the inventory, at cost, is approximately

7    $1,806,942 (the resale value is obviously going to be higher), (2) the Debtor owns at least four

8    (4) parcels of real estate, which were purchased for a total of $5,725,500 and which have a

9    current aggregate assessed value of approximately $10.9 million, and (3) the Debtor has

10   equipment which the Debtor believes has aggregate current market value (after accounting for

11   depreciation and net of any remaining lease payments) of approximately $17 million. In total,

12   the Debtor estimates that the aggregate current market value of just the inventory, equipment and

13   real property which serve as collateral for the Secured Creditors is at least $24 million

14   Additionally, all of the obligations of the Debtor to Center and KEB are personally guarantied by

15   Jong Uk Byun, the sole shareholder of the Debtor, who has significant personal assets including

16   a tremendous amount of real property which are estimated to have current market value in excess

17   of $10 million.

18   Given the aggregate current market value of the Secured Creditors' key collateral, and

19   with the current aggregate debt owing to the Secured Creditors of approximately $17.2 million,

20   the Debtor submits that both Secured Creditors are oversecured creditors protected by an

21   adequate equity cushion, even without attributing any value to any other assets of the Debtor,

22   including the goodwill of the Debtor's business.

23   Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash

25   [1] Wilshire State Bank ("Wilshire") recorded a financing statement against the Debtor with the
26   California Secretary of State indicating that it asserts a security interest and lien upon substantially all
     of the Debtor's assets; however, the Debtor contends that Wilshire provided the Debtor with purchase
27   money financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the security
     interest and lien of Wilshire applies only against these trucks, and not against any other assets of the
28   estate.

3

1  collateral to pay operating expenses that the Debtor must pay in order to stay in business and
2  preserve the going concern value of its business.  The Budget reflects the expenses that the
3  Debtor must pay for the period from the week ending January 16, 2010 through and including
4  the week ending February 27, 2010 (on a weekly basis) to stay in business.  The Debtor is
5  requesting that it be permitted to use cash collateral in accordance with the Budget, subject to a
6  permitted deviance of up to 10% of the total expenses for any week, with any unused portions to
7  be carried over into the following week.  Needless to say, the Debtor must be able to use its
8  current cash and its daily sales revenue to stay in business and to pay the Debtor's post-petition
9  operating expenses, including continuing purchases of scrap metal, payroll, rent, utilities, etc.
10 Without the ability to use cash collateral, the Debtor would be forced to shut down its business,
11 would lose the going concern value of its business, and would be unable to reorganize.

12      As reflected in the Budget, over the next seven weeks, the Debtor will be using its
13 revenue to buy more scrap metal in order to maintain adequate inventory levels.  Indeed, with the
14 exception of the week ending January 16, 2010, the Debtor intends to spend 79% (week 2), 77%
15 (week 3), 79% (week 4), 64% (week 5) 62% (week 6) and 62% (week 7) of its gross cash
16 receipts to purchase additional scrap metal.  The Debtor submits that its continuing purchase of
17 scrap metal which, in turn, keeps the Debtor's inventory of re-saleable metal products constant
18 (or increasing) maintains the good will of its customers, and maintains (and likely increases) the
19 value of the liens asserted by the Secured Creditors.  Therefore, if allowed to use cash collateral
20 to, among other things, purchase additional scrap metal to replenish sold inventory, the value of
21 the Debtor's assets and business will certainly remain the same, but more likely increase, and not
22 decline in value.

23      Given that the Secured Creditors are oversecured creditors protected by an adequate
24 equity cushion, and the Debtor's ongoing operations, which entails significant purchases of scrap
25 metals to replenish sold inventory, the Debtor submits that the Secured Creditors will remain
26 adequately protected despite the Debtor's use of cash collateral pursuant to the terms proposed
27 herein.  As additional adequate protection, the Secured Creditors will receive replacement liens

28

4

Main Document    Page 8 of 75

1 against the Debtor's assets, with such replacement lien to have the same extent, validity, and
2 priority as the pre-petition lien held by such creditors. The existing personal guaranty by Jong
3 Uk Byun provides further adequate protection. While the Debtor is attempting to reach the terms
4 of a consensual and interim cash collateral arrangement with the Secured Creditors, given the
5 Debtor's immediate cash needs, the Debtor has filed this emergency motion for authority to use
6 cash collateral.

7       Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing
8 on this Emergency Motion earlier than 15 days after service of this Emergency Motion, the Court
9 may conduct a preliminary hearing before such 15-day period expires to enable the Debtor to use
10 cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate
11 pending a final hearing.

12      Here, the Debtor cannot survive 15 days without any use of cash collateral. The Debtor
13 must be able to pay expenses in accordance with the Budget (such as payroll which is due this
14 Friday, January 15, 2010) pending a final hearing in order to avoid immediate and irreparable
15 harm to the Debtor's business and this bankruptcy estate.

16      Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtor submits that the interim relief
17 requested by the Debtor pertaining to the Debtor's use of cash collateral does not contain any of
18 the following provisions:

| Provision | Paragraph |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |

5

| Provision | Paragraph |
|---|---|
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

The relief sought in the Emergency Motion is based upon the Emergency Motion, the annexed Memorandum of Points and Authorities and Declarations in support of the Emergency Motion, the statements, arguments and representations of counsel to be made at the hearing on

6

1    the Emergency Motion, and any other evidence properly presented to the Court at or prior to the

2    hearing on the Emergency Motion.

3        **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

4        1.        granting the Emergency Motion on an interim basis pending a final hearing

5    thereon;

6        2.        authorizing the Debtor to use cash collateral to pay the expenses set forth in the

7    Budget on an interim basis pending a final hearing;

8        3.        setting a final hearing on the Emergency Motion; and

9        4.        granting such other and further relief as the Court deems just and proper.

10    Dated: January 12, 2010                    CENTRAL METAL, INC., a California corporation

11

12                                        By:_____

13                                            MONICA Y. KIM
                                             JULIET Y. OH
14                                            LEVENE, NEALE, BENDER,
                                                 RANKIN & BRILL L.L.P.
15                                            Proposed Attorneys for Chapter 11
                                             Debtor and Debtor in Possession
16

17

18

19

20

21

22

23

24

25

26

27

28

7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### CASE BACKGROUND

**A.    Background.**

1.    On January 8, 2010 (the "Petition Date"), Central Metal, Inc., a California corporation, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a fully integrated scrap metal processing company that purchases, processes and sells ferrous and non-ferrous metals domestically and internationally. The Debtor is one of the largest processing companies on the West Coast, has one of the largest land sites and processing capacities, and is fully diversified in its business portfolio that entails dynamic trading relationships with renowned metal manufacturers around the world.

3.    The Debtor currently operates out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield.

4.    The Debtor was founded in 1993 by Jong Uk Byun, the sole shareholder and President of the Debtor.    Under Mr. Byun's management, the Debtor has experienced extraordinary growth, particularly in the last three years. In 2006, total sales volume was at approximately 50,000 tons. By 2008, total sales volume had increased to over 150,000 tons. Mr. Byun remains actively involved in the management of the Debtor. In 2009, the Debtor had annual gross sales totaling approximately $36.5 million.

**B.    Events Leading To The Filing Of The Debtor's Bankruptcy Case.**

5.    Over the years, the Debtor has obtained financing from Center Bank ("Center") on a secured basis to operate and expand its business. According to the Debtor's books and records,

1   Center asserts liens against substantially all of the Debtor's assets. As of the Petition Date, Center

2   was owed approximately $16.3 million.    In 2007, the Debtor also obtained loans from KEB LA

3   Financial Corp. ("KEB"). As of the Petition Date, KEB was owed approximately $900,000.

4       6.      In order to increase its processing capacity and produce the level of volume

5   necessary to meet the demand from its customers, the Debtor heavily invested in new equipment

6   beginning in late 2005 and through early 2008.    Since 2006, the Debtor has committed

7   approximately $25 million – through a combination of cash and financing from various equipment

8   lessors/lenders – to obtain new equipment and heavy duty trucks.

9       7.      Once installed in early 2008, the new equipment could not be operated at full

10   capacity until they were "broken in," approximately six months to one year later. As a result, the

11   Debtor was unable to produce the level of volume it had anticipated during the "break in" period

12   following the installation of the new equipment. Nevertheless, the Debtor was obligated to make

13   payments on the new equipment, and continued to do so throughout 2008 and through April 2009

14       8.      The price of steel peaked in the summer of 2008, at approximately $750 to $800 per

15   ton.    However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to

16   approximately $200 per ton.    This dramatic drop in steel prices was accompanied by a

17   corresponding decline in demand for steel, due at least in part to the overall decline in the economy

18   worldwide.

19       9.      The demand for steel and the price of steel plunged at the same time that the

20   Debtor's new equipment became fully functional.  At the same time, availability of scrap metal

21   decreased by at least 50%, requiring the Debtor to pay more for its supply. This increase in the

22   cost of its supply, along with the drop in steel prices and the drop in demand for steel, all of which

23   occurred virtually simultaneously, resulted in the Debtor's inability to generate the level of revenue

24   necessary to service all of its debts.

25       10.     As a result, beginning in approximately May 2009, the Debtor stopped making

26   payments to Center, and other creditors including its equipment lessors/lenders.  In November

27   2009, a number of the Debtor's equipment lessors/lenders filed complaints against the Debtor in

28

9

1  state court based upon the Debtor's nonpayment and default under their respective loans/capital
2  leases.

3     11.     Upon its default, the Debtor attempted to restructure its payment obligations to
4  Center.  The parties successfully negotiated and entered into a forbearance agreement, but the
5  Debtor was ultimately unable to perform on the terms of such agreement.  Notwithstanding this,
6  the parties continued to discuss the plight of the Debtor's situation.

7     12.     In October 2009, the Debtor submitted a restructuring proposal to Center.  In
8  response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its
9  financial advisors to review the Debtor's financial data and operations.  The Debtor did, in fact,
10 hire Focus in December 2009.  Members associated with Focus came on-site at the Debtor, and
11 received a tremendous amount of requested information, documents, data and reports.  The main
12 on-site personnel of Focus was Edmund C. King ("King").

13     13.     Without any advance notice or warning, on or about January 6, 2010, Center filed a
14 complaint against the Debtor, Mr. Byun, and other related defendants, and on the morning of
15 January 7, 2010 (before the complaint had been served), Center's counsel provided telephonic
16 notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for the appointment of a
17 receiver over the properties of all of the defendants, including the Debtor.  The Debtor filed its
18 Chapter 11 case on an emergency basis to avoid the possibility of a receiver being appointed over
19 its properties, and reorganize.

20     14.     As part of its *ex parte* application for the appointment of a receiver, Center filed
21 with the state court several declarations, including a declaration for King.  King states in his
22 declaration that:  (a) accounting records or details regarding cash payments totaling $17.8 million
23 were "lost" by the Debtor, (b) that the Debtor's accounting practices are "severely lacking and
24 unsophisticated" and (c) Byun wanted to give him a cash gift (which was not accepted).  Counsel
25 for Center has characterized this "gift" as an attempted bribe.  The Debtor vigorously disputes
26 such allegations.

27
28

10

1    15.    In the ordinary course of its business, the Debtor transacts much of its business

2    dealings in cash. Because a large amount of the Debtor's scrap metal comes from individual

3    "peddlers" who simply drive up to the Debtor's business locations in pick-up trucks with scrap

4    metal (which the Debtor then processes into usable steel) to sell, the Debtor pays for such metal

5    in cash. Cash transactions are expected and very commonplace for this business and industry

6    and if news spread around town that the Debtor pays for purchases with a check, then peddlers

7    would elect to go to a different scrap metal dealer in town. In short, the Debtor's access to scrap

8    that is essential to sales would be severely impaired if it is not allowed to continue to pay in cash

9    for scrap metal.

10    16.    The filing of a bankruptcy case presented the only viable way for the Debtor to

11    survive and restructure its financial affairs. The Debtor intends to aggressively pursue a financial

12    transaction, including a possible sale of some or substantially all of its assets, locate a financial

13    partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to develop and

14    pursue all of its options and strategies.

15    17.    The cash nature of the Debtor's business and the current state of the Debtor's books

16    and records have given rise to a variety of concerns by Center which need to be addressed in this

17    case. In addition, the Debtor is aware that being in Chapter 11, as well as transitioning into

18    Chapter 11 as a debtor in possession, are complex matters with extensive reporting and disclosure

19    requirements. Based on all of these factors, the Debtor has determined that it would be in the best

20    interests of its estate to employ financial advisors and a Chief Restructuring Officer ("CRO") in

21    this case. Towards that end, the Debtor has retained C.T. Moffitt & Company ("CTMC") as its

22    financial advisors and Charles T. Moffitt as CRO for the Debtor to oversee all aspects of the

23    Debtor's business operations and financial affairs. Concurrently herewith, the Debtor has filed an

24    application to employ CTMC as the Debtor's financial advisor and Mr. Moffitt as the Debtor's

25    CRO, effective as of the Debtor's chapter 11 filing date of January 8, 2010.

26

27

28

11

**C.    Secured Liabilities of the Debtor.**

18.    There are three creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon substantially all of the Debtor's assets as follows:

a.    Center Bank.  During the period from May 2006 to November 2007, the Debtor obtained a variety of loans from Center, including real estate loans, commercial term loans, commercial revolving line of credit, and other lines of credit.  The aggregate principal amount of these loans was approximately $16.9 million.   To secure these obligations, the Debtor granted to Center a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Center.  On May 26, 2006, Center recorded a financing statement with the California Secretary of State (file no. 20067071769689).  The outstanding balance is approximately $16.3 million as of this date. The Debtor has not made any payments to Center since May 2009.

b.    KEB LA Financial Corp.  Around November 2007, the Debtor obtained loans from KEB in the aggregate principal amount of approximately $900,000.   On October 11, 2007, KEB recorded a financing statement with the California Secretary of State (file no. 20077132387563).  The outstanding balance is approximately $900,000, as of this date.  The Debtor has not made any payments to Center since May 2009.

c.    Wilshire State Bank. ("Wilshire").  Around May 2008, the Debtor obtained loans from Wilshire for the purpose of purchasing three (3) heavy duty trucks.  While Wilshire was granted a purchase money security interest in these vehicles, it was not granted a blanket lien upon the Debtor's assets to secure the loans.  Nonetheless, on May 27, 2008, Wilshire recorded a financing statement with the California Secretary of State (file no. 20087159210902) asserting a lien upon substantially all of the Debtor's assets. The Debtor disputes the extent and scope of the lien asserted by Wilshire.

19.    Based on the foregoing, the Debtor believes that it is only Center and KEB which may have valid and enforceable liens on the Debtor's inventory and the proceeds therefrom.  In

1   addition to the foregoing, all other financing statements or liens asserted pertain to a lien against

2   equipment only and/or has been filed solely as a precautionary measure by an equipment lessor. A

3   complete lien search of the official records of the California Secretary of State's Office is attached

4   to the Declaration of Monica Y. Kim which is being filed concurrently herewith.

5 **D.**   **Assets of the Debtor.**

6         20.    The main assets of the Debtor are the Debtor's inventory of metals which are

7   located throughout the Debtor's business locations and which also vary greatly in type and

8   category, the Debtor's equipment, and the Debtor's real property. As set forth in the Declaration

9   of Suk Won "Tim" Byun (the "Byun Declaration") and exhibits attached thereto:

10         a.    As summarized in Exhibit "2" to the Byun Declaration annexed hereto, the

11       current value of the inventory, at cost, is approximately $1,806,942. The resale value of the

12       Debtor's inventory will obviously be higher.

13         b.    The Debtor owns at least four (4) parcels of real estate, which were

14       purchased for a total of $5,725,500 and which have a current aggregate assessed value of

15       approximately $10.9 million. Attached as Exhibit "3" to the Byun Declaration annexed

16       hereto are the property transaction detail reports for such properties obtained from

17       www.title365.com which provides, among other things, the current assessed value of each

18       property.

19         c.    As summarized in Exhibit "4" to the Byun Declaration annexed hereto, the

20       Debtor has equipment which has an aggregate current market value (after accounting for

21       depreciation and net of any remaining lease payments) of approximately $17 million.

22         21.    In total, the Debtor estimates that the aggregate current market value of just the

23   inventory, equipment and real property which serve as collateral for Center and KEB (collectively,

24   the "Secured Creditors") is at least $24 million.

25         22.    Additionally, all of the obligations of the Debtor to Center and KEB are personally

26   guarantied by Jong Uk Byun, the sole shareholder of the Debtor, who has significant personal

27

28

13

1   assets including a tremendous amount of real property which are estimated to have current market

2   value in excess of $10 million.

3   **E.      The Debtor's Need for Use of Cash Collateral.**

4           23.      In order for the Debtor to be able to stay in business until its reorganization goals

5   can be meaningfully assessed and achieved, the Debtor must be able to use its current cash to pay

6   the Debtor's post-petition operating expenses.  A copy of the Debtor's proposed operating budget

7   for the period from the week ending January 16, 2010 through the week ending to February 27,

8   2010 (the "Budget") is attached as Exhibit "1" to the Byun Declaration annexed hereto.

9           24.      Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash

10  collateral on an interim basis pending a final hearing.    The Budget attached to the Byun

11  Declaration reflects the ordinary operating expenses that the Debtor must pay in order to stay in

12  business and preserve the going concern value of its business.  The Debtor will use cash collateral

13  in accordance with the Budget, subject to a permitted deviance of up to 10% of the total expenses

14  for any week, with any unused portions to be carried over into the following week.  Needless to

15  say, the Debtor must be able to use its current cash to stay in business and to pay the Debtor's post-

16  petition operating expenses, including payroll, rent, utilities, etc.  The Budget does **not** include the

17  payment of any rents, or lease payments to equipment lessors/lenders.

18          25.      The real property upon which the Debtor runs its facilities is either owned by the

19  Debtor or by the Debtor's principal, Jong Uk Byun.  Center has already indicated to the Debtor that

20  it wishes to investigate payments received by Jong Uk Byun from proceeds of the Debtor's

21  business.  The Debtor estimates that a creditors' committee, if one is appointed, is likely to desire a

22  similar investigation.    Therefore, the Debtor believes that it would be prudent, especially in

23  conjunction with an interim request for use of cash collateral, to defer the payment of any post-

24  petition rents to Jong Uk Byun.

25          26.      The Debtor also believes that it would be prudent to defer making lease payments

26  to those parties contending to be equipment lessors during the interim cash collateral use period.

27  While the Debtor is undertaking further review, the initial impression of the Debtor is that many, if

28

14

1   not all, of the Debtor's lease agreements are, in fact, disguised financing arrangements and the

2   Debtor may be initiating declaratory relief actions shortly for judicial determination as to the true

3   nature of the contracts and transactions at issue.

4        27.    Without the ability to use cash collateral, the Debtor would be forced to shut down

5   its business, lose all going concern value, and would be unable to reorganize.  The Debtor has

6   prepared the Budget, with the goal of reflecting only those ordinary operating expenses which must

7   be paid to avoid irreparable harm to the Debtor's business.  In addition, with the employment of an

8   independent CRO and financial advisors, the Debtor is confident that it will comply with the

9   Budget during the period in which the Debtor is authorized to use cash collateral.  Therefore, the

10  Debtor submits that it should be authorized to use cash collateral in accordance with the provisions

11  of the Budget.

12                                            **II.**

13                                       **DISCUSSION**

14  **A.     The Debtor Must Be Authorized To Use Cash Collateral to Operate, Maintain and**

15  **Preserve its Business.**

16        The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy

17  Code.  Section 363(c)(l) provides in pertinent part:

18              If the business of the debtor is authorized to be operated under

19              section. . .1108. . . of this title and unless the court orders otherwise,

20              the trustee may enter into transactions, including the sale or lease of

21              property of the estate, in the ordinary course of business, without

22              notice or a hearing, and may use property of the estate in the ordinary

23              course of business without notice or a hearing.

24  11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with

25  respect to property of the estate, including the right to use property of the estate in compliance

26  with Section 363.  See 11 U.S.C. §1107(a).

27

28

                                            15

1    "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

2    securities, deposit accounts or other cash equivalents in which the estate and an entity other than

3    the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special

4    requirement with respect to "cash collateral," providing that the trustee or debtor in possession

5    may use "cash collateral" under subsection (c)(l) if:

6              (A)    each entity that has an interest in such cash collateral
               consents; or
7

8              (B)    the court, after notice and a hearing, authorizes such use, sale
                      or lease in accordance with the provisions of this section.
9

10   See 11 U. S.C. §363(c)(2)(A) and (B).

11         It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

12   purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-

13   Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614

14   (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely

15   important that the access to cash collateral be allowed in order to facilitate the goal of

16   reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

17   collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr

18   D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

19         The only source of money available to the Debtor to use to operate its business is the

20   Debtor's current cash on hand and its daily sales revenue. As a result, the Debtor has no ability

21   to continue to operate its business and maintain the going concern value of the Debtor's business

22   unless the Debtor has immediate access to and use of its cash collateral to pay the Debtor's

23   ordinary operating expenses, including, but not limited to, additional purchases of scrap metal,

24   utilities, payroll, etc. The expenses the Debtor must be able to pay during the period from the

25   week ending January 16, 2010 through the week ending February 27, 2010 are set forth in the

26   Budget. The Debtor's inability to pay those expenses would cause immediate and irreparable

27   harm to the Debtor and its business. The inability of the Debtor to use its cash collateral would

28

16

1    result in the immediate shut down of the Debtor's business, loss of the going concern value of
2    the Debtor's business and assets, and terminate the estate's opportunity to reorganize.

3    **B.    The Secured Creditors are Adequately Protected by an Adequate Equity Cushion,**
4         **the Debtor's Continued Use Of Cash Collateral, Personal Guaranty and**
5         **Replacement Liens.**

6         To the extent that an entity has a valid security interest in the revenues generated by
7    property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy
8    Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured
9    creditor's cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d
10   1396, 1400 (9th Cir. 1984). See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In
11   re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988) ("McCombs").

12        Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood
13   Forest Associates, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property
14   interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the
15   Bankruptcy Code is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630.
16   See also McCombs, Id., at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the
17   secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the
18   collateral." McCombs, Id., at 266. Therefore, the law is clear that only the secured portions of
19   the Secured Creditors' claims are entitled to be adequately protected, AND, pursuant to Section
20   506(a)(1) of the Bankruptcy Code, any undersecured creditor is not entitled to any post-petition
21   interest, fees, costs, or the like on its claim.

22        The principle of adequate protection reconciles the competing interests of the debtor, who
23   needs time to reorganize free from harassing creditors, and the secured creditor, which is entitled
24   to constitutional protection for its bargained-for property interest. See, H.R. Rep. No. 95-595,
25   95th Cong., 1st Sess. (1977), 1978 U.S. Code Cong. & Admin. News, p. 5787. In re Jug End In
26   The Berkshires, Inc., 46 B.R. 892 (Bankr.D.Mass.1985). In In re Planned Systems, Inc., 78 B.R.
27   852, 862 (Bankr. S.D. Ohio 1987), the Court noted that it is proof of a post-petition decline in the
28

17

1  value of the equipment as opposed to a mere lack of equity in the equipment, which would

2  support a finding of lack of adequate protection.  It further noted that the existence or non-

3  existence of equity should not be the *sine qua non* for adequate protection.  As the court in In re

4  Smithfield Estates, Inc., 48 B.R. 910 (Bankr. D. R.I. 1985), observed:

5      "The weight of authority and in our view the better reasoned opinions,

6      hold that adequate protection relates to maintaining the status-quo

7      during the period after the filing of the petition and before

8      confirmation or rejection of the plan.  The secured creditor is entitled

9      to protection against any depreciation or diminution in the value of

10      the collateral as it existed and was available to satisfy the debt on the

11      date of the filing of the petition in bankruptcy."

12      Thus, while an equity cushion is generally considered *prima facie* evidence of adequate

13  protection, the absence of an equity cushion does not establish the converse, *i.e.*, that, as a matter

14  of law, the creditor is not adequately protected.  An (under)secured creditor's position is not

15  worse immediately after the bankruptcy filing than it was just prior thereto, and the provisions

16  for adequate protection may only protect the secured creditor from any impairment in the value

17  of its interest.    The concept of adequate protection was not designed or intended to place an

18  undersecured or minimally secured creditor in a better post-filing position than it was in before

19  the imposition of the automatic stay.  Additionally, in determining adequate protection, other

20  courts have determined that a debtor's continued business operations can constitute the adequate

21  protection of a secured creditor.  See, Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713

22  (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr.

23  D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen

24  Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

25      Here, and as discussed above, the Debtor believes that, based just on the current values of

26  its inventory, equipment, and real property, the Secured Creditors are oversecured and protected

27  by a significant equity cushion.

28

18

1    But, even if an equity cushion did not exist, the law is also clear that the preservation of
2    the value of a secured creditor's lien is sufficient to provide adequate protection to a secured
3    creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex
4    1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In Stein, the Court found that
5    as a general rule, a debtor may use cash collateral where such use would enhance or preserve the
6    value of the collateral, and allowed the debtor therein to use cash collateral even though the
7    secured party had no equity cushion for protection. The Stein Court determined that the use of
8    cash collateral was necessary to the continued operations of the debtor, and that the creditor's
9    secured position could only be enhanced by the continued operation of the debtor's business.
10   See also In re McCombs, supra, where the court determined that the debtor's use of cash
11   collateral for needed repairs, renovations and operating expenses eliminated the risk of
12   diminution in the creditor's interest in the cash collateral and such use would more likely
13   increase cash collateral. Therefore, the Secured Creditors will be further adequately protected by
14   the continued operation of the Debtor's business.

15   In a similar situation, the Court in the Matter of Pursuit Athletic Footwear, Inc., 193 B.R.
16   713 (Bankr. D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting
17   the debtor's argument that no additional adequate protection payments need be made:

18          if there is no actual diminution in the value of [the] collateral through the
19          date of the hearing, and [Debtor] can operate profitably post-petition,
20          [creditor] is adequately protected for the use of its cash collateral. 11
21          U.S.C. Section 361; In re Newark Airport/Hotel Ltd. Partnership, 156 B.R.
22          444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr.
23          D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D.
24          Fla. 1994).

25   Additionally, in determining adequate protection, Courts have stressed the importance of
26   promoting a debtor's reorganization. In In re O'Connor, supra, the Tenth Circuit stated:

27          "In this case, Debtors, in the midst of a Chapter ll proceeding, have

28

19

1  proposed to deal with cash collateral for the purpose of enhancing

2  the prospects of reorganization.  This quest is the ultimate goal of

3  Chapter 11.  Hence, the Debtor's efforts are not only to be

4  encouraged, but also their efforts during the administration of the

5  proceeding are to be measured in light of that quest.  Because the

6  ultimate benefit to be achieved by a successful reorganization

7  inures to all the creditors of the estate, a fair opportunity must be

8  given to the Debtors to achieve that end.  Thus, while interests of

9  the secured creditor whose property rights are of concern to the

10  court, the interests of all other creditors also have bearing upon the

11  question of whether use of cash collateral shall be permitted during

12  the early stages of administration."

13  808 F.2d at 1937.

14  Here, even if an equity cushion did not exist (which it does), the continuing operations of

15  the Debtor's business which maintains, if not increases, the value of the Secured Creditors'

16  collateral protects the Secured Creditors from any diminution in the value of their collateral that

17  is caused by the Debtor's use of cash collateral during this case.  As additional adequate

18  protection, the Secured Creditors will also have replacement liens against the Debtor's assets,

19  with such replacement lien to have the same extent, validity, and priority as the pre-petition lien

20  held by such creditor.    Finally, the existing personal guaranty by Jong Uk Byun, who

21  individually and personally holds significant assets including real property assets, will provide

22  further adequate protection.  See In re Swedeland Development Group, Inc., 16 F.3d 552, 564,

23  n.14 (3d Cir. 1994) ["Obviously we are not suggesting that in all cases a third-party guaranty

24  would be sufficient.  The sufficiency of the guaranty would depend, inter alia, on the financial

25  strength of the guarantor."].

20

1    **C.    The Procedural Requirements Regarding Approval of the Emergency Motion Have**
2         **Been Satisfied.**

3         Bankruptcy Rule 4001(b) sets forth procedural requirements for obtaining use of cash
4    collateral.  There are three general procedural requirements.  First, the Emergency Motion must
5    contain a copy of the proposed form of order, which has been done by attaching the proposed
6    order as Exhibit "5" to the annexed Byun Declaration.  Second, the Emergency Motion must
7    provide a concise statement of the relief requested, which was done above.    Third, the
8    Emergency Motion is required to be served on any entity with an interest in the Debtor's cash
9    collateral, any committee appointed or the twenty largest unsecured creditors if there is no
10   committee, and on such other parties as the Court directs.  No committee has been appointed in
11   the Debtor's case to date.  However, the Debtor has served a copy of the Emergency Motion and
12   all supportive papers upon the Office of the United States Trustee, all secured creditors and their
13   counsel (if known), and parties requesting special notice via overnight mail.  The foregoing
14   parties will receive delivery of the Emergency Motion and all supportive papers by not later than
15   the morning of Wednesday, January 13, 2010.  Accordingly, the Emergency Motion complies
16   with the requirements of Bankruptcy Rule 4001(b).

                                                    **III.**

                                               **CONCLUSION**

19        Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an
20   order:

21        1.    granting the Emergency Motion on an interim basis pending a final hearing
22   thereon;

23        2.    authorizing the Debtor to use cash collateral to pay the expenses set forth in the
24   Budget on an interim basis pending a final hearing;

25        3.    setting a final hearing on the Emergency Motion; and

26   ///

27   ///

28

                                                    21

1        4.    granting such other and further relief as the Court deems just and proper.

2    Dated: January 12, 2010                CENTRAL METAL, INC., a California corporation

3

4                                   By:

5                                     MONICA Y. KIM
                               JULIET Y. OH
6                                   LEVENE, NEALE, BENDER,
                                  RANKIN & BRILL L.L.P.
7                                   Proposed Attorneys for Chapter 11
                               Debtor and Debtor in Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SUK WON BYUN

I, Suk Won "Tim" Byun, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am the General Manager of Central Metal, Inc., a California corporation (the "Debtor"), debtor and debtor in possession herein, and, as such, am familiar with the business operations and financial affairs of the Debtor. I have access to the Debtor's books and records and, to the extent necessary to complete this declaration, I have reviewed such books and records.

3.    I make this declaration in support of the Debtor's emergency motion (the "Emergency Motion") for entry of an interim order authorizing the Debtor to use cash collateral on an emergency interim basis, pending a final hearing, in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "1" hereto. I have reviewed the Emergency Motion and agree with the factual assertions contained therein.

4.    The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 8, 2010 (the "Petition Date").

5.    The Debtor is a fully integrated scrap metal processing company that purchases, processes and sells ferrous and non-ferrous metals domestically and internationally. To the best of my knowledge, the Debtor is one of the largest processing companies on the West Coast, has one of the largest land sites and processing capacities, and is fully diversified in its business portfolio that entails dynamic trading relationships with renowned metal manufacturers around the world.

6.    The Debtor currently operates out of five (5) active facilities throughout Southern California – two facilities in the Los Angeles County area, one facility in Hinkley, one facility in San Bernardino, and one facility in Bakersfield.

7.    It is my understanding and belief that the Debtor was founded in 1993 by Jong Uk Byun, the sole shareholder and President of the Debtor. In 2006, the Debtor's total sales volume

1    was at approximately 50,000 tons. By 2008, the Debtor's total sales volume had increased to

2    over 150,000 tons. Mr. Byun remains actively involved in the management of the Debtor   In

3    2009, the Debtor had annual gross sales totaling approximately $36.5 million.

4        8.      Based on my review of the Debtor's books and records, it is my understanding

5    and belief that, over the years, the Debtor has obtained financing from Center Bank ("Center")

6    on a secured basis to operate and expand its business. According to the Debtor's books and

7    records, Center and an entity called KEB LA Financial Corp. ("KEB") may have liens against

8    substantially all of the Debtor's assets. As of the Petition Date, Center was owed approximately

9    $16.3 million and KEB was owed approximately $900,000 by the Debtor.

10       9.      It is my understanding and belief that Wilshire State Bank ("Wilshire") recorded a

11   financing statement against the Debtor with the California Secretary of State indicating that it

12   asserts a security interest and lien upon substantially all of the Debtor's assets. However, the

13   Debtor's books and records reflect that Wilshire provided the Debtor with purchase money

14   financing with respect to the purchase of three (3) heavy-duty trucks. Therefore, the Debtor

15   contends that the security interest and lien of Wilshire applies only against these trucks, and not

16   against any other assets of the estate.

17       10.     In order to increase its processing capacity and produce the level of volume

18   necessary to meet the demand from its customers, the Debtor heavily invested in new equipment

19   beginning in late 2005 and through early 2008. Based on my review of the Debtor's books and

20   records, since 2006, the Debtor has committed approximately $25 million – through a

21   combination of cash and financing from various equipment lessors/lenders – to obtain new

22   equipment and heavy duty trucks.

23       11.     Once installed in early 2008, the new equipment could not be operated at full

24   capacity until they were "broken in," approximately six months to one year later. As a result, the

25   Debtor was unable to produce the level of volume it had anticipated during the "break in" period

26   following the installation of the new equipment. Nevertheless, the Debtor was obligated to make

27

28

24

1  payments on the new equipment, and continued to do so throughout 2008 and through April
2  2009.

3      12.    The price of steel peaked in the summer of 2008, at approximately $750 to $800
4  per ton.  However, shortly thereafter, in late 2008 and early 2009, the price of steel plunged to
5  approximately $200 per ton.   This dramatic drop in steel prices was accompanied by a
6  corresponding decline in demand for steel.

7      13.    The demand for steel and the price of steel plunged at the same time that the
8  Debtor's new equipment became fully functional.  At the same time, availability of scrap metal
9  decreased by at least 50%, requiring the Debtor to pay more for its supply.  I believe that this
10  increase in the cost of its supply, along with the drop in steel prices and the drop in demand for
11  steel, all of which occurred virtually simultaneously, resulted in the Debtor's inability to generate
12  the level of revenue necessary to service all of its debts.

13      14.    As a result, beginning in approximately May 2009, the Debtor stopped making
14  payments to Center, Wilshire and its equipment lessors/lenders.  It is my understanding and
15  belief that, in November 2009, a number of the Debtor's equipment lessors/lenders filed
16  complaints against the Debtor in state court based upon the Debtor's nonpayment and default
17  under their respective loans/capital leases.

18      15.    Upon its default, the Debtor attempted to restructure its payment obligations to
19  Center.  The parties successfully negotiated and entered into a forbearance agreement, but the
20  Debtor was ultimately unable to perform on the terms of such agreement.  Notwithstanding this,
21  the parties continued to discuss the plight of the Debtor's situation.

22      16.    In October 2009, the Debtor submitted a restructuring proposal to Center.  In
23  response, Center instructed the Debtor to engage Focus Management Group ("Focus") as its
24  financial advisors to review the Debtor's financial data and operations.  The Debtor did, in fact,
25  hire Focus in December 2009.  Members associated with Focus came on-site at the Debtor, and
26  were provided with a tremendous amount of requested information, documents, data and reports.
27  The main on-site personnel of Focus was Edmund C. King ("King").

28

25

17.     Without any advance notice or warning, on or about January 6, 2010, Center filed a complaint against the Debtor, Mr. Byun, and other related defendants. It is my understanding that, on the morning of January 7, 2010 (before the complaint had been served), Center's counsel provided telephonic notice of an *ex parte* hearing scheduled for 8:30 a.m. on January 8, 2010 for the appointment of a receiver over the properties of all of the defendants, including the Debtor. The Debtor filed its Chapter 11 case on an emergency basis to avoid the possibility of a receiver being appointed over its properties, and reorganize.

18.     I believe that the filing of a bankruptcy case presented the only viable way for the Debtor to survive and restructure its financial affairs. The Debtor intends to aggressively pursue a financial transaction, including a possible sale of some or substantially all of its assets, locate a financial partner, or pursue a plan of reorganization. Needless to say, the Debtor needs time to develop and pursue all of its options and strategies.

19.     The cash nature of the Debtor's business and the current state of the Debtor's books and records have given rise to a variety of concerns by Center which I believe need to be addressed in this case. In addition, the Debtor and its management are aware that being in Chapter 11, as well as transitioning into Chapter 11 as a debtor in possession, are complex matters with extensive reporting and disclosure requirements. Based on all of these factors, the Debtor has determined that it would be in the best interests of its estate to employ financial advisors and a Chief Restructuring Officer ("CRO") in its case. Towards that end, the Debtor has retained C.T. Moffitt & Company ("CTMC") as its financial advisors and Charles T. Moffitt as CRO for the Debtor to oversee all aspects of the Debtor's business operations and financial affairs. Concurrently herewith, the Debtor has filed an application to employ CTMC as the Debtor's financial advisor and Mr. Moffitt as the Debtor's CRO, effective as of the Debtor's chapter 11 filing date of January 8, 2010.

20.     It is my understanding and belief that there are three creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon substantially all of the Debtor's assets as follows:

1        a.      <u>Center Bank</u>. During the period from May 2006 to November 2007, the

2 Debtor obtained a variety of loans from Center, including real estate loans, commercial

3 term loans, commercial revolving line of credit, and other lines of credit. The aggregate

4 principal amount of these loans was approximately $16.9 million. To secure these

5 obligations, the Debtor granted to Center a lien and security interest upon substantially all

6 of the Debtor's assets as collateral for the Debtor's obligations to Center. Based on my

7 review of the Debtor's books and records, the outstanding balance is approximately $16.3

8 million as of this date. The Debtor has not made any payments to Center since May 2009.

9        b.      <u>KEB LA Financial Corp.</u> Around November 2007, the Debtor obtained

10 loans from KEB in the aggregate principal amount of approximately $900,000. Based on

11 my review of the Debtor's books and records, the outstanding balance is approximately

12 $900,000, as of this date. The Debtor has not made any payments to Center since May

13 2009.

14        c.      <u>Wilshire State Bank. ("Wilshire")</u>. Around May 2008, the Debtor obtained

15 loans from Wilshire for the purpose of purchasing three (3) heavy duty trucks. While

16 Wilshire was granted a purchase money security interest in these vehicles, it was not

17 granted a blanket lien upon the Debtor's assets to secure the loans.

18      21.      Based on the Debtor's books and records, I believe that it is only Center and KEB

19 which may have valid and enforceable liens on the Debtor's inventory and the proceeds

20 therefrom.

21      22.      Based on the Debtor's books and records, the main assets of the Debtor are the

22 Debtor's inventory of metals which are located throughout the Debtor's business locations and

23 which also vary greatly in type and category, the Debtor's equipment, and the Debtor's real

24 property.

25        a.      As summarized in Exhibit "2" annexed hereto, the current value of the

26 inventory, <u>at cost</u>, is approximately $1,806,942. I believe that the resale value of the

27 Debtor's inventory will be higher.

28

1      b.      The Debtor owns at least four (4) parcels of real estate, which were

2   purchased for a total of $5,725,500 and which have a current aggregate assessed value of

3   approximately $10.9 million.  Attached as Exhibit "3" hereto are the property transaction

4   detail reports for such properties obtained from www.title365.com, which provides, among

5   other things, the current assessed value of each property.

6      c.      As summarized in Exhibit "4" hereto, the Debtor has equipment which has

7   an aggregate current market value (after accounting for depreciation and net of any

8   remaining lease payments) of approximately $17 million.

9      23.      In total, I estimate that the aggregate current market value of the Debtor's

10   inventory, equipment and real property, which I understand and belief serve as collateral for

11   Center and KEB (collectively, the "Secured Creditors"), is at least $24 million.

12      24.      Additionally, it is my understanding and belief that all of the obligations of the

13   Debtor to Center and KEB are personally guarantied by Jong Uk Byun, the sole shareholder of

14   the Debtor, who has significant personal assets including a tremendous amount of real property

15   which I am advised are estimated to have current market value in excess of $10 million.

16      25.      In order for the Debtor to be able to stay in business until its reorganization goals

17   can be meaningfully assessed and achieved, I believe that the Debtor must be able to use its

18   current cash to pay the Debtor's post-petition operating expenses.  A copy of the Debtor's

19   proposed operating budget for the period from the week ending January 16, 2010 through the

20   week ending to February 27, 2010 (the "Budget") is attached as Exhibit "1" hereto.

21      26.      I believe that the Budget attached hereto as Exhibit "1" reflects only those

22   ordinary operating expenses that the Debtor must pay in order to stay in business and preserve

23   the going concern value of its business.

24   ///

25   ///

26   ///

27   ///

28

28

1       27.    The Debtor seeks authority to use cash collateral on an emergency interim basis in

2   accordance with the Budget, subject to a permitted deviance of up to 10% of the total expenses

3   for any week, with any unused portions to be carried over into the following week. I believe that

4   the Debtor must be able to use its current cash to stay in business and to pay the Debtor's post-

5   petition operating expenses, including payroll, rent, utilities, etc. Without the ability to use cash

6   collateral, I believe the Debtor would be forced to shut down its business, lose all going concern

7   value, and would be unable to reorganize.

8       28.    The Budget does **not** include the payment of any rents, or lease payments to

9   equipment lessors/lenders.

10      29.    To the best of my knowledge, the real property upon which the Debtor runs its

11  facilities is either owned by the Debtor or by the Debtor's principal, Jong Uk Byun.

12      30.    I believe that it would be prudent for the Debtor to defer making lease payments

13  to those parties contending to be equipment lessors during the interim cash collateral use period.

14  While the Debtor is undertaking further review, the initial impression of the Debtor is that many,

15  if not all, of the Debtor's lease agreements are, in fact, disguised financing arrangements and the

16  Debtor may be initiating declaratory relief actions shortly for judicial determination as to the true

17  nature of the contracts and transactions at issue.

18      I declare under penalty of perjury that the foregoing is true and correct.

19      Executed this 12th day of January 2010, at Huntington Park, California.

20

21                           Suk Won "Tun" Byun, Declarant

22

23

24

25

26

27

28

29

# EXHIBIT 1

# CENTRAL METAL, INC.

### CASH FLOW PROJECTION AND PROJECTED CURRENT ASSETS

### INDEX

| | |
|---|---|
| Cash Flow Projection | 2 |
| Projected Current Assets | 3 |
| Statement of Projected Income | 4 |
| Scrap Metal Sale Projection | 5 |

1

## CASH FLOW PROJECTION
### Central Metal, Inc.

| Week Ending | 01/16/10 | 01/23/10 | 01/30/10 | 02/06/10 | 02/13/10 | 02/20/10 | 02/27/10 |
|---|---|---|---|---|---|---|---|
| **CASH-Beginning** | **24,542** | **465,420** | **426,074** | **302,100** | **250,755** | **329,790** | **496,644** |
| CASH RECEIPTS | | | | | | | |
| Ferrous Sales | 414,220 | 455,800 | 455,800 | 455,800 | 616,180 | 634,000 | 634,000 |
| Nonferrous Sales | 180,000 | 230,000 | 300,000 | 200,000 | 250,000 | 300,000 | 250,000 |
| Total Cash Receipts | 594,220 | 685,800 | 755,800 | 655,800 | 866,180 | 934,000 | 884,000 |
| CASH DISBURSEMENTS | | | | | | | |
| Direct Costs; | | | | | | | |
| Scrap Metal Purchases; | | | | | | | |
| Ferrous | 0 | 401,250 | 401,250 | 401,250 | 401,250 | 401,250 | 401,250 |
| Non-Ferrous | 0 | 138,000 | 180,000 | 120,000 | 150,000 | 180,000 | 150,000 |
| Yard Labor | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 |
| Contracted Labors | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| Freight-in | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Equipment Mainenace | 11,412 | 12,680 | 12,680 | 12,680 | 12,680 | 12,680 | 12,680 |
| Payroll Taxes | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 |
| Workers' Compensation | | | 23,349 | | | | 31,132 |
| Operating Expenses; | | | | | | | |
| Auto | 0 | 0 | 8,550 | 0 | 0 | 0 | 11,400 |
| Bank Charges | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Freight-out | 0 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 |
| Insurance | 0 | 0 | 14,850 | 0 | 0 | 0 | 19,800 |
| Laundry & Uniform | 0 | 0 | 1,755 | 0 | 0 | 0 | 2,340 |
| Miscellaneous | 0 | 1,285 | 1,285 | 1,285 | 1,285 | 1,285 | 1,285 |
| Office-Korea | 0 | 0 | 6,000 | 0 | 0 | 0 | 8,000 |
| Repairs and Maintenance | 0 | 0 | 9,150 | 0 | 0 | 0 | 12,200 |
| Salaries-Officer | | | | | | | |
| Salaries-General | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 |
| Payroll Taxes | 274 | 274 | 274 | 274 | 274 | 274 | 274 |
| Pier Pass | 0 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Professional Fees-CT Moffitt | 25,000 | 0 | 0 | 0 | 50,000 | 0 | 0 |
| Other Taxes and Licenses | 0 | 0 | 7,140 | 0 | 0 | 0 | 9,520 |
| Telephone | 0 | 0 | 3,045 | 0 | 0 | 0 | 4,060 |
| Trash Removal | 0 | 0 | 3,615 | 0 | 0 | 0 | 4,820 |
| Utilities | 46,000 | 0 | 35,175 | 0 | 0 | 0 | 46,900 |
| Total Disbursements | 153,342 | 725,145 | 879,774 | 707,145 | 787,145 | 767,145 | 887,317 |
| **CASH-Ending** | **465,420** | **426,074** | **302,100** | **250,755** | **329,790** | **496,644** | **493,327** |

2

**PROJECTED   CURRENT ASSETS**
**Central Metal, Inc.**

| Week Ending | 01/16/10 | 01/23/10 | 01/30/10 | 02/06/10 | 02/13/10 | 02/20/10 | 02/27/10 |
|---|---|---|---|---|---|---|---|
| Cash in Bank | 465,420 | 426,074 | 302,100 | 250,755 | 329,790 | 496,644 | 493,327 |
| Accounts Receivable | | | | | | | |
| Ferrous Receivable | 171,180 | 342,360 | 513,540 | 760,800 | 760,800 | 760,800 | 760,800 |
| Inventory | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 |
| Total Current Assets | 1,865,350 | 1,997,184 | 2,044,390 | 2,240,305 | 2,319,340 | 2,486,194 | 2,482,877 |

**Details of Accounts Receivable Collection**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ferrous Local Sales-COD | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Ferrous Export -70% of The Wk | 374,220 | 415,800 | 415,800 | 415,800 | 415,800 | 415,800 | 415,800 |
| Ferrous Export -30% of 4 Wk term | 0 | 0 | 0 | 0 | 160,380 | 178,200 | 178,200 |
| Total A/R Collection | 414,220 | 455,800 | 455,800 | 455,800 | 616,180 | 634,000 | 634,000 |

3

## STATEMENT OF PROJECTED INCOME
### Central Metal, Inc.
#### (Accrual Basis)

| Week Ending | 01/16/10 | 01/23/10 | 01/30/10 | 02/06/10 | 02/13/10 | 02/20/10 | 02/27/10 |
|---|---|---|---|---|---|---|---|
| **SALES:** | | | | | | | |
| Ferrous Scrap Metal | 570,600 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 |
| Nonferrous Scrap Metal | 180,000 | 230,000 | 300,000 | 200,000 | 250,000 | 300,000 | 250,000 |
| **Total Sales** | 750,600 | 864,000 | 934,000 | 834,000 | 884,000 | 934,000 | 884,000 |
| **COST OF GOODS SOLD** | | | | | | | |
| **Inventory-Beginning** | 1,750,000 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 |
| Scrap Metal Purchases | | | | | | | |
| Ferrous Scrap Metal | 0 | 401,250 | 401,250 | 401,250 | 401,250 | 401,250 | 401,250 |
| Non-Ferrous Scrap Metal | 0 | 138,000 | 180,000 | 120,000 | 150,000 | 180,000 | 150,000 |
| Yard Labor | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 | 38,914 |
| Contracted Labors | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| Freight-In | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Equipment Maintenance | 11,412 | 12,680 | 12,680 | 12,680 | 12,680 | 12,680 | 12,680 |
| Payroll Taxes | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 | 3,502 |
| Workers' Insurance | 7,783 | 7,783 | 7,783 | 7,783 | 7,783 | 7,783 | 7,783 |
| **Total Goods Available** | 1,836,111 | 1,855,379 | 1,897,379 | 1,837,379 | 1,867,379 | 1,897,379 | 1,867,379 |
| **Inventory-Ending** | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 | 1,228,750 |
| **Total Cost of Goods Sold** | 607,361 | 626,629 | 668,629 | 608,629 | 638,629 | 668,629 | 638,629 |
| **GROSS PROFIT** | 143,239 | 237,371 | 265,371 | 225,371 | 245,371 | 265,371 | 245,371 |
| **OPERATING EXPENSES** | | | | | | | |
| Auto | 2,850 | 2,850 | 2,850 | 2,850 | 2,850 | 2,850 | 2,850 |
| Bank Charges | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Freight-out | 89,100 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 |
| Insurance | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 |
| Laundry & Uniform | 585 | 585 | 585 | 585 | 585 | 585 | 585 |
| Miscellaneous | 1,285 | 1,285 | 1,285 | 1,285 | 1,285 | 1,285 | 1,285 |
| Office-Korea | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Repairs and Maintenance | 3,050 | 3,050 | 3,050 | 3,050 | 3,050 | 3,050 | 3,050 |
| Salaries-Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Salaries-General | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 | 3,040 |
| Payroll Taxes | 274 | 274 | 274 | 274 | 274 | 274 | 274 |
| Pier Pass | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Professional Fees-CT Moffitt | 25,000 | 30,000 | 30,000 | 30,000 | 20,000 | 20,000 | 20,000 |
| Other Taxes and Licenses | 2,380 | 2,380 | 2,380 | 2,380 | 2,380 | 2,380 | 2,380 |
| Telephone | 1,015 | 1,015 | 1,015 | 1,015 | 1,015 | 1,015 | 1,015 |
| Trash Removal | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 |
| Utilities | 11,725 | 11,725 | 11,725 | 11,725 | 11,725 | 11,725 | 11,725 |
| **Total Operating Expenses** | 151,159 | 166,059 | 166,059 | 166,059 | 156,059 | 156,059 | 156,059 |
| Operating Income Before | | | | | | | |
| Debt Services & Depreciatic | -7,920 | 71,312 | 99,312 | 59,312 | 89,312 | 109,312 | 89,312 |

4

## SCRAP METAL  SALE PROJECTION
### Central Metal, Inc.

| Week Ending | 01/16/10 | 01/23/10 | 01/30/10 | 02/06/10 | 02/13/10 | 02/20/10 | 02/27/10 |
|---|---|---|---|---|---|---|---|
| **FERROUS SALES** | 570,600 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 |
| **NONFERROUS SALES** | 180,000 | 230,000 | 300,000 | 200,000 | 250,000 | 300,000 | 250,000 |
| **TOTAL SCRAP METAL SALES** | 750,600 | 864,000 | 934,000 | 834,000 | 884,000 | 934,000 | 884,000 |

### Details of Ferrous Sales

#### Export Sale

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ferrous Tonnage/week/Hyundai | 1,485 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 |
| Unit Price/Ton | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| | 445,500 | 495,000 | 495,000 | 495,000 | 495,000 | 495,000 | 495,000 |

#### Domestic Sale

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ferrous Tonnage/week/Local | 180 | 200 | 200 | 200 | 200 | 200 | 200 |
| Unit Price/Ton | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Ferrous Sales | 481,500 | 535,000 | 535,000 | 535,000 | 535,000 | 535,000 | 535,000 |
| Freight charges/Hyundai | 89,100 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 | 99,000 |
| Total Ferrous Sales | 570,600 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 | 634,000 |

# EXHIBIT 2

**Central Metal Inc.**
**Inventory List**

|  |  |  |  |  |
|---|---|---:|---:|---:|
| **Breakage Group** | Reg. Breakage | 160,000 | $ 0.10 | $ 16,000.00 |
|  | Transformer (Cop Core) | 48,000 | $ 0.20 | $ 9,600.00 |
|  | Transformer (Al Core) | 14,000 | $ 0.10 | $ 1,400.00 |
|  | Water Pump | 110,000 | $ 0.12 | $ 13,200.00 |
|  | Transmission | 30,000 | $ 0.12 | $ 3,600.00 |
|  | SM Motors A/C | 30,000 | $ 0.15 | $ 4,500.00 |
|  | Large Motors D/C | 90,000 | $ 0.15 | $ 13,500.00 |
|  | Motor Blocks W/Al. | 0 |  | $ - |
|  | Light Ballast | 23,000 | $ 0.10 | $ 2,300.00 |
|  | Sealed Units | 90,000 | $ 0.12 | $ 10,800.00 |
|  | TV Cables | 15,000 | $ 0.12 | $ 1,800.00 |
|  | Amateur Transformer | 70,000 | $ 0.30 | $ 21,000.00 |
|  |  | 0 |  | $ - |
| **Misc. Group** | Lead | 700 | $ 0.08 | $ 56.00 |
|  | Heavy Lead Copper Cable | 2,000 | $ 0.20 | $ 400.00 |
|  | Die Cast | 3,800 | $ 0.12 | $ 456.00 |
|  |  | 0 |  | $ - |

## Total Non Ferrous Amount    1,386,050  $  0.38  $      520,192.00

| Group | Materials | Prep. Wt (GT) | Purchase Price | Amount |
|---|---|---:|---:|---:|
| **Steel Group** | Cast Fe-Drums & rotors | 600.00 | $ 220.00 | $ 132,000.00 |
|  | # 1 HMS | 1,500.00 | $ 210.00 | $ 315,000.00 |
|  | # 2 HMS | 1,500.00 | $ 190.00 | $ 285,000.00 |
|  | TIN | 600.00 | $ 170.00 | $ 102,000.00 |
|  | Appliances | 485.00 | $ 150.00 | $ 72,750.00 |
|  | Car Bodies | 1,000.00 | $ 160.00 | $ 160,000.00 |
|  | Plate & Struct | 1,000.00 | $ 220.00 | $ 220,000.00 |

## Total Steel Amount    6,685.00  $  192.48  $    1,286,750.00

## Central Metal Inventory Total Amount    $   1,806,942.00

# EXHIBIT 3

| Property Address / Description | Parcel ID Nos. | Ownership | Purchase Price | Assessment Value |
|---|---|---|---|---|
| 1746 E. 22nd Street, Vernon, CA 90058 | 5167-015-045 | CMI | $325,000 | $338,130 |
| San Antonio RO | 6202-036-010<br>6202-036-011 | CMI | $650,500 | $703,579 |
| 8150 Marbrisa Avenue, Huntington Park, CA 90255 | 6202-038-032<br>6202-038-033<br>6202-038-034<br>6202-038-035 | CMI | $1,150,000 | $1,244,794 |
| 220 Industrial Street, Bakersfield, CA 93307 | 140-380-01<br>140-390-05 | CMI | $3,600,000 | $8,647,165 |
| | | | $5,725,500 | $10,933,668 |



## PROPERTY DETAIL

1746 E 22Nd St, Vernon, CA 90058

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Industrial) | Year Built: | - |
| Rooms: | - | Parcel #: | 5167-015-045 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | LAM2 |
| SqFt (Structure): | - | Tract: | 060372270.103010 |
| SqFt (Lot): | 5097 | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, #1630-620, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | ELDER PLACE LOT 103 | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 3/14/2007 | Lender: | - |
| Document #: | 07-0566037 | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $4,191 |
| Value (Land): | $338,130 | Tax Area: | 6-658 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $338,130 | | |

Data is deemed reliable, but not guaranteed.

**PROPERTY HISTORY**
1746 E 22Nd St, Vernon, CA 90058

### TRANSACTION 1: SALE

| | | | |
|---|---|---|---|
| Sale Date: | · | Sale Price: | · |
| Sale Type: | · | Sale Price Type: | - |
| Recording Date: | 3/14/2007 | Document Number: | 07-0566037 |
| Title Company: | · | Document Type: | Grant Deed |
| Seller: | · | | |
| Buyer: | CENTRAL METAL INC, | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | · | Loan Type: | · |
| Lender: | · | Loan Term: | · |
| Loan Amount: | · | Interest Rate: | · |

### TRANSACTION 2: SALE

| | | | |
|---|---|---|---|
| Sale Date: | · | Sale Price: | · |
| Sale Type: | · | Sale Price Type: | · |
| Recording Date: | 3/14/2007 | Document Number: | 2007-0566037 |
| Title Company: | · | Document Type: | N/A |
| Seller: | · | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |
| | | | |
| Loan Document Number: | · | Loan Type: | · |
| Lender: | N/A | Loan Term: | · |
| Loan Amount: | · | Interest Rate: | · |

Data is deemed reliable, but not guaranteed.

## PROPERTY DETAIL

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Industrial) | Year Built: | - |
| Rooms: | - | Parcel #: | 6202-036-010 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | SGM2* |
| SqFt (Structure): | - | Tract: | 060375353.0010 |
| SqFt (Lot): | - | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | SAN ANTONIO RO FOR DESC SEE ASSESSOR'S MAPS POR OF SD RO | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender: | N/A |
| Document #: | - | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $1,404 |
| Value (Land): | $108,242 | Tax Area: | 12-039 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $108,242 | | |

Data is deemed reliable, but not guaranteed.

## PROPERTY HISTORY

### TRANSACTION 1: SALE

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | Document Number: | . |
| Title Company: | . | Document Type: | N/A |
| Seller: | . | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |
| | | Loan Type: | . |
| Loan Document Number: | . | Loan Term: | . |
| Lender: | N/A | Interest Rate: | . |
| Loan Amount: | . | | |

Data is deemed reliable, but not guaranteed.

**PROPERTY DETAIL**

GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Industrial) | Year Built: | - |
| Rooms: | - | Parcel #: | 6202-036-011 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | SGM3* |
| SqFt (Structure): | - | Tract: | 060375353.0010 |
| SqFt (Lot): | - | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | SAN ANTONIO RO FOR DESC SEE ASSESSOR'S MAPS POR OF SD RO | | |

SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender: | N/A |
| Document #: | - | | |

ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $7,211 |
| Value (Land): | $595,337 | Tax Area: | 0-911 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $595,337 | | |

Data is deemed reliable, but not guaranteed.

**PROPERTY HISTORY**

**TRANSACTION 1: SALE**

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | Document Number: | . |
| Title Company: | . | Document Type: | N/A |
| Seller: | . | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |

| | | | |
|---|---|---|---|
| Loan Document Number: | . | Loan Type: | . |
| Lender: | N/A | Loan Term: | . |
| Loan Amount: | . | Interest Rate: | . |

Data is deemed reliable, but not guaranteed.

PROPERTY DETAIL

**8150 Marbrisa Ave, Huntington Park, CA 90255**

GENERAL

| | | | |
|---|---|---|---|
| Type: | Industrial (Manufacturing) | Year Built: | 1930 |
| Rooms: | - | Parcel #: | 6202-038-032 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | LCM2* |
| SqFt (Structure): | 16355 | Tract: | 060375353.001004 |
| SqFt (Lot): | 16797 | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | FLORENCE STATION TRACT LOTS 14,15 AND LOT 16 BLK 4 | | |

SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender:- | |
| Document #: | 05-1197309 | | |

ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | $378,850 | Tax Amount: | $12,604 |
| Value (Land): | $427,560 | Tax Area: | 1-200 |
| Percent Improved: | 47 | Exemption: | - |
| Value (Total): | $806,410 | | |

Data is deemed reliable, but not guaranteed.

**PROPERTY HISTORY**

**8150 Marbrisa Ave, Huntington Park, CA 90255**

## TRANSACTION 1: FINANCE

| | | | |
|---|---|---|---|
| Recording Date: | 9/25/2006 | Document Number: | 06-2122731 |
| Title Company: | - | Document Type: | - |
| Borrower: | CENTRAL METAL INC, | | |
| Borrower Vesting: | N/A | | |
| Lender: | KEB LA FINANCIAL CORP | Loan Type: | Unknown |
| Loan Amount: | $900,000 | Loan Term: | - |
| Loan Due Date: | - | Interest Rate: | - |

## TRANSACTION 2: FINANCE

| | | | |
|---|---|---|---|
| Recording Date: | 11/7/2005 | Document Number: | 05-2685248 |
| Title Company: | - | Document Type: | - |
| Borrower: | CENTRAL METAL INC, | | |
| Borrower Vesting: | N/A | | |
| Lender: | CIT SMALL BUSINESS LENDING CORP | Loan Type: | Unknown |
| Loan Amount: | $470,000 | Loan Term: | - |
| Loan Due Date: | - | Interest Rate: | - |

## TRANSACTION 3: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 5/23/2005 | Document Number: | 05-1197309 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | CENTRAL METAL INC, | | |
| Buyer Vesting: | N/A | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | - | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

## TRANSACTION 4: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 5/23/2005 | Document Number: | - |
| Title Company: | - | Document Type: | N/A |
| Seller: | - | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | N/A | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

## TRANSACTION 5: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 3/1/2005 | Document Number: | 05-0457491 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | BYUN, JONG UK; BYUN, BOK SOON | | |
| Buyer Vesting: | Joint Tenancy | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | SAEHAN BANK | Loan Term: | - |
| Loan Amount: | $747,500 | Interest Rate: | - |

TRANSACTION 6: SALE

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 10/18/2001 | Document Number: | 01-1989117 |
| Title Company: | . | Document Type: | Intrafamily Transfer or Dissolution |
| Seller: | . | | |
| Buyer: | THE DERALD PETERSON TRUST, ; PETERSON, DERALD L | | |
| Buyer Vesting: | Trust | | |

| | | | |
|---|---|---|---|
| Loan Document Number: | . | Loan Type: | . |
| Lender: | . | Loan Term: | . |
| Loan Amount: | . | Interest Rate: | . |

Data is deemed reliable, but not guaranteed.

## PROPERTY DETAIL

**Huntington Park, CA 90255**

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Residential) | Year Built: | - |
| Rooms: | - | Parcel #: | 6202-038-033 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | LCM2* |
| SqFt (Structure): | - | Tract: | 060375353.001004 |
| SqFt (Lot): | 5593 | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | FLORENCE STATION TRACT LOT 17 BLK 4 | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender: | - |
| Document #: | 05-1197309 | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $1,925 |
| Value (Land): | $146,128 | Tax Area: | 1-200 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $146,128 | | |

Data is deemed reliable, but not guaranteed.

**PROPERTY HISTORY**

Huntington Park, CA 90255

### TRANSACTION 1: SALE

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | Document Number: | 05-1197309 |
| Title Company: | . | Document Type: | Grant Deed |
| Seller: | . | | |
| Buyer: | CENTRAL METAL INC, | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | . | Loan Type: | . |
| Lender: | . | Loan Term: | . |
| Loan Amount: | . | Interest Rate: | . |

### TRANSACTION 2: SALE

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | Document Number: | . |
| Title Company: | . | Document Type: | N/A |
| Seller: | . | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |
| | | | |
| Loan Document Number: | . | Loan Type: | . |
| Lender: | N/A | Loan Term: | . |
| Loan Amount: | . | Interest Rate: | . |

### TRANSACTION 3: SALE

| | | | |
|---|---|---|---|
| Sale Date: | . | Sale Price: | . |
| Sale Type: | . | Sale Price Type: | . |
| Recording Date: | 3/1/2005 | Document Number: | 05-0457491 |
| Title Company: | . | Document Type: | Grant Deed |
| Seller: | . | | |
| Buyer: | BYUN, JONG UK; BYUN, BOK SOON | | |
| Buyer Vesting: | Joint Tenancy | | |
| | | | |
| Loan Document Number: | . | Loan Type: | . |
| Lender: | SAEHAN BANK | Loan Term: | . |
| Loan Amount: | $747,500 | Interest Rate: | . |

Data is deemed reliable, but not guaranteed.

PROPERTY DETAIL

**Huntington Park, CA 90255**

GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Residential) | Year Built: | - |
| Rooms: | - | Parcel #: | 6202-038-034 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | LCM2* |
| SqFt (Structure): | - | Tract: | 060375353.001004 |
| SqFt (Lot): | 5593 | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | FLORENCE STATION TRACT LOT 18 BLK 4 | | |

SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender:- | |
| Document #: | 05:1197309 | | |

ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $1,925 |
| Value (Land): | $146,128 | Tax Area: | 1-200 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $146,128 | | |

Data is deemed reliable, but not guaranteed.

1/12/2010 11:23 AM

## PROPERTY HISTORY
**Huntington Park, CA 90255**

### TRANSACTION 1: SALE

| | | | | |
|---|---|---|---|---|
| Sale Date: | . | | Sale Price: | . |
| Sale Type: | . | | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | | Document Number: | 05-1197309 |
| Title Company: | . | | Document Type: | Grant Deed |
| Seller: | . | | | |
| Buyer: | CENTRAL METAL INC, | | | |
| Buyer Vesting: | N/A | | | |
| | | | | |
| Loan Document Number: | . | | Loan Type: | . |
| Lender: | . | | Loan Term: | . |
| Loan Amount: | . | | Interest Rate: | . |

### TRANSACTION 2: SALE

| | | | | |
|---|---|---|---|---|
| Sale Date: | . | | Sale Price: | . |
| Sale Type: | . | | Sale Price Type: | . |
| Recording Date: | 5/23/2005 | | Document Number: | . |
| Title Company: | . | | Document Type: | N/A |
| Seller: | . | | | |
| Buyer: | CENTRAL METAL INC | | | |
| Buyer Vesting: | CO | | | |
| | | | | |
| Loan Document Number: | . | | Loan Type: | . |
| Lender: | N/A | | Loan Term: | . |
| Loan Amount: | . | | Interest Rate: | . |

### TRANSACTION 3: SALE

| | | | | |
|---|---|---|---|---|
| Sale Date: | . | | Sale Price: | . |
| Sale Type: | . | | Sale Price Type: | . |
| Recording Date: | 3/1/2005 | | Document Number: | 05-0457491 |
| Title Company: | . | | Document Type: | Grant Deed |
| Seller: | . | | | |
| Buyer: | BYUN, JONG UK; BYUN, BOK SOON | | | |
| Buyer Vesting: | Joint Tenancy | | | |
| | | | | |
| Loan Document Number: | . | | Loan Type: | . |
| Lender: | SAEHAN BANK | | Loan Term: | . |
| Loan Amount: | $747,500 | | Interest Rate: | . |

Data is deemed reliable, but not guaranteed.

## PROPERTY DETAIL

Huntington Park, CA 90255

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Vacant (Residential) | Year Built: | - |
| Rooms: | - | Parcel #: | 6202-038-035 |
| Beds: | - | County: | Los Angeles |
| Baths: | - | Zoning: | LCM2* |
| SqFt (Structure): | - | Tract: | 060375353.001004 |
| SqFt (Lot): | 5593 | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | FLORENCE STATION TRACT LOT 19 BLK 4 | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 5/23/2005 | Lender: | - |
| Document #: | 05-1197309 | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $1,925 |
| Value (Land): | $146,128 | Tax Area: | 1-200 |
| Percent Improved: | - | Exemption: | - |
| Value (Total): | $146,128 | | |

Data is deemed reliable, but not guaranteed.

1/12/2010 11:24 AM

## PROPERTY HISTORY

Huntington Park, CA 90255

### TRANSACTION 1: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 5/23/2005 | Document Number: | 05-1197309 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | CENTRAL METAL INC, | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | - | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

### TRANSACTION 2: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 5/23/2005 | Document Number: | - |
| Title Company: | - | Document Type: | N/A |
| Seller: | - | | |
| Buyer: | CENTRAL METAL INC | | |
| Buyer Vesting: | CO | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | N/A | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

### TRANSACTION 3: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 3/1/2005 | Document Number: | 05-0457491 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | BYUN, JONG UK; BYUN, BOK SOON | | |
| Buyer Vesting: | Joint Tenancy | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | SAEHAN BANK | Loan Term: | - |
| Loan Amount: | $747,500 | Interest Rate: | - |

Data is deemed reliable, but not guaranteed.



## PROPERTY DETAIL
220 Industrial St, Bakersfield, CA 93307

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Industrial (Warehouse, Storage) | Year Built: | - |
| Rooms: | | Parcel #: | 140-380-01 |
| Beds: | - | County: | Kern |
| Baths: | - | Zoning: | - |
| SqFt (Structure): | - | Tract: | 060290023.022011 |
| SqFt (Lot): | - | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Bakersfield Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | LOTS 27 & 28 TRACT 1646 | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | $830,000 | Loan Type: | - |
| Last Sale Date: | 12/31/1998 | Lender: | California Fed Bk |
| Document #: | 0198185683 | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | - | Tax Amount: | $4,646 |
| Value (Land): | $383,520 | Tax Area: | 56-089 |
| Percent Improved: | | Exemption: | - |
| Value (Total): | $383,520 | | |

Data is deemed reliable, but not guaranteed.

Title365 | Print                                                                                    Page 3 of 3

**PROPERTY HISTORY**
220 Industrial St, Bakersfield, CA 93307

**TRANSACTION 1: SALE**

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 12/21/1998 | Document Number: | 0198185683 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | MACKENZIE, MICHAEL G; MACKENZIE, BARBARA A | | |
| Buyer Vesting: | Tenants in Common | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | CALIFORNIA FED BK | Loan Term: | - |
| Loan Amount: | $415,000 | Interest Rate: | - |

**TRANSACTION 2: SALE**

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | - | Sale Price Type: | - |
| Recording Date: | 12/21/1998 | Document Number: | 0198185682 |
| Title Company: | - | Document Type: | Intrafamily Transfer or Dissolution |
| Seller: | - | | |
| Buyer: | MULLIKIN, KEVIN | | |
| Buyer Vesting: | Married Man as his sole and separate property | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | - | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

Data is deemed reliable, but not guaranteed.



## PROPERTY DETAIL

220 Industrial St, Bakersfield, CA 93307

### GENERAL

| | | | |
|---|---|---|---|
| Type: | Industrial (Manufacturing) | Year Built: | - |
| Rooms: | - | Parcel #: | 140-390-05 |
| Beds: | - | County: | Kern |
| Baths: | - | Zoning: | - |
| SqFt (Structure): | - | Tract: | 060290023.022011 |
| SqFt (Lot): | / | Pool: | - |
| Stories: | - | View: | - |
| Garage: | 0 | Fireplace: | - |
| Number of Units: | - | | |

### OWNERSHIP

| | | | |
|---|---|---|---|
| Primary Owner: | Bakersfield Central Metal Inc | Mail Address: | 2203 S Alameda St, Vernon, CA 90058 |
| Secondary Owner: | - | Vesting: | - |
| Legal: | LOTS 29-33 TRACT 1546 | | |

### SALE & LOAN

| | | | |
|---|---|---|---|
| Last Sale Amount: | - | Loan Type: | - |
| Last Sale Date: | 6/18/2007 | Lender: | - |
| Document #: | 0207127969 | | |

### ASSESSMENT & TAX

| | | | |
|---|---|---|---|
| Value (Structure): | $7,318,105 | Tax Amount: | $111,433 |
| Value (Land): | $945,540 | Tax Area: | 56-089 |
| Percent Improved: | 89 | Exemption: | - |
| Value (Total): | $8,263,645 | | |

Data is deemed reliable, but not guaranteed.

Title365 | Print                                                    Page 3 of 3

## PROPERTY HISTORY
220 Industrial St, Bakersfield, CA 93307

### TRANSACTION 1: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | | Sale Price Type: | |
| Recording Date: | 6/18/2007 | Document Number: | 0207127969 |
| Title Company: | - | Document Type: | Correction Deed |
| Seller: | - | | |
| Buyer: | BAKERSFIELD CENTRAL METAL INC. | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | - | Loan Term: | - |
| Loan Amount: | - | Interest Rate: | - |

### TRANSACTION 2: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | | Sale Price Type: | - |
| Recording Date: | 11/16/2006 | Document Number: | 0206283505 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | BAKERSFIELD CENTRAL METAL INC. | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | - | Loan Term: | |
| Loan Amount: | - | Interest Rate: | - |

### TRANSACTION 3: SALE

| | | | |
|---|---|---|---|
| Sale Date: | - | Sale Price: | - |
| Sale Type: | | Sale Price Type: | - |
| Recording Date: | 3/31/2005 | Document Number: | 0205079767 |
| Title Company: | - | Document Type: | Grant Deed |
| Seller: | - | | |
| Buyer: | MULLIKIN, KEVIN | | |
| Buyer Vesting: | N/A | | |
| | | | |
| Loan Document Number: | - | Loan Type: | - |
| Lender: | SELECT RESOURCES CORP | Loan Term: | - |
| Loan Amount: | $1,100,000 | Interest Rate: | |

Data is deemed reliable, but not guaranteed.

# EXHIBIT 4

# CENTRAL METAL INC.

## VALUATION OF EQUIPMENT

|  | Depreciable Basis | Remaining Balance | Net |
|---|---|---|---|
| Central Metal Inc. | $ 16,458,329.00 | $ 5,913,007.95 | $ 10,545,321.05 |
| San Bernardino CMI | $ 4,845,898.00 | $ 2,994,977.74 | $ 1,850,920.26 |
| Bakersfield CMI | $ 8,665,010.00 | $ 4,237,552.86 | $ 4,427,457.14 |
| Total | $ 29,969,237.00 | $ 13,145,538.55 | $ 16,823,698.45 |

# EXHIBIT 5

1  MONICA Y. KIM (SBN 180139)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: myk@lnbrb.com, jyo@lnbrb.com

6  Proposed Attorneys for Chapter 11 Debtor
7  and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10                  LOS ANGELES DIVISION
11

12  In re                              )   Case No. 2:10-bk-10642-VZ
                                       )
13  CENTRAL METAL, INC., a California  )   Chapter 11
14  corporation,                       )
                                       )
15              Debtor.                )   **ORDER GRANTING DEBTOR'S
                                       )   EMERGENCY MOTION FOR USE OF
16                                     )   CASH COLLATERAL ON AN INTERIM
                                       )   BASIS PENDING A FINAL HEARING**
17                                     )
                                       )   DATE:    January 14, 2010
18                                     )   TIME:    11:00 a.m.
                                       )   PLACE:   Courtroom 1368
19                                     )            255 E. Temple Street
                                       )            Los Angeles, California
20                                     )
21                                     )
                                       )
22                                     )
                                       )
23  _____ )

24      A hearing was held on January 14, 2010, at 11:00 a.m., before the Honorable Vincent P.

25  Zurzolo, United States Bankruptcy Judge for the Central District of California, in Courtroom

26  "1368" located at 255 East Temple Street, Los Angeles, California, to consider the emergency

27  motion (the "Emergency Motion") filed by Central Metal, Inc., a California corporation (the

28

                                    1

1 "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy
2 case, for the entry of an order, pursuant to 11 U.S.C. § 363(c), authorizing the Debtor to use cash
3 collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's
4 operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the Declaration of
5 Suk Won Byun (the "Byun Declaration") annexed to the Emergency Motion. Appearances at the
6 hearing on the Motion were made as set forth on the record of the Court.

7 The Court, having considered the Motion and all papers filed by the Debtor in support of
8 the Motion, the response to the Motion filed by Bank of America, N.A., individually and as
9 agent for a group of lenders (the "Bank"), the joinder to the Motion filed by the Official
10 Committee of Unsecured Creditors appointed in the Debtor's case (the "Committee"), and the
11 oral arguments and statements of counsel made at the hearing on the Motion, proper notice of the
12 Motion and the hearing on the Motion having been provided, and good cause appearing therefor.

13 IT IS HEREBY ORDERED AS FOLLOWS:

14 A. The Motion is granted on an interim basis pending a final hearing thereon.

15 B. The Debtor is authorized to use cash collateral to pay all of the expenses set forth
16 in the Budget, subject to a permitted deviance of up to 10% of the total expenses for any week,
17 with any unused portions to be carried over into the following week.

18 C. Center Bank and KEB LA Financial Corp. (collectively, the "Secured Creditors")
19 shall have and are hereby granted, effective as of January 8, 2010, the date of the filing of the
20 Debtor's bankruptcy case, replacement liens pursuant to 11 U.S.C. §§ 361 and 363(e) against the
21 Debtor's assets (excluding avoidance causes of action), with such replacement liens to have the
22 same extent, validity, and priority as the pre-petition liens held by the Secured Creditors.

23 D. A final hearing on the Emergency Motion will be held on _____
24 2010 at _____ _____. ___.m.

25 ###
26
27
28

2

| In re:<br>CENTRAL METAL, INC. | Debtor. | Chapter 11<br>2:10-bk-10642-VZ |
| --- | --- | --- |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SUK WON BYUN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 12 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Monica Y Kim    myk@lnbrb.com
- Dare Law    dare.law@usdoj.gov
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **January 12, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

*By overnight mail:*
*Secured creditors*
*20 largest creditors*
*(See attached)*

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 12, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

*By attorney service:*
*The Honorable Vincent P. Zurzolo*
*255 East Temple Street*
*Los Angeles, CA 90012*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 12, 2010 | Marguerite Hardin | *[signature]* |
| --- | --- | --- |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                              **F 9013-3.1**

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
20 Largest

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Sun Construction
26071 Hinckley Street
Loma Linda, CA 92354

Bay City Trading
4051 Via Oro
Long Beach, CA 90810

Zimex Logitech, Inc.
5400 Orange Avenue, Suite 108
Cypress, CA 90630

US Bank
P.O. Box 790408
Saint Louis, MO 63179

American Express
P.O. Box 981535
El Paso, TX 79998

Bank of America
P.O. Box 851001
Dallas, TX 75285

In re Central Metal, Inc.
Case No. 2:10-bk-10642-VZ
Secured

Central Metal, Inc.
8201 Santa Fe Avenue
Huntington Park, CA 90255

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

American Honda Finance Corp.
P.O. Box 6070
Cypress, CA 90630-6070

Bank of America
c/o Frandzel, Robbins, Bloom, et al
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

Center Bank
3435 Wilshire Blvd., Suite 700
Attn: Lisa K. Pai
Los Angeles, CA 90010

Center Capital Corporation
P.O. Box 330
Hartford, CT 06141

Chase
P.O. Box 78067
Phoenix, AZ 85062-8067

GE
300 E. John Carpenter Fwy, 4th Fl.
Attn: Rena Harris
Irving, TX 75062

H. West Equipment, Inc.
645 N. Main Street
Orange, CA 92868-1103

Lexus Financial Services
P.O. Box 2991
Mail Drop L201
Torrance, CA 90509

People's Capital and Leasing Corp.
255 Bank Street
Attn: Jeffrey A. Kennedy
Waterbury, CT 06702-2219

The CIT Group/Equipment Financing
305 Fellowship Road, Suite 300
Attn: Paul Plunkett
Mount Laurel, NJ 08054

Wilshire State Bank
3822 Wilshire Blvd.
Los Angeles, CA 90010

Counsel for Center Bank
Steven G. Polard, Esq.
Perkins Coie LLP
1888 Century Park East, Ste 1700
Los Angeles, CA 90067-1721