Steven G. F. Polard, Bar No. 90319
SPolard@perkinscoie.com
Jeffrey S. Goodfried, Bar No. 253804
JGoodfried@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for Secured Creditor
Center Bank, a California state chartered bank

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>CENTRAL METAL, INC., a California corporation<br><br>Debtor. | CASE NO.: 2:10-BK-10642 VZ<br><br>Chapter: 11<br><br>**MOTION FOR APPOINTMENT OF EXAMINER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:<br>Time:<br>Courtroom: 1368<br><br>Before the Hon. Vincent Zurzolo |

Secured creditor Center Bank, a California state chartered bank ("Movant" or "Lender") respectfully hereby moves this Court for an Order granting the following:

1.  Appointing an examiner for debtor Central Metal, Inc., a California corporation (the "Debtor") pursuant to 11 U.S.C. § 1104(c); and

2.  For such other and further relief as the Court deems just and proper.

Several grounds are present that warrant the Court granting Movant's Motion for Appointment of Examiner (the "Motion"). The appointment of an examiner is in the best interests of creditors, equity security holders and the estate. The factual support provided in the concurrently filed declarations illustrate that it appears the Debtor has engaged in dishonesty, incompetence, misconduct and mismanagement of its affairs to the detriment of all creditors and the estate. Specifically, the Declarations show that the Debtor has diverted from its own inventory, bribed a turnaround consultant, and cannot account for $17.8 million in cash, which has been taken out of the estate. When pressed pre-petition to provide financial records of the $17.8 million, the Debtor has claimed it inputted all such information on a single computer, which it claims has become inoperable as of October 2009. An examiner is needed to properly determine the financial condition of the Debtor, the extent in the past it has engaged in bribery, and to *investigate and report* the whereabouts of the $17.8 million in cash.

And what is the reaction of the Debtor's counsel to these facts? They now call them "baseless allegations" and make frivolous accusations against the Lender while asking Lender to be satisfied with the Debtor's handpicked CRO. The Debtor appears to be concealing its wrongful conduct even from its present law firm who the Lender does not believe is a knowing party to any cover up.

The appointment of a CRO is an insufficient step to assure the integrity of the Debtor's post-petition operations and to investigate the serious pre-petition problems. The CRO was selected by Debtor and even if the Debtor no longer offers bribes, the CRO is tainted merely by his selection by the Debtor and its counsel. Indeed it is still unclear to the extent that the CRO answers to the Board of Directors of the Debtor.

1  The Motion is based on the attached Memorandum of Points and Authorities, the
2  concurrently filed Declarations of Yi Yong Oh and Edmund King, the concurrently filed
3  Appendix of Unreported Decision, and all pleadings, papers and records on file with the
4  Court, and such other evidence, oral or documentary, as may be presented to the Court
5  with respect to this Motion.
6  DATED: January 22, 2010

PERKINS COIE LLP

By: _____
Steven G. Polard
Attorneys for Creditor Center Bank, a California state chartered bank

## I. INTRODUCTION

The evidence submitted below presents a compelling case that the Debtor and related debtors[1] have appeared to have engaged in a series of self-dealing cash payments, the related destruction or noncreation of financial records, diversion of company inventories, and bribery of a turnaround consultant that by contract was supposed to provide information about the Debtor to the creditors, including the Lender. Given the need for neutral investigating and reporting of the self-dealing transactions, the bribe (which the Debtor denies), the apparent October 2009 destruction of financial records, which have got to be repaired, the unrecorded $17.8 million in cash flow of the managed operations, the Debtor's profitability and ability to pay arrearages on the Loans (as defined below), the Movant seeks the appointment of an examiner in this case.

An examiner experienced with the scrap/recycling industry can conduct a focused investigation to determine what cash this business really generates, what other bribes have been made, from where came the $17.8 million in pre-petition cash payments, where the $17.8 million in pre-petition cash payments went, whether the Debtor can be profitable with market-based non-insider expenses, and what the business can be sold for to pay the creditors. The examiner's analysis may also provide the fundamental structure for the Debtor's reorganization plan to resolve its debts.

## II. STATEMENTS OF FACTS

### A. THE SECURED LOANS.

Movant has made six secured loans to the Debtor, Jong Uk Byun, Bok Soon Byun, and San Bernardino Central Metal, Inc. for the aggregate principal sum of $17,000,000.[2]

---

[1] Principals Jong Uk Byun and Bok Soon Byun filed for Chapter 11 in *pro per* under the Bankruptcy Code shortly after Debtor on or about January 11, 2010. Their cases are also before this Court.

[2] On or about May 24, 2006, Plaintiff made Loan No. 750735 to Jong Uk Byun ("Byun"), Bok Soon Byun ("Bok"), and Debtor (collectively, "Loan I Borrowers") in the original amount of $11,000,000 ("Loan I"). *See* Declaration of Yi Yong Oh filed concurrently herewith ("Oh Decl."), ¶ 2. On or about May 24, 2006, Plaintiff made Loan No. 750737 to Jong, Bok, and Central Metal (collectively, "Loan II Borrowers") in the original amount of $3,000,000 ("Loan II"). *Id.*, ¶ 5. On or about November 9, 2007, Plaintiff made Loan No. 757068 to Central Metal ("Loan III Borrower") in the original amount of $1,500,000 ("Loan III"). *Id.*, ¶ 8. On or about November 9, 2007, Plaintiff made Loan No. 757070 to Central Metal ("Loan IV Borrower") in the original amount of $1,000,000 ("Loan IV"). *Id.*, ¶ 11. On or about November 9, 2007, Plaintiff made Loan No. 757072 to Central Metal ("Loan V Borrower") in the original amount of $300,000 ("Loan V"). *Id.*, ¶ 14. On or about March 6, 2007, Plaintiff made Loan No. 754138

For details of each loan, including loan documents, see Paragraphs 1 through 21 and Exhibits A through V in Declaration of Yi Yong Oh (the "Oh Decl.") filed concurrently herewith.

### B. THE LOAN DEFAULTS.

**Failure to Make Payments When Due and to Pay Accelerated Amount**

Commencing in September 2009, and continuing to the present, the Borrowers have failed to timely make their required monthly payments as and when due under the Loan Documents, including during the time of the unaccounted for $17.8 million. Oh Decl., ¶ 24.

Pursuant to the Loan Documents, the Borrowers' failure to deliver the monthly payments as and when due to the Lender constitutes an event of default permitting the Lender to exercise all rights and remedies contained in the Loan Documents.

Accordingly, more than $17,264,579.88 in principal, interest, late charges, and other costs and expenses are due and outstanding as of January 1, 2010. *See* Oh Decl., ¶ 27.

Due to the defaults under the Loan Documents, Plaintiff commenced non-judicial foreclosures on its real estate collateral by causing Notice of Defaults to be recorded in the Official Records on: (a) October 26, 2009, as Instrument No. 2009-1614894; (b) September 16, 2009, as Instrument No. 09-1413065; (c) October 26, 2009, as Instrument No. 2009-1614895; (d) October 26, 2009, as Instrument No. 2009-1614896; and (e) October 26, 2009, as Instrument No. 2009-1614893 (collectively, the "Notices of Default"). Oh Decl., ¶ 28 & Exh. X.

There was a receiver appointed against the real property and collateral owned by the Byuns prior to their Chapter 11 filings. Those real properties (except for Parcel 5) constitute the leaseholds of Central Metal, yet the Debtor has failed to provide for *any* lease payments in its cash collateral budget.

---

to S.B. Central ("Loan VI Borrower") in the original amount of $200,000 ("Loan VI"). *Id.*, ¶ 17. Loans I-V are secured by real property owned by the Byuns (except for Parcel 5 which is owned by the Debtor). Loans I-VI are secured by a floating lien on all assets of the Debtor. See Oh Decl., ¶¶ 2-22.

### C. FACTS SHOWING WHY AN EXAMINER SHOULD BE APPOINTED.

**Systematic Depletion of Collateral From Site**

Over the prior eight months, the Movant's representatives have visited the Properties, and have noticed a precipitous decline in inventories. Oh Decl., ¶ 31.

**Defendants Engage in Suspect Accounting Measures, Destruction or Noncreation of "Lost" Financial Records, and Attempted Bribery**

In December 2009, the Borrowers' disbursement logs were reviewed and analyzed by a turnaround consultant referred by the Lender and subsequently hired by the Borrowers. *See* concurrently filed Declaration of Edmund C. King ("King Decl."), ¶ 1. The consultant discovered that out of $29.2 million in total disbursements, approximately $17.8 million were cash payments (the "Cash Payments"). King Decl., ¶ 3. The Cash Payments were made through one of four ways: (a) cashiers' check, (b) checks made out to "CASH," (c) checks made payable to the Borrower itself and subsequently cashed; and (d) checks made payable to names of certain employees that were subsequently cashed. *Id.*

Throughout December 2009 the consultant constantly requested from Nam Lee, an accounting manager, Tim Byun, a company manager, and Michael Park, CPA, their outside accountant, a detail of the Cash Payments. King Decl., ¶ 4. Mr. Park insisted that the consultant did not need the cash details, but should use the CPA firm's audited financials. *Id.* Mr. Lee and Mr. Byun repeatedly stated they will have the cash details delivered to the consultant but failed to do so. *Id.* Yet no action by the Debtor to rectify the "lost" computer records was apparently taken. In late December 2009, and for the first time, Mr. Lee informed the consultant that all details for the Cash Payments were "lost" due to a "computer malfunction" that occurred in October 2009. *Id.* This statement was confirmed by Tim Byun and Mr. Park. *Id.* They claimed they could only provide the consultant details of Cash Payments for November 2009. *Id.* & Exh. B. "Lost" computer records of this nature could hardly be inadvertent, particularly where the Debtor cannot explain why three months later such computer records are still missing.

1    The consultant has reported that the Borrowers' accounting practices are severely
2    lacking and unsophisticated for such a large operation. King Decl., ¶ 5. How convenient
3    for a cash business. In particular, the Borrowers do *not* input invoices into their accounts
4    payable accounting software until they actually pay them. *Id.* By this practice, it is
5    unknown how much money Borrowers owe to third parties, and moreover, there is little to
6    no detail of existing unsecured debt. *Id.* Hence no doubt the delay in creating schedules.
7    The Debtor's request for an extension beyond the usual 15 day period reinforces the point
8    that the Debtor's records are in disarray and their lack of reliability will no doubt prompt a
9    further request for extension or risk severe sanctions if the schedules turn out to be false.

10   On December 30, 2009, the consultant met with Tim Byun and Jong Uk Byun
11   regarding the foregoing issues. King Decl., ¶ 6. The consultant discussed with them the
12   problems he encountered throughout December and in response, they assured him of their
13   cooperation. *Id.* The consultant advised them, among other things, to hire a company
14   controller, put in place a new accounting system, and to improve and rework their cash
15   management system. *Id.* The consultant also advised them that the Lender would be
16   frustrated that the detail for the Cash Payments was missing. *Id.* At this point, Jong Uk
17   Byun said something in a foreign language to Tim Byun (who is his nephew). *Id.* Tim
18   Byun left the room and closed the door behind him. *Id.* Jong Byun pulled out from his
19   pocket a sealed envelope and handed it to the consultant. *Id.* Jong Byun told the
20   consultant that it was "a gift." *Id.* The consultant inquired as to what it was, and Mr.
21   Byun responded that it was cash. *Id.* The consultant immediately gave the envelope back
22   to Jong Byun. *Id.* Jong Byun told the consultant that he just wanted to make sure the
23   consultant would take care of them. *Id.* The consultant (Mr. King) promptly left the
24   room. The Debtor and counsel now describe this is a joke over sports tickets. That
25   cavalier conclusion reflects that the Debtor's counsel is simply accepting what Byun tells
26   them.

27   The circumstances of this case call for the Court to exercise its discretion under 11
28   U.S.C. § 1104(c)(1) and appoint an examiner. It is in the interest of creditors and the

estate to investigate the Debtor's cash flows in light of the consultant's experiences with the Debtor. This is particularly true since the Debtor's business is a cash business with very little, if any, paper trail to show where the Debtor's cash came from and, more importantly, where it went. Indeed the Debtor admits all the detailed financials for the whereabouts of $17.8 million in cash were "lost" since they were inputted on a single computer hard drive that is, according to the Debtor, now inoperable. *See* King Decl., ¶ 4.

### III. ARGUMENT

#### A. Appointment of an Examiner is Necessary to Ascertain the Debtor's True Financial Condition

The Bankruptcy Code at section 1104(c) provides for the appointment of an examiner upon the request of an interested party to conduct an investigation of any *allegations* of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor" if "such appointment is in the interests of creditors." The Court has discretion to appoint an examiner. *In re Gilman Services, Inc.*, 46 B.R. 322, 327 (Bankr. Mass. 1985).

The Court in *In re Gilman Services* ordered the appointment of an examiner where the debtors, among other things, failed to adequately explain post-petition losses and submitted unintelligible financial statements. While the court balanced the interest of the estate and creditors against the cost of an examiner, the court believed an *independent* auditor was necessary to ascertain the debtor's true financial condition and investigate potential pre-petition causes of action. *Id.* at 328.

Here, the Debtor has obstructed secured and unsecured creditors alike from gaining pertinent knowledge of the Debtor's cash flows pre- and post-petition. As discussed above, in December 2009, the Debtor made approximately $17.8 million in cash payments (the "Cash Payments") through cashiers' checks, checks made out to "CASH", checks made payable to the Debtor itself, and checks made out to names of employees of the Debtor. King Decl., 4. The recorded details for these Cash Payments were entered on a single computer. According to the Debtor, the computer has "malfunctioned" and the records have been "lost." *Id.* Curiously the "lost" records have not been restored since

their October disappearance. The Debtor is no doubt feverishly trying to reconstruct history during its extended period of time to file schedules.

Further, the accounting system set up by the Debtor is conveniently unsophisticated. Specifically, the Debtor did not input invoices in their accounts payable accounting software until the invoices were paid, which means that anyone auditing the books will have no details of unsecured debt and cash flow management.

An examiner is needed to investigate and report the Debtor's accounts receivables and payables since obviously the Debtor is unable to do it itself. The CRO here, who was handpicked by the Debtor as early as September 2009 as a consultant nominee, is hardly independent.

Finally, there is evidence of the Debtor diverting its own inventory. Oh Decl., ¶ 31. Representatives of the Movant have visited the Debtor's site and have noticed a precipitous decline in inventories. *Id.* Since the inventories are part of the Movant's Collateral, Movant requests an examiner be appointed that can investigate and report this inventory drop.

The Debtor may argue that since it hired a CRO, there is presently no need for an examiner. Such argument lacks merit. Even though a CRO has been hired by the Debtor, a court will still appoint a *neutral* examiner where the examiner would be in a much better position to protect the interests of secured creditors, unsecured creditors, and the estate. *See, e.g., In re Firstline Corp.*, 2006 WL 3717777, 1 (Bankr. M.D. Ga.). Here, the CRO is demonstrably *not* independent as Moffitt was handpicked by the alleged wrongdoer, the Debtor, as early as September of 2009 as its consultant of choice.[3] Instead Mr. King's company was hired by the Debtor and later offered a bribe.

In *Firstline Corp.*, the court appointed a Chapter 11 trustee despite the fact that the debtor hired a third-party as a chief restructuring officer. In *Firstline Corp.*, the CRO's duties included managing the debtor's cash flow. *Id.* The Committee of Unsecured

---

[3] *See* Application of Debtor and Debtor in Possession to Employ C.T. Moffitt & Company as Financial Consultants and Charles T. Moffitt as Chief Restructuring Officer, p. 7:12-13.

Creditors, however, offered evidence that the debtor's principal was nonetheless disrupting efforts to successfully reorganize under Chapter 11 of the Bankruptcy Code, and filed a motion to appoint a trustee. *Id.* The court granted the Committee's motion, ultimately concluding that the appointment of a trustee was "in the interest of creditors and the estate." *Id.* at 3.

As with *Firstline Corp.*, the Court here should find that appointment of a neutral examiner is preferable to protect the interests of the creditors and the estate despite the Debtor hiring a CRO. <u>First</u>, based on the Debtor's attempted bribery of the turnaround consultant, it is conceivable that the Debtor will repeat the same dirty tricks and attempt to bribe the CRO. This time the CRO's contract does not have a provision allowing information gained to be shared with creditors. <u>Second</u>, the CRO's duties are essentially to manage the Debtor's cash flow to ensure the proper payments of cash collateral. Here, the creditors need more than that; specifically, the creditors need a neutral examiner to *investigate* and *report* why $17.8 million in cash payments were dispersed in the months leading to the bankruptcy petition, how this was done so it can be avoided post-petition, and furthermore, why no financial records exist detailing such cash payments. Even if the CRO has a cash policeperson monitoring the operation, cash can pass unnoticed. Indeed the Debtor's customers insist on cash no doubt because they have established a way to assure improper tax free income – a point that might apply to the Debtor as well, further justifying an appointment of examiner.

The Debtor's pre-petition financial condition is a mystery without more disclosure. The general lack of knowledge regarding the financial operations of the Debtor, the apparent gross mismanagement of pre-petition funds, and lack of accountability constitute cause for appointment of an examiner.

**B.  Appointment of an Examiner Outweighs the Cost of an Examiner to the Estate.**

The benefits of an examiner to the estate should outweigh the costs of an examiner. *In re Gilman Services*, 46 B.R. at 328. While the actual costs of an examiner are not

known, the benefits of full financial disclosure will most likely outweigh the cost of an examiner to comply with the duties prescribed in section 1106(a)(3) and (4) as made applicable by section 1106(b).

### IV. CONCLUSION

WHEREFORE, Movant respectfully requests the Court to order the appointment of an independent examiner and any further relief the Court deems just and proper.

DATED: January __, 2010

PERKINS COIE LLP

By: /s/ Steven G. Polard
Steven G. Polard
Attorneys for Creditor Center Bank, a California state chartered bank