1  MONICA Y. KIM (SBN 180139)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: myk@lnbrb.com, jyo@lnbrb.com

6  Proposed Attorneys for Chapter 11 Debtor
   and Debtor in Possession
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 LOS ANGELES DIVISION

11

12  In re                          )  Case No. 2:10-bk-10642-VZ
                                   )
13  CENTRAL METAL, INC., a California )  Chapter 11
    corporation,                    )
14                                  )
                                    )  **SUPPLEMENT** TO DEBTOR'S
15              Debtor.             )  **EMERGENCY MOTION FOR USE OF**
                                    )  **CASH COLLATERAL ON AN INTERIM**
16                                  )  **BASIS PENDING A FINAL HEARING**
                                    )
17                                  )  **DECLARATION OF CHARLES T.**
                                    )  **MOFFITT FILED CONCURRENTLY**
18                                  )  **HEREWITH**
                                    )
19                                  )  **DECLARATION OF SUK WON "TIM"**
                                    )  **BYUN FILED CONCURRENTLY**
20                                  )  **HEREWITH**
                                    )
21                                  )  **DECLARATION OF JONG UK BYUN**
                                    )  **FILED CONCURRENTLY HEREWITH**
22                                  )
                                    )
23                                  )  DATE:      February 16, 2010
                                    )  TIME:      1:30 p.m.
24                                  )  PLACE:     Courtroom 1368
                                    )             255 E. Temple Street
25                                  )             Los Angeles, California
                                    )
26  _____)

27

28

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 3

II.    ADDITIONAL FACTS ............................................................................. 4

    A.    The Debtor's Post-Petition Employment of C.T. Moffitt
        & Company as Financial Advisors ...................................................... 4

    B.    Details of the Debtor's Business Operations ....................................... 6

    C.    The Debtor's Pre-Petition Cash Management System ........................... 8

    D.    Implementation of Changes to the Debtor's Cash Management
        System ............................................................................................ 11

    E.    The Debtor's Pre-Petition Accounting System ................................... 12

    F.    Implementation of Changes to the Debtor's Accounting System ......... 13

    G.    Pre-Petition Interaction with Center Bank .......................................... 15

    H.    Assets of the Debtor ....................................................................... 19

    I.    The Debtor's Continuing Need for Use of Cash Collateral and
       The Second Budget ......................................................................... 21

III.    CONCLUSION ..................................................................................... 24

# TABLE OF AUTHORITIES

**Statutes**

11 U.S.C. § 101 ................................................................................................ 2
11 U.S.C. § 363(c) ........................................................................................... 2
11 U.S.C. § 363(c)(2)(B) ................................................................................ 23
11 U.S.C. § 506(c) ................................................................................. 22, 23
11 U.S.C. § 544 .............................................................................................. 23
11 U.S.C. § 545 .............................................................................................. 23
11 U.S.C. § 547 .............................................................................................. 23
11 U.S.C. § 548 .............................................................................................. 23
11 U.S.C. § 549 .............................................................................................. 23

Rule 4001, Federal Rules of Bankruptcy Procedure ........................................ 2
Rule 9014, Federal Rules of Bankruptcy Procedure ........................................ 2

Local Bankruptcy Rule 2081-1(a)(9) ................................................................ 2
Local Bankruptcy Rule 4001-2 ......................................................................... 2
Local Bankruptcy Rule 4001-2(b) .................................................................. 22
Local Bankruptcy Rule 9075-1 ......................................................................... 2

1   **TO ALL SECURED CREDITORS; THE OFFICIAL COMMITTEE OF**
2   **UNSECURED CREDITORS AND ITS COUNSEL OF RECORD; THE OFFICE OF THE**
3   **UNITED STATES TRUSTEE; AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

4         Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of
5   title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy
6   Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy
7   Rules"), Central Metal, Inc., a California corporation, Chapter 11 debtor and debtor in possession
8   herein (the "Debtor"), filed its emergency motion (the "Emergency Motion"), for entry of an
9   interim order authorizing the Debtor to use cash collateral on an emergency interim basis
10   pending a final hearing in accordance with the Debtor's operating budget (the "First Budget"), a
11   copy of which was attached as Exhibit "1" to the Declaration of Suk Won Byun (the "Byun
12   Declaration") filed in support of the Emergency Motion.   An emergency hearing on the
13   Emergency Motion was held on January 14, 2010 at 11:00 a.m.

14         Prior to the January 14, 2010 hearing, the Debtor and its primary secured lender, Center
15   Bank (the "Bank" or "Center") entered into an interim cash collateral stipulation.   With the
16   exception of certain terms of such stipulation (which are identified in the interim order
17   authorizing the Debtor to use cash collateral on an interim basis), the Court approved the
18   stipulation.   The stipulation expires on February 18, 2010.   As it relates to creditors other than
19   the Bank who assert liens in the Debtor's cash collateral, the Emergency Motion was granted and
20   the Debtor was given authority to use cash collateral in accordance with the terms and conditions
21   set forth in the Emergency Motion.   A further hearing on the Emergency Motion was set for
22   February 16, 2010 at 1:30 p.m.

23         In further support of the Emergency Motion, the Debtor respectfully submits this
24   Supplement to the Emergency Motion.

25   ///
26   ///
27   ///
28

2

# I.

## INTRODUCTION

As of the filing date of this Supplement, the Debtor had not reached a further cash collateral stipulation with the Bank; however, the Debtor will continue to reach out to the Bank with regard to cash collateral matters.

Even absent a further cash collateral stipulation with the Bank, the Debtor submits that the Bank is, and will remain, adequately protected despite the Debtor's use of the Bank's cash collateral to operate its business during this case. The First Budget covered the period from the week ending January 16, 2010 through the week ending February 27, 2010. Attached as **Exhibit "1"** to the Declaration of Charles T. Moffitt (the "Moffitt Declaration") filed in support of this Supplement are the First Budget, and a cash flow summary of the Debtor's performance during the first two weeks covered by the First Budget which provides both the projected and actual performance for these periods, as well as the resulting variance. This summary shows that the Debtor is mostly on track on, if not exceeding, its weekly beginning cash position. This summary also shows that the Debtor is continuing to purchase sufficient amounts of scrap metal to replenish sold inventory, thereby maintaining adequate inventory levels to protect the Bank from any decline in the value of the inventory that results from the Debtor's use of cash collateral. In addition, the value of the Bank's other collateral, namely, real estate and equipment, all of which remains with the estate, has not materially diminished in value since the filing of the Debtor's Chapter 11 case. Accordingly, the Bank's claim (which is approximately $17 million) continues to be adequately protected by the total value of the Bank's collateral (which is estimated to be at least $24 million), and, therefore, a substantial equity cushion.

Attached to the Moffitt Declaration as **Exhibit "2"** is a new operating budget (the "Second Budget") for the period from the week ending January 30, 2010 through the week ending March 20, 2010. Like the First Budget, the Second Budget reflects the ordinary operating expenses that the Debtor must pay in order to stay in business and preserve the going concern value of its business. The Debtor proposes to use the cash collateral in accordance with the

1  Second Budget, subject to a permitted deviance of up to 10% of the total expenses for any week,

2  with any unused portions to be carried over into the following week. The Second Budget does

3  **not** include the payment of any real property lease rents to the principal of the Debtor, or lease

4  payments to equipment lessors/lenders, several of which have already acknowledged to the

5  Debtor that the pre-petition agreements between the parties are not true leases at all, but rather,

6  disguised sale agreements. The Debtor is in the process of obtaining appraisals of its equipment,

7  and coordinating with equipment sellers to inspect their respective equipment, and if necessary,

8  to conduct their own appraisal to determine the value of their respective equipment.

9      By this Supplement, the Debtor requests that the Court authorize the Debtor to continue

10  using cash collateral, with the deviance described above, through March 20, 2010, and that a

11  further cash collateral hearing be scheduled on or prior to March 20, 2010.

12                                    **II.**

13                          **ADDITIONAL FACTS**

14      In addition to the facts provided by the Debtor in its Emergency Motion, which are

15  incorporated herein by this reference, the Debtor states the following in further support of its

16  Emergency Motion.

17      **A.    The Debtor's Post-Petition Employment Of C.T. Moffitt & Company As**

18          **Financial Advisors.**

19      1.    Given the concerns expressed by Center, the extensive reporting and disclosure

20  requirements for a chapter 11 debtor, and the Debtor's extremely lean accounting and

21  administrative staff, the Debtor believed it would be prudent to engage an experienced financial

22  advisor to assist the Debtor in connection with its Chapter 11 case. The Debtor also believed that

23  an experienced and knowledgeable financial advisor would be able to provide independent

24  assessments of the Debtor's business operations, the current state of the Debtor's books and

25  records, the Debtor's accounting practices and system, the Debtor's cash management system, and

26  the allegations that have been (and will presumably continue to be) made by Center, and provide

27  guidance on and assist in the implementation of any changes or improvements to the Debtor's

28

4

1 || accounting and cash management systems.  Based on all of the foregoing, the Debtor retained C.T

2 || Moffitt & Company ("CTMC") as its financial advisors, effective as of January 8, 2010, the date of

3 || the Debtor's bankruptcy filing (the "Petition Date"), and has filed an application seeking Court

4 || approval of CTMC's employment.[1]

5      2.     Since both the Debtor and CTMC view Center's allegations very seriously, upon its

6 || engagement, CTMC immediately undertook an independent investigation of the Debtor's cash

7 || management practices to assess, among other things, traceability, auditability and protection

8 || against any interference with the normal day-to-day cash needs of the Debtor.

9      3.     In the approximately three weeks since the Petition Date, CTMC has spent nearly

10 || every business day ensconced at the Debtor's main office located at 8201 Santa Fe Avenue,

11 || Huntington Park, California 90255 (the "Main Office") and the Debtor's facilities, familiarizing

12 || itself with the Debtor's business operations, facilities, personnel, and books and records, reviewing

13 || and assessing the Debtor's accounting practices and procedures, reviewing and assessing the

14 || Debtor's cash management system, and investigating the allegations that have been made by

15 || Center.  CTMC's observations and assessments of all of the foregoing are discussed below and set

16 || forth in detail in the Moffitt Declaration filed concurrently herewith.  In summary, CTMC's review

17 || and assessment of the Debtor's business operations and accounting/cash management practices

18 || confirm that, while the Debtor's accounting and cash management systems may be somewhat

19 || rudimentary for a business of its size and complexity and require improvement, such systems do, in

20 || fact, already exist, are routinely followed and are traceable and auditable.  In addition, based on its

21 || investigation, CTMC believes that the inflammatory allegations regarding untraceable cash

22

23      [1] The Debtor's application to employ CTMC as financial advisors also seeks to employ Charles

24 || T. Moffitt, a principal of CTMC, as the Debtor's Chief Restructuring Officer ("CRO").  However, in response to the concerns expressed by the Office of the United States Trustee, the Debtor and CTMC

25 || have agreed to modify the employment application to withdraw the Debtor's request to employ Mr. Moffitt as the Debtor's CRO.  Essentially, the Office of the United States Trustee indicated that it would

26 || be a conflict for Mr. Moffitt to serve as the Debtor's CRO while his company is serving as the financial advisors to the Debtor.  Accordingly, the Debtor has agreed to employ CTMC as its financial advisors and

27 || not seek to have any member or employee of CTMC (including Mr. Moffitt) act as an employee or officer of the Debtor while CTMC is employed as the Debtor's financial advisors; however, in its capacity as

28 || financial advisors to the Debtor, CTMC will handle all of the tasks that are normally handled by a CRO

1    distributions implied by Center and Edmund C. King of Focus Management Group, the turnaround

2    firm the Debtor was required to retain pre-petition by Center ("Focus"), are based on Mr. King's

3    failure or unwillingness to specifically evaluate the Debtor's cash management procedures and are

4    completely false and unfounded.

**B.    Details Of The Debtor's Business Operations.**

6    4.    The Debtor is a business that purchases different types of scrap metal, sorts the

7    metal into different categories, and processes and distributes the metal in bulk to its domestic and

8    international customers.

9    5.    Description of the Debtor's Facilities. As noted in the Emergency Motion, the

10    Debtor currently operates from five separate facilities – (1) the Main Office facility on Santa Fe

11    Avenue in Huntington Park, (2) the facility located at 2203 S. Alameda Street, Los Angeles,

12    California 90058 (the "Alameda Facility"), (3) the Barstow/Hinkley facility, (4) the San

13    Bernardino facility, and (5) the Bakersfield facility.

14    a.    Each of the Debtor's five facilities has a cashier on hand responsible for

15    cash transactions and a safe to secure cash at night. Only the manager of each facility

16    knows the combination to the safe.

17    b.    The Alameda Facility is approximately 4 acres and is the primary location

18    for the processing of non-ferrous metal. The Alameda Facility has three drop-off

19    locations – one for ferrous metal only and the other two for both ferrous and non-ferrous

20    metal. Cash is kept in two of these drop-off locations, but the combined location

21    provides only one set of invoices back to the main office. The ferrous drop-off location

22    is not allowed to exchange cash.

23    c.    The Main Office facility is approximately 14 acres and is the primary

24    location for the processing of ferrous metal.

25    d.    The Barstow/Hinkley facility is approximately 40 acres and is primarily a

26    feeder yard for the Alameda Facility and the Main Office facility. The Barstow/Hinkley

27    facility accepts both ferrous and non-ferrous materials.

28

6

e.      The San Bernardino facility is approximately 8 acres and is primarily a feeder yard for the Alameda Facility and the Main Office facility. The San Bernardino facility accepts both ferrous and non-ferrous materials as well as aluminum cans.

f.      The Bakersfield facility is approximately 10 acres and is primarily a feeder yard for the Alameda Facility and the Main Office facility. The Bakersfield facility accepts both ferrous and non-ferrous materials as well as aluminum cans.

6.      The Process for Purchasing Scrap Metal. In the ordinary course of its business, the Debtor transacts much of its business dealings in cash. A large amount of the Debtor's scrap metal supply comes from individual "peddlers" who simply drive up to the Debtor's business locations in pick-up trucks with scrap metal (which the Debtor then processes into usable steel) to sell. Cash transactions are expected and very commonplace for this business and industry, and if news spread among the Debtor's suppliers and competitors that the Debtor will only pay for purchases with a check, then suppliers would likely elect to go to a different scrap metal dealer. In short, the Debtor's access to scrap metal, which is essential to its business and the generation of revenue, would be severely impaired if the Debtor is not allowed to continue to pay in cash for scrap metal. Scrap metal is purchased daily by the Debtor at the Debtor's five facilities. The vast majority of the scrap metal that is purchased by the Debtor is paid for in cash. The Debtor needs cash of approximately $80,000 to $120,000 per day to purchase scrap metal.

a.      Ferrous material is typically purchased by the Debtor for approximately $120-240 per ton while non-ferrous material is typically purchased for approximately $.08-$2.85 per pound (or $160-$5,700 per ton).

b.      On any given business day, numerous companies and individuals deliver scrap metal to seven drop-off locations at the Debtor's five facilities. Each of the Debtor's drop-off locations is manned by a scale operator. Scrap suppliers drive their trucks onto the scales upon arrival and the initial weight is either electronically stamped or hand written onto an invoice. The truck is then unloaded and weighed again upon exit. The scale electronically stamps the emptied weight of the truck otherwise the scale

operator annotates the ticket with the empty weight. In the event the truck contains both ferrous and non-ferrous material (which are purchased at different price points), the truck is weighed after the removal of one of the materials, then weighed again when emptied.

c.    The scale operator provides a visual assessment of the type of material and provides written notes on the invoice. The scale operator may also apply a discount to adjust for weight attributable to additional trash or non-metal items with no value. The scale operator then calculates the adjusted weight and assigns a dollar value based on the type of material. Both the scale operator and the scrap supplier sign off on the agreed upon weight and value of the material. The scale operator then slides the invoice through the window to the locked office of the cashier at each facility.

d.    Other than established accounts with a business license on file, every driver is required to provide a copy of their driver's license. Any driver selling non-ferrous material with a value in excess of $20 is also required to provide a fingerprint on the invoice. A three (3) day hold is placed on all payments for non-ferrous material as a legal precaution in the event that the material is stolen.

e.    Most suppliers are paid with cash. The cashier at each facility will stamp the invoice "paid" and leave the check number section blank if paid with cash. If paid with a check, the cashier will enter the check number. If the cashier requires the main office to pay the invoice, they do not stamp the invoice as "paid." The cashier keeps the top, white copy of the invoice and gives the bottom, yellow carbon copy to the supplier as a receipt for the transaction. At the end of each day, each cashier faxes all invoices and cash on hand to the main office.

C.    **The Debtor's Pre-Petition Cash Management System.**

7.    Based on the size of each facility and the type of material purchased at such facility, each of the Debtor's facilities has a minimum cash quantity on hand. As of the Petition Date, each facility also had signed blank checks to address any cash shortfalls. The practice of utilizing signed blank checks has since been eliminated.

8

8.      Invoices. Each of the Debtor's facilities utilizes a set of carbon copy invoices.  The invoices can be distinguished from the address stamped at the top of each invoice and/or by reviewing the signature at the bottom of each invoice. Each facility stores the original invoices by day, month and year.  The original invoices are required to remain at each facility so police departments may access them from time to time.  The faxed copies of the invoices are kept at the Main Office for approximately one month until all cash is reconciled.

9.      Cash Allocations for the Debtor's Facilities. The minimum cash allocation, number of checks and approximate daily transactions for each facility are summarized below:

        a.      Alameda Facility - $40,000 cash, approximately 10 checks per week, approximately 100 transactions per day;

        b.      Main Office facility - $40,000 cash, checks written from the main office, approximately 100 transactions per day;

        c.      Barstow/Hinkley facility - $4,000 cash, checks written from main office, approximately 15 transactions per day;

        d.      San Bernardino facility - $25,000 cash, approximately 20 checks per week, approximately 40 transactions per day; and

        e.      Bakersfield facility - $20,000 cash, approximately 20 checks per week, approximately 30 transactions per day.

        f.      Safes. As of the Petition Date, the Debtor maintained a total of six (6) safes located at its various facilities.

10.     Cash Reconciliation Procedure.

        a.      John Lee and Jenny Valencia (also at the Main Office) reconcile the cash payments made at each facility to determine the total cash needs for each facility.  If an invoice was paid with a check, Ms. Valencia issues a new blank check to the facility.  If the invoice is unpaid, Ms. Valencia issues a check directly from the Main Office and records the check number at the Main office.

9

b.    The following morning, by 9:30 a.m., Ms. Valencia issues a written request to Dunbar, a national armored car company, for cash delivery on the following day. Dunbar provides the cash delivery by 9:30 a.m. the following day and the Debtor provides a check made out to "Cash" to Dunbar. These transactions occur daily, six days a week and typically are for amounts of $80,000 to $120,000 per day.

c.    The cash delivered by Dunbar is then divided into the required amounts for each facility (typically within an hour of delivery). A driver delivers the cash and any new blank checks to each facility. When the driver arrives at a facility, the cashier at the facility calls Ms. Valencia and conveys how much cash was actually received. Ms. Valencia then confirms the amount with her records.

11.    Control of Debtor's Cash and Bank Accounts. Following the Petition Date, Mr. Moffitt of CTMC maintained exclusive control over the Debtor's cash until the Debtor was able to open debtor-in-possession bank accounts ("DIP Accounts"). On Friday, January 15, 2010, under Mr. Moffitt's supervision, the Debtor established three DIP Accounts at Wells Fargo Bank – one general operating account, one payroll account and one tax account. Mr. Moffitt is the sole signatory on all three DIP Accounts. As such, Mr. Moffitt has been responsible for obtaining the required amounts of cash (generally, from Wells Fargo Bank) for each facility on a daily or near-daily basis, and overseeing the distribution and delivery of such cash to each of the facilities.

12.    CTMC's Assessment of Debtor's Cash Management Procedures and Areas for Improvement. Since the Petition Date, CTMC has spent a significant amount of time reviewing and assessing the Debtor's cash management system and has noted areas in the cash management system that could be updated and improved. However, based on its investigation, CTMC believes that the concerns expressed by Mr. King and Center regarding untraceable cash distributions are unfounded. Moreover, as described below, many of the updates and improvements suggested by CTMC have now been implemented by the Debtor.

///

///

10

1

        **D.**    **Implementation Of Changes To The Debtor's Cash Management System.**

2        13.    In the weeks since the Petition Date, CTMC has identified a number of changes and

3 improvements it believes should be made to the Debtor's cash management system, and has

4 assisted the Debtor in the implementation of certain of these changes and improvements, as further

5 discussed below.

6        14.    *Identify potential alternative solution for delivering and distributing cash to each of*

7 *the Debtor's facilities.* The Debtor is working with Wells Fargo Bank (through its Cash Vault

8 service) to arrange for daily armored deliveries of cash to the Main Office. In addition, the Debtor

9 and CTMC are reviewing the feasibility of establishing alternative forms of cash distributions and

10 payment to material suppliers. Possible solutions may include establishing limited bank accounts

11 for each location and/or enabling each location to print their own checks.

12       15.    *Increase cash security at the Main Office.* The Debtor has now installed a metal

13 door in the storage room that houses the safe at that location. Only two employees of the Debtor

14 have a key to the storage room. In addition, the combination on the safe at the Main Office was

15 changed and only CTMC employees have the combination to that safe. As a result of these

16 increased security measures, any withdrawal of cash from the safe at the Main Office requires an

17 employee of the Debtor to open the storage room and one CTMC employee to open the safe. A

18 counting table was placed in the storeroom. All money counting is done under CTMC's

19 supervision in the storeroom, behind a locked door.

20       16.    *Identify potential solution to avoid faxing duplicate invoices to the Main Office.*

21 The invoices from each facility are not received in numerical order because there is a three day

22 waiting period on the payment of non-ferrous material. As a result, it is possible that an invoice

23 could be faxed to the Main Office more than once. Although Ms. Valencia routinely questions any

24 invoice that is more than three days old, it is possible that a duplicate invoice could be faxed to the

25 Main Office and processed. In order to address this issue, the Debtor is in the process of installing

26 a new Point of Sale system ("POS System") at each of the Debtor's locations to record individual

27 inventory purchase transactions. The computer system at each location would electronically

28

11

transfer the data to the main computer at the Main Office, eliminating the need for faxing invoices to the Main Office altogether. Another remedy currently being considered is requiring each location to report all invoices generated during the day regardless of payment status (paid or hold). Each transaction would include the invoice number. Invoices with a payment status of "hold" would be reported in a daily exception report. Retroactive disbursements would be permitted only for invoices with a status of hold.

17.     *Eliminate the use of signed, blank checks at the facilities*, possibly by implementing a system which enables the printing of signed checks remotely at each facility or by converting remote customers to a different payment method. The Debtor has, in fact, eliminated the use of signed, blank checks at its facilities. Each drop-off location has been encouraged to pay for material purchases in excess of $500 with a check processed from the Main Office. During the week ending January 22, 2010, approximately 10% of the material purchases were paid for with a check processed from the Main Office. Since there appears to be some pushback from suppliers regarding the payment process (specifically, the delay caused when processing payments through the Main Office), the Debtor and CTMC are looking into other possible solutions including setting up small checking accounts for each remote location and allowing the manager of each remote location to process and write checks from such accounts.

### E.    The Debtor's Pre-Petition Accounting System.

18.     Pre-petition, the Debtor filed all invoices for non-material related goods and services by due date, and paid such invoices with checks generated from the Main Office. Typically, the Debtor issued checks to pay such invoices on the actual due dates. Since these invoices were generally not entered into the Debtor's QuickBooks accounting system until their due dates, the Debtor's system did not reflect a current Accounts Payable balance at any given time. In addition, since the Debtor typically recorded just the check payments rather than the actual invoices (or any deposits relating to such invoices), QuickBooks reflected a significant negative cash balance.

12

19.    Pre-petition, the Debtor's invoices to customers were generated in Microsoft Excel, and the Debtor's accounts receivable activity and balances were tracked in Excel.

20.    Pre-petition, the Debtor's daily inventory purchases were summarized by each of the five facilities in an Excel spreadsheet format. The cash distributions to each facility (from cash delivered to each facility and signed blank checks provided to each facility) were reconciled against daily purchases in Excel.

21.    Pre-petition, incoming inventory and outgoing inventory were not typically recorded. Instead, each facility manager performed inventory reviews on a visual basis. There were no documented inventory transfers between facilities.

22.    Pre-petition, all accounting information and bank statements were sent to the Debtor's outside CPA, Michael Park, for reconciliation approximately every three (3) months.

23.    Pre-petition, the Debtor's payroll was processed internally using QuickBooks. The Debtor paid all payroll taxes directly.

**F.    Implementation Of Changes To The Debtor's Accounting System.**

24.    Since the Petition Date, CTMC has spent a significant amount of time reviewing and assessing the Debtor's accounting system and noting the various ways in which the Debtor's accounting system could be modernized and improved. CTMC's investigation has revealed that, while the Debtor fastidiously maintains records of its financial transactions (often, in hard copy), the system utilized by the Debtor to maintain such records is somewhat rudimentary. However, notwithstanding the allegations made by Mr. King and Center, the Debtor has always maintained hard copies of the backup for all of its cash payment transactions. The details of such cash payment transactions were not necessarily reflected in the Debtor's accounting system, particularly after the computer malfunction, which generally made it difficult to extract the information in an automated or summarized format.

25.    In the weeks since the Petition Date, CTMC has identified a number of changes and improvements it believes should be made to the Debtor's accounting system, has assisted the Debtor in the implementation of certain of these changes and improvements, and has identified

longer-term accounting goals for the Debtor. Specifically, CTMC and the Debtor have implemented the following changes and improvements to the Debtor's accounting system:

    a.    The Debtor has opened a new set of books and records for the period following the Petition Date, utilizing an updated version of QuickBooks (Premiere 2010 edition). The Debtor's new books and records utilize an updated chart of accounts, vendor files and customer files from the Debtor's pre-petition accounting system, but do not include the Debtor's historical financial information.

    b.    Cash accounts have been set up in QuickBooks for the Debtor's three DIP Accounts, the cash maintained at the Main Office, and the cash maintained at each of the seven drop-off locations. All cash withdrawals from the general operating DIP Account, which are delivered to the Main Office, and cash distributions from the Main Office to the various facilities, are recorded daily in QuickBooks. The cash distributions to each facility are then reconciled against purchases of scrap metal inventory on a daily basis.

    c.    Inventory accounts have been set up in QuickBooks for seven different types of metals purchased by the Debtor on a daily basis: (1) scrap iron, (2) copper, (3) brass, (4) aluminum, (5) stainless steel, (6) miscellaneous, and (7) California Redemption Value (CRV). Inventory balances, by type of metal, for each of the Debtor's locations were established and recorded in QuickBooks. Daily purchases of scrap metal are recorded in QuickBooks to increase inventory balances and reconcile the use of the Debtor's cash. These changes allow the Debtor to maintain a perpetual inventory.

    d.    The Debtor has retained Paychex, one of the largest payroll processing companies in the United States, to handle the Debtor's weekly payroll. Paychex will ensure that all payroll taxes are paid, provide data import capability for accounting purposes, manage employee vacation time and handle all unemployment claims.

26.    In addition to the foregoing changes and improvements, which have already been implemented by the Debtor, CTMC and the Debtor have identified longer-term accounting goals, as follows:

a.     All open sales transactions prior to the Petition Date and all sale transactions following the Petition Date need to be entered into QuickBooks to establish an accurate accounts receivable balance and revenue record, and to accurately reflect inventory depletion.

b.     All inventory transfers between the Debtor's facilities need to be recorded to produce accurate inventory balances at each facility.

c.     The manager at each of the Debtor's facilities will prepare a new daily report in Excel spreadsheet format, which details all inventory purchases (including cash transactions) that day. These reports will be emailed by the managers to the Main Office on a daily basis and will be used to generate a daily cash purchase order for each facility to properly account for new material.

d.     Based on the foregoing updates to the Debtor's accounting system, the Debtor will have the ability to provide daily reporting on, among other things: (1) cash in the DIP Accounts and at each location, (2) inventory valuation by location, (3) profit and loss statement for the Debtor, and (4) accurate accounts payable and accounts receivable balances.

e.     CTMC will conduct physical inspections of each location to verify approximate inventory values and assist in the implementation of a system for taking inventory on monthly basis at each of the Debtor's locations, with any adjustments from such monthly inventories to be recorded in QuickBooks.

f.     The installation of a POS System at each of the Debtor's locations will not only eliminate the need for faxing invoices to the Main Office, but may also provide the Debtor with an automated, integrated system for recording and tracking its inventory purchase transactions company-wide.

G.     **Pre-petition Interaction With Center Bank.**

27.     The Debtor's defaults led the Debtor and Center to have discussions regarding the Debtor's financial condition, and ways in which the Debtor's obligations to Center could be

15

1   modified given current market conditions. Shortly after the initial default around May 2009, the
2   Debtor entered into various deferral agreements with Center which the Debtor had understood
3   generally provided for the Debtor to resume monthly payments to Center by September 2009.
4   However, when the Debtor made its normal monthly payment in September, 2009, Center rejected
5   the payment without any explanation. After a few days, the Debtor was told by Center that a
6   "cure" amount was due, not the normal monthly payment amount. Ultimately, the Debtor learned
7   that the deferral agreements which the Debtor signed did not accurately reflect the terms which the
8   Debtor had thought that it agreed to. More specifically, the Debtor had believed the deferral
9   agreements to reflect essentially the same terms as the agreement that the Debtor had previously
10   worked out with another lender, Wilshire State Bank, which agreement had been shared with
11   Center. Indeed, Center assured the Debtor verbally that the deferral agreements were essentially
12   reflective of the same terms as the Wilshire State Bank's agreement, and rushed the Debtor the
13   sign them. However, this was not the case. At any rate, the parties continued to have a dialogue to
14   work out a mutually acceptable and feasible payment plan after September 2009.

15   28.   In November 2009, the Debtor submitted a payment proposal to Center through the
16   Debtor's outside accountant, Michael Park, who had a personal relationship with Center personnel.
17   Center questioned the Debtor's ability to honor the proposed terms, and indicated that it would
18   need to hire an outside turnaround consultant to evaluate the proposal in an objective manner. In
19   December 2009, at Center's direction, the Debtor interviewed Focus and another consultant with
20   Michael Park and Seong Jin Park, a Vice President and Loan Officer at Center. The Debtor
21   informed Center's representative, Seong Jin Park, that, in addition to the foregoing two
22   consultants, there were other consultants that the Debtor wished to consider including consultants
23   which the Debtor had previously interviewed. However, Seong Jin Park informed the Debtor that
24   it would require the Debtor to hire Focus as the Bank had already met and was comfortable with
25   Focus. Additionally, Seong Jin Park stated that the Bank would not bring any legal action against
26   the debtor until Focus produced a written report. Given Center's mandate, the Debtor signed an
27   agreement with Focus, despite Focus's high retainer and hourly rates, believing that Focus would
28

16

1   objectively verify the payment proposal submitted by the Debtor to Center and would help the

2   Debtor reach a mutually agreeable restructuring of the Debtor's obligations to Center.

3       29.    Edmund King ("King") and Barrey Davis ("Davis") were the members of Focus

4   assigned to the task of "helping" the Debtor, although Davis was never on site. King was present

5   at the Debtor's Main Office for 4-5 days in December 2009. On 2-3 of the days that King was at

6   the Main Office, King was present most of the entire business day. On the remaining days, King

7   was present only for a few hours. In December 2009, King was given a tour of the Alameda

8   Facility although the tour was limited due to heavy rains on that particular day. King was also

9   given tours of the Debtor's facilities located in Bakersfield, San Bernardino, Barstow/Hinkley and

10   Huntington Park on different days.

11       30.    King sent a request for information via e-mail to Michael Park, the Debtor's outside

12   accountant for the following information:   (a) a list of deposits from customers, (b) bank

13   statements, (c) a list of all purchases, and (d) a copy of the QuickBooks General Ledger. All of

14   this information was provided to King via electronic mail. Other than the foregoing information

15   King did not request information or data from the Debtor. Although King was informed by the

16   Debtor and the Debtor's outside CPA, Michael Park, of the existence of voluminous hard copy

17   documentation regarding the Debtor's cash payment transactions, King never requested or

18   reviewed such documentation.

19       31.    Indeed, in connection with King's reference to the Debtor's computer malfunction

20   caused by rain leaking onto one of the Debtor's computer which resulted in the loss of details for

21   what he characterizes as "Cash Payments," he and the Bank's counsel have alleged that some

22   "cover up" was happening. However, any details that were lost could have been confirmed by

23   reviewing the invoices which are the source of the details in the first place. However, King never

24   asked to review the invoices.

25       32.    Additionally, King references that the only detail that he received was for

26   November 2009 which is attached to his Declaration. However, what is attached are QuickBook

27   summaries which the Debtor continues to have for the periods prior to November 2009 and would

28

1 have produced to King had he asked for them. In short, King's review and assessment of the

2 Debtor and the Debtor's business were incomplete, and, therefore, completely inaccurate and

3 unreliable.

4 33.   In his Declaration, King testifies that, on December 24, 2009, he met with J. Byun

5 and Suk Won "Tim" Byun upon his request. Up to that point, although the Debtor had supplied

6 King with all of the information that he had requested from the Debtor's management, King did

7 not communicate any of his findings, opinions, views, ideas or conclusions to the Debtor. At or

8 around the time of the December 24, 2009 meeting, King orally expressed three observations to the

9 Debtor: (a) the Debtor needed better cash management, (b) the Debtor needed new accounting

10 software, and (c) the Debtor needed to hire an in-house Chief Financial Officer. Based on these

11 observations from King, the Debtor anticipated that King would continue to help the Debtor

12 address these observations to his satisfaction. The Debtor believed that Focus was, from the outset,

13 acting essentially as Center's agent and that the Debtor would have to address King's observations

14 to his satisfaction as a condition to reaching an arrangement with Center with regard to the

15 defaulted payments.

16 34.   During the meeting with King on December 24, 2009, J. Byun handed a holiday

17 gift to King for his efforts in "helping" the Debtor. The holiday gift was a combination of $100

18 cash and four basketball tickets to the Los Angeles Clippers game on January 4, 2010. Although

19 no one at the Debtor came to know King very well on a personal level, J. Byun and Tim Byun

20 came to learn that King enjoyed basketball. Additionally, at least in the Korean culture (and many

21 Asian cultures), it is very common to provide cash gifts to friends, family, acquaintances or

22 business colleagues. The gift to King was meant simply to be a gesture of holiday giving to

23 someone whom J. Byun believed was there to "help" the Debtor with its financial situation and

24 would continue to "help" the Debtor in addressing the areas identified for needing improvement or

25 change.

26 35.   Nowhere in King's Declaration is there any statement as to what J. Byun was

27 allegedly "bribing" King to do or not do. King testifies only that, at the December 30, 2009

28

18

meeting, J. Byun told him that "he just wanted to make sure that I would take care of them." King fails to elaborate on what he believes J. Byun meant by his statement and/or how he believes such statement constituted a "bribe," especially when the reason and purpose for Focus's (and King's) employment was presumably to "help" the Debtor. The Debtor expected Focus to identify areas of improvement and assist with change – the very things that CTMC have been doing over the last three weeks.

36.     On January 6, 2010, Center, very suddenly and without any warning or advance notice whatsoever, filed a complaint against the Debtor, J. Byun and other defendants. The very next day, on January 7, 2010 (before the complaint had even been served), Center filed *ex parte* papers for the appointment of a receiver. The Debtor and its counsel were given telephonic notice of both the filing of Center's complaint and the hearing on Center's *ex parte* papers for the very first time on January 7, 2010. Until January 7, 2010, no one at the Debtor had any knowledge that Center was planning to commence litigation. Therefore, it cannot be true that J. Byun was trying to bribe King to persuade Center not to file the lawsuit. In short, under these circumstances, it is offensive and insulting for J. Byun's expression of gratitude of the assistance which J. Byun had genuinely expected would be forthcoming to be construed now as a bribe.

## H.     Assets of the Debtor.

37.     As set forth in the Emergency Motion, the main assets of the Debtor are the Debtor's inventory of metals which are located throughout the Debtor's business locations and which also vary greatly in type and category, the Debtor's equipment, and the Debtor's real property. The declaration of Suk Won "Tim" Byun (the "Byun Declaration") filed in support of the Emergency Motion and exhibits attached thereto indicated as follows:

a.     As summarized in Exhibit "2" to the Byun Declaration, the current value of the inventory around the Petition Date, at cost, was approximately $1,806,942. The resale value of the Debtor's inventory will obviously be higher.

b.     The Debtor owns at least four (4) parcels of real estate, which were purchased for a total of $5,725,500 and which have a current aggregate assessed value of

approximately $10.9 million. Attached as Exhibit "3" to the Byun Declaration were the property transaction detail reports for such properties obtained from www.title365.com which provides, among other things, the current assessed value of each property.

c. As summarized in Exhibit "4" to the Byun Declaration, the Debtor has equipment which has an aggregate current market value (after accounting for depreciation and net of any remaining lease payments) of approximately $17 million.

38. In total, the Debtor estimates that the aggregate current market value of just the inventory, equipment and real property which serve as collateral for Center and KEB (collectively, the "Secured Creditors") is at least $24 million.

39. Additionally, all of the obligations of the Debtor to Center and KEB are personally guarantied by J. Byun, the sole shareholder of the Debtor, who has significant personal assets including a tremendous amount of real property which are estimated to have current market value in excess of $10 million.

40. As part of the Emergency Motion, the Debtor submitted its First Budget which covered the period from the week ending January 16, 2010 through the week ending February 27, 2010. Attached as **Exhibit "1"** to the Moffitt Declaration filed in support of this Supplement are the First Budget, and a cash flow summary of the Debtor's performance during the first two weeks covered by the First Budget which provides both the projected and actual performance for these periods, as well as the resulting variance. This summary shows that the Debtor is mostly on track, if not exceeding, its weekly beginning cash position. This summary also shows that the Debtor is continuing to purchase sufficient amounts of scrap metals to replenish sold inventory, thereby maintaining adequate inventory levels to protect the Bank from any decline in the value of the inventory that results from the Debtor's use of cash collateral. In addition, the value of the Bank's other collateral, namely, real estate and equipment, all of which remains with the estate, has not materially diminished in value since the filing of the Debtor's Chapter 11 case. Accordingly, the Bank's claim (which is approximately $17 million) continues to be adequately protected by the

1  total value of the Bank's collateral (which is estimated to be at least $24 million), and, therefore, a
2  substantial equity cushion.

3  **I.  The Debtor's Continuing Need for Use of Cash Collateral and the Second**
4  **Budget.**

5  41.  In order for the Debtor to be able to stay in business until its reorganization goals
6  can be meaningfully assessed and achieved, the Debtor must be able to continue using its current
7  cash to pay the Debtor's post-petition operating expenses. A copy of the Debtor's proposed
8  operating budget for the period from the week ending January 30, 2010 through the week ending
9  March 20, 2010 (i.e., the Second Budget) is attached as **Exhibit "2"** to the Moffitt Declaration.
10 Like the First Budget, the Second Budget reflects the ordinary operating expenses that the Debtor
11 must pay in order to stay in business and preserve the going concern value of its business. The
12 Debtor proposes to use the cash collateral in accordance with the Second Budget, subject to a
13 permitted deviance of up to 10% of the total expenses for any week, with any unused portions to be
14 carried over into the following week. The Second Budget does **not** include the payment of any
15 real property lease rents to the principal of the Debtor, or lease payments to equipment
16 lessors/lenders, several of which have already acknowledged to the Debtor that the pre-petition
17 agreements between the parties are not true leases at all, but rather, disguised sale agreements. The
18 Debtor is in the process of obtaining appraisals of its equipment, and coordinating with equipment
19 sellers to inspect their respective equipment, and if necessary, to conduct their own appraisal to
20 determine the value of their respective equipment.

21 42.  Most importantly, the Second Budget confirms (1) that the Debtor will continue to
22 use a significant portion of its revenue to purchase metals, thereby continuing to sustain adequate
23 and sufficient inventory levels without a material diminishment from the levels existing as of the
24 Petition Date; and (2) through March 20, 2010, the Debtor anticipates that, although it is accruing
25 rent charges, it is operating on a cash positive basis.

26 43.  By this Supplement, the Debtor requests that the Court authorize the Debtor to use
27 cash collateral pursuant to the Second Budget, with the deviance described above, and that a
28

21

1   further cash collateral hearing be scheduled on or prior to March 20, 2010.  The Second Budget

2   reflects the ordinary operating expenses that the Debtor must pay in order to stay in business and

3   preserve the going concern value of its business.  Without the ability to use cash collateral, the

4   Debtor would be forced to shut down its business, lose all going concern value, and would be

5   unable to reorganize.  The Debtor and CTMC have prepared the Second Budget, with the goal of

6   reflecting only those ordinary operating expenses which must be paid to avoid irreparable harm to

7   the Debtor's business.  Therefore, the Debtor submits that it should be authorized to use cash

8   collateral in accordance with the provisions of the Second Budget.

9       44.    Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtor submits that the relief

10   requested by the Debtor pertaining to the Debtor's use of cash collateral (on a final basis) will not

11   include any of the following provisions:

| Provision | Paragraph |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |

22

| | |
|---|---|
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

///

///

///

///

///

///

///

23

## III.

## <u>CONCLUSION</u>

Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an order:

1.      granting the Emergency Motion through March 20, 2010 and setting a further hearing on the Emergency Motion; and

2.      granting such other and further relief as the Court deems just and proper.

Dated: January 28, 2010                          CENTRAL METAL, INC., a California corporation


                                                 By: _____
                                                     MONICA Y. KIM
                                                     JULIET Y. OH
                                                     LEVENE, NEALE, BENDER,
                                                         RANKIN & BRILL L.L.P.
                                                     Proposed Attorneys for Chapter 11
                                                     Debtor and Debtor in Possession

24